IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ANDRE R. LEVESQUE,

                    Plaintiff,

                                              Civil Action No.
          v.                                  9:10-CV-0787 (DNH/DEP)

CLINTON COUNTY, *et al.*,

                    Defendants.


APPEARANCES:                         OF COUNSEL:

FOR PLAINTIFF:

ANDRE R. LEVESQUE, *Pro Se*
93 Elm Street, Apartment #3
Champlain, New York 12919

FOR DEFENDANTS:

LEMIRE JOHNSON LLC                   GREGG T. JOHNSON, ESQ.
P.O. Box 2485                        APRIL J. LAWS, ESQ.
2534 Route 9
Malta, New York 12020

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT, RECOMMENDATION AND ORDER

*Pro se* plaintiff Andre R. Levesque, who, at the relevant times, was incarcerated at the Clinton County Correctional Facility ("CCCF"), has commenced this action against the County of Clinton ("County") and various, unidentified "John Doe" defendants asserting a variety of claims arising out of his confinement.  Plaintiff's complaint alleges that prison officials at the CCCF failed to accommodate his medical needs stemming from a skin disorder, which, he maintains, constitutes a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*  Plaintiff's complaint additionally alleges that he was assaulted by prison guards in retaliation for filing grievances related to his disability.

Currently pending before the court in connection with this action are twenty-two motions, twenty of which have been filed by the plaintiff, seeking a variety of relief.  Defendant County has moved for judgment on the pleadings dismissing plaintiff's complaint for failure to state a claim upon which relief may be granted.  The County also seeks reconsideration of a prior order compelling discovery.  Plaintiff, in turn, has twice requested leave to file an amended complaint adding new defendants and claims, and has filed eighteen other motions seeking appointment of

counsel, orders compelling discovery, various forms of injunctive intervention, and other relief unrelated to the factual allegations and causes of action set forth in his complaint. For the reasons set forth below, I recommend that defendant County's motion to dismiss be granted in part and denied in part; all of plaintiff's motions for injunctive relief be denied; plaintiff's motion for contempt and sanctions be denied; and plaintiff's motion for an order vacating his criminal conviction be denied. In addition, defendant County's motion for reconsideration is granted; plaintiff's motions for leave to amend his complaint are denied; and the remaining motions, all of which have been filed by plaintiff, are denied.

I.     BACKGROUND[1]

Plaintiff suffers from a skin disorder known as Epidermolysis Bullosa Simplex ("EBS"), Weber-Cockayne type. Complaint (Dkt. No. 1) at 2. Plaintiff describes EBS as a progressively debilitating chronic condition that can be painful, causing skin blistering and other similar damage, and often resulting in extreme sensitivity to temperature changes. *Id.* Plaintiff

---

[1]     In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

alleges that while he was confined in the CCCF, prison officials failed to accommodate his EBS condition by neglecting to provide him with appropriate clothing. *Id.* at 3. Plaintiff also alleges that, on June 10, 2009, he was assaulted by prison guards at the prison facility in retaliation to his filing grievances against prison officials for allegedly failing to accommodate his EBS condition. *Id.* at 4.

As a result of these allegations, plaintiff's complaint, liberally construed, asserts five causes of action against defendants, including (1) violation the ADA; (2) excessive force, in violation of his Eighth Amendment rights, pursuant to 42 U.S.C. § 1983; (3) deliberate indifference to his serious medical needs, in violation of his Eighth Amendment rights, pursuant to section 1983; (4) retaliation, in violation of his First Amendment rights, pursuant to section 1983; and (5) municipal liability against defendant County, pursuant to section 1983. *See generally* Complaint (Dkt. No. 1). As relief, plaintiff seeks the arrest of "all parties . . . who stood by and watched [the assault], yet did nothing," as well as $25 million and an apology by the governor of the State of New York. *Id.* at 4.

## II. PROCEDURAL HISTORY

On July 20, 2009, prior to commencing this action, Levesque filed suit in the United States District Court for the District of New Hampshire against various defendants, including Clinton County and the CCCF, raising several of the same claims now asserted in this action. *Levesque v. State of New York, et al.*, No. 1:09-CV-00246. While the complaint in that action discussed his alleged disability in a general sense, it did not appear to focus upon the failure of personnel at the jail to accommodate that disability. *Id.,* Dkt. No. 1. The complaint in that action did, however, make reference to the alleged assault on June 10, 2009. *Id.* at 2. Following an initial review of plaintiff's complaint, that action was dismissed based upon a report and recommendation issued by Magistrate Judge James R. Muirhead on October 14, 2009, and approved by Chief District Judge Stephen J. McAuliffe on November 3, 2009. *Id.*, Dkt. Nos. 3, 5. Judge Murihead's report included a finding that plaintiff's complaint failed to allege facts plausibly suggesting the existence of a policy or custom allowing or enabling employees to violate the constitutional rights of inmates like the plaintiff. *Id.*

Plaintiff commenced this action on July 10, 2010, against the

County, an unidentified lieutenant corrections officer, and unidentified "John Doe" prison guards. Complaint (Dkt. No. 1). Issue was joined by the filing of an answer on behalf of defendant County on October 6, 2011. Dkt. No. 22. Shortly thereafter, the court issued a mandatory pretrial discovery and scheduling order, dated October 11, 2011, setting forth certain requirements for discovery and establishing deadlines for completion of discovery and the filing of motions.[2] Dkt. No. 23.

On February 16, 2012, plaintiff submitted a proposed amended complaint in the action, in which he seeks to add defendants and expand the factual allegations supporting his claims. Dkt. No. 45. Because plaintiff's time to amend without leave of court has expired, the court construes this as a motion for leave to amend his complaint. Defendant County has opposed the filing of that amended complaint, largely on the basis of futility. *See generally* Dkt. Nos. 47, 48. Without waiting for the court to respond to his first motion to for leave to amend, plaintiff filed a second motion for leave to amend on May 29, 2012. Dkt. No. 74.

In addition to opposing plaintiff's motion to amend, defendant County has moved for judgment on the pleadings dismissing the claims set forth

---

[2]     The deadlines set forth in the court's scheduling order have since been stayed by the court. Text Minute Entry dated Mar. 21, 2012.

in plaintiff's original complaint, pursuant to Rule 12(c) of the Federal Rule of Civil Procedure. Dkt. No. 48. Plaintiff opposed defendant County's motion to dismiss on April 30, 2012, Dkt. No. 63, and the County filed its reply to that opposition on May 11, 2012, Dkt. No. 71.[3]

Plaintiff's motions for leave to amend fall within my non-consensual jurisdiction, and therefore will be decided in this opinion. Defendant County's motion to dismiss, which is dispositive in nature, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). Fed. R. Civ. P. 72(b).

In addition to the foregoing, the following nineteen motions are pending before the court in connection with this action:

| Date Filed | Dkt. No. | Movant | Relief Sought |
|------------|----------|--------|---------------|
| 3/1/12 | 46 | Plaintiff | Restraining order precluding plaintiff's return to the CCCF |
| 5/11/12 | 55 | Plaintiff | Appointment of counsel and private investigator or special prosecutor |

---

[3]     On May 29, 2012, the court received a submission from plaintiff that it has construed as a surreply in connection with defendants' dismissal motion. Dkt. No. 76. Because surreplies are not permitted under this court's local rules, and plaintiff did not seek permission to file a surreply, that submission is stricken and has not been considered by the court. *See* N.Y.N.D. L.R. 7.1(b)(1) ("A surreply is not permitted.").

| 4/18/12 | 56 | Plaintiff | An order directing the CCCF to provide plaintiff with free postage |
|---------|----|-----------|----------|
| 4/25/12 | 59 | Plaintiff | An order compelling discovery |
| 4/25/12 | 60 | Plaintiff | Stay of the deportation of a fellow CCCF inmate |
| 4/27/12 | 62 | Def. Cnty. | Reconsideration of a prior order (Dkt. No. 50) compelling discovery |
| 4/30/12 | 64 | Plaintiff | Order compelling discovery |
| 5/2/12 | 66 | Plaintiff | Appointment of counsel |
| 5/7/12 | 67 | Plaintiff | Relief from criminal laws regarding possession of marijuana |
| 5/7/12 | 68 | Plaintiff | Injunction against implementation of the Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat. 284 (2011) |
| 5/29/12 | 74 | Plaintiff | Appointment of counsel |
| 5/29/12 | 77 | Plaintiff | Order compelling discovery |
| 7/16/12 | 78 | Plaintiff | Order compelling discovery |
| 8/16/12 | 80 | Plaintiff | Contempt order and sanctions |
| 9/6/12 | 81 | Plaintiff | Order compelling discovery |
| 9/10/12 | 82 | Plaintiff | Disqualification of myself as the assigned magistrate judge |

| 11/2/12 | 85 | Plaintiff | Order compelling discovery |
| 11/29/12 | 87 | Plaintiff | Injunction and/or restraining order against New York State, order directing an investigation by the USDOJ, and an order vacating plaintiff's conviction |

All of these nineteen motions will be disposed of in this decision, with the exception of plaintiff's seven motions for injunctive relief, plaintiff's motion for contempt, and plaintiff's motion for an order vacating his conviction, which will be addressed herein as a recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B).

III.   DISCUSSION

A.   Defendant County's Motion for Judgment on the Pleadings[4]

(1)   Legal Standard Governing Judgment on the Pleadings

Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  When analyzing a Rule 12(c) motion, the court must apply the same standard as that applicable to a motion under Rule 12(b)(6).  *See, e.g.*, *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *Wynn v. Uhler*, 941 F. Supp. 28, 29 (N.D.N.Y. 1996) (Pooler, J.).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences

---

[4]      Because defendant County has moved for judgment on the pleadings, the court will only analyze plaintiff's ADA and section 1983 municipal liability claims, which are the only two claims asserted against that defendant.  As it relates to plaintiff's section 1983 claims of excessive force, deliberate indifference, and retaliation allegedly caused by individuals, a municipality cannot be found liable under a theory of *respondeat superior* for the alleged constitutional violations by its employees.  *See Monell v. Dep't Soc. Svcs. of City of New York*, 436 U.S. 658 (1978) ("In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  The court will also address defendant County's argument that "plaintiff's punitive damage claims must be dismissed[.]" Dkt. No. 48, Attach. 1 at 22.

in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'"  *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)).  Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 570 (2007); *see also Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.'") (quoting *Twombly*).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'"  *In re Elevator*

*Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal quotations marks omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991) (citing Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires.")).

2.    Plaintiff's Title II ADA Claim[5]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  The protections offered under this provision extend to inmates in state and local correctional facilities like the CCCF.  *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To state a claim under Title II of the ADA, a plaintiff must allege "that (1) he or she is a qualified individual with a disability; (2) . . . the defendants are subject to the ADA; and (3) . . . plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by

---

[5]    To the extent that plaintiff's complaint could be construed to assert a Title I ADA claim, I recommend dismissal of that claim with prejudice for the reasons stated in defendant County's memorandum of law in support of its motion for judgment on the pleadings.  Dkt. No. 48, Attach. 1 at 14.  *See Padilla v. New York State Dep't of Labor*, 09-CV-5291, 2010 WL 3835182, at *3 (S.D.N.Y. Sept. 13, 2010) ("To plead a Title I violation, a plaintiff must allege that (1) the defendant is subject to the ADA; (2) he is "disabled" within the meaning of the statute or perceived to be so by his employer; (3) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he was subject to an adverse employment action because of his disability.").  Plaintiff's complaint does not allege that he is, or was, an employee of defendant County.  *See generally* Complaint (Dkt. No. 1).

defendants, by reason of plaintiff's disabilities." *Shomo v. City of New York*, 579 F.3d 176, 185 (2d Cir. 2009) (internal quotation marks and alterations omitted).  In its motion, defendant County argues that plaintiff's Title II ADA claim does not meet this standard because plaintiff cannot establish that his skin condition constitutes a disability under the ADA, and also in light of the fact that his complaint has not alleged facts plausibly suggesting that he was prevented from participating in or benefitting from any prison program or services because of his disability.  Dkt. No. 48, Attach. 1 at 14-16.

(a)  Whether Plaintiff's Complaint Alleges a Disability Under the ADA

The threshold inquiry in this case is whether plaintiff's complaint alleges facts plausibly suggesting that EBS constitutes a disability under the ADA.  Generally, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of an individual[.]"  42 U.S.C. § 12102(1)(A); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 668 n.7 (2001).  "Major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  42 U.S.C. § 12102(2)(A).  "An activity is 'substantially limited' when an individual cannot perform an activity that an

average person in the general population could perform, or faces significant restrictions in the condition manner, or duration under which the individual can perform the activity." *Murphy v. Bd. of Educ. of Rochester City School Dist.*, 273 F. Supp. 2d 292, 315 (W.D.N.Y. 2003) (internal quotation marks and alterations omitted).

To state a claim under the ADA, a plaintiff's complaint must plead facts plausibly suggesting that his alleged disability can meet all of the elements contained in the ADA's definition of disability.  *See Thompson v. New York City Dep't of Probation*, No. 03-CV-4182, 2003 WL 22953165, at *3 n.5 (S.D.N.Y. Dec. 12, 2003) ("Under the ADA definition of 'disability,' merely pleading a physical impairment without specifying that it 'substantially limits' a 'major life activity' may be insufficient to state a claim for relief."); *see also Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) (holding that, "[t]o establish a claim under [42 U.S.C. § 12102(1)(A)], a plaintiff must allege that he (1) has a[n] . . . impairment that (2) substantially limits (3) a major life activity," and dismissing plaintiff's complaint where it failed to allege, *inter alia*, "that his conditions substantially limited him in his performance of a life activity"); *Cox v. Civista Med. Ctr.*,16 F. App'x 185, 186 (4th Cir. 2001) (affirming district

court's dismissal of the plaintiff's complaint because it failed to "demonstrate a disability" under 42 U.S.C. § 12102(1)(A) or (B)); *Ajuluchuku v. Macy's*, No. 12-CV-1855, 2012 WL 5464467, at *3 (E.D. Cal. Nov. 7, 2012) (dismissing plaintiff's amended complaint because it did "not allege facts establishing any of [the] elements [of 42 U.S.C. § 12102(1)]); *Detko v. Blimpies Rest.*, 924 F. Supp. 555, 557 (S.D.N.Y. 1996) (dismissing plaintiff's complaint for failure to state a claim where the complaint failed to allege that his speech impediment "*substantially* limits his speaking" (emphasis in original)).

With these guiding principles as a backdrop, and after careful consideration, I find that plaintiff's complaint does not contain allegations plausibly suggesting that his EBS condition is an impairment that substantially limits any major life activity, as those terms are defined by the ADA. *See generally* Complaint (Dkt. No. 1). More specifically, plaintiff's complaint contains only the following allegation explaining his EBS condition: "I have Epidermalysis Bullosa Simplex weber cocayne/Dytrofic toraine ect etc. progressive Debilitating c[h]ronic . . . severe genetic disposition thats excruciatingly painful at times." *Id.* at 2.

This allegation, even liberally construed and taken as true,[6] does not plausibly suggest that the condition substantially limits his major life activities because, by the allegation's own terms, the EBS condition only causes plaintiff pain, and only occasionally affects him in a significant manner.

While his complaint is lacking in this regard, in response to defendant County's motion for judgment on the pleadings, plaintiff argues that EBS is more than just severely painful some of the time.  *See generally* Dkt. No. 63.  For example, he argues that writing with a pen causes him "bodily injury," that he cannot walk a far distance without pain ("unless barefoot in the sand"), and that EBS is a severe, painful, genetic disorder that "is life altering from birth to death and can be fatal[.]"  Dkt. No. 63 at 3-4.  Liberally construed, I conclude that these allegations are sufficient to plausibly suggest that EBS substantially limits plaintiff's major life activities.[7]

---

[6]     *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("In considering Rule 12 motions to dismiss, the Court must accept the facts appearing on the face of the complaint as true, and consider them along with such reasonable inferences as may be drawn in a complainant's favor.").

[7]     The court is permitted to consider these arguments contained in plaintiff's response because they are consistent with the allegations contained in plaintiff's complaint.  *See Donhauser*, 314 F. Supp. 2d at 121 ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials

Accordingly, I conclude that plaintiff's ADA claim is not subject to dismissal at this early procedural juncture for failure to plausibly allege that he has a disability as that term is defined under the ADA.

(b) Whether Plaintiff's Complaint Alleges Facts Plausibly Suggesting That Defendant County Failed to Accommodate His Disability

Defendant County's second argument is that plaintiff's complaint fails to allege facts plausibly suggesting that defendant County did not accommodate plaintiff's disability as required by the ADA because failing to provide special clothing does not constitute denial of "services, programs, or activities" under Title II of the ADA. Dkt. No. 48, Attach. 1 at 16.

The plain language of Title II provides that a public entity may not deny a person the opportunity to take advantage of "services, programs, or activities" because of his disability. 42 U.S.C. § 12132. The Second Circuit has said that "services, programs, or activities" "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of context[.]" *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *superceded on other grounds by Zervos v. Verizon*

_____

outside of the complaint to the extent they are consistent with the allegations of the complaint." (internal quotation marks omitted)).

*New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) ("Quite simply, the ADA's broad language brings within its scope 'anything a public entity does.'" (quoting *Yeskey v. Pennsylvania Dep't of Corrs.*, 118 F.3d 168, 171 & n.5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998))); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) ("[W]e find that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does.").

In this instance, plaintiff's complaint alleges that defendant County discriminated against him based on his alleged disability by failing to provide him with "appropriate clothing to accom[o]date for [his] disability[.]" Complaint (Dkt. No. 1) at 3.  Mindful of the Second Circuit's broad construction of the phrase "services, programs, or activities," I find that this is sufficient to state a claim under Title II of the ADA, since it alleges that defendant County refused to provide Levesque with clothing that would allegedly accommodate his EBS condition.  Assuming that plaintiff's allegations are true, they could plausibly suggest that defendant County unlawfully discriminated against plaintiff based on his EBS condition.

For these reasons, I recommend that defendant County's motion for

judgment on the pleadings, as it relates to plaintiff's Title II ADA claim, be denied.

　　　　3.　　　Plaintiff's Section 1983 Municipal Liability Claim

Although defendant County did not address plaintiff's section 1983 municipal liability claim in its motion for judgment on the pleadings, for the sake of completeness, I will address it briefly.

To state a claim against a municipality for a constitutional violation pursuant to section 1983, a plaintiff must allege that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Monell v. Dep't of Soc. Svcs. of City of New York*, 436 U.S. 658, 690 (1978).  A municipality cannot be held liable under section 1983 for the "actions alleged to be unconstitutional by its employees below the policymaking level on the basis of *respondeat superior*." *Zahra v. Town of Southbold*, 48 F.3d 674, 685 (2d Cir. 1995); *see also Monell*, 436 U.S. at 691.  To prevail on a section 1983 claim against a municipality, a plaintiff must demonstrate that the policy, ordinance, regulation, or decision adopted by the municipality, and implemented by its employee(s), caused the plaintiff's alleged

constitutional deprivation. *Monell*, 436 U.S. at 691-92. This can be shown by establishing either that the policy itself is unconstitutional, or that the application of an otherwise lawful policy is unconstitutional. *Amnesty Am. v. Town of Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

Here, plaintiff's complaint contains no allegations plausibly suggesting that defendant County has promulgated a policy, ordinance, regulation, or decision that, when implemented by its officers, has resulted in a violation of plaintiff's constitutional rights. *See generally* Complaint (Dkt. No. 1). Indeed, a review of plaintiff's complaint reveals that it is wholly devoid of allegations regarding defendant County, and none of the allegations contained within it plausibly suggest that defendant County's policies gave rise to his section 1983 claims of retaliation, excessive force, or medical indifference. *Id.*

Moreover, in plaintiff's response to defendant County's motion for judgment on the pleadings, he only conclusorily alleges that defendant County created a "culture and custom of ass[a]ulting people, . . . civil rights violations etc. at CCCF by its employees." Dkt. No. 63 at 12, 40. Such conclusory allegations are insufficient to state a claim. *Anderson v. Connell*, No. 08-CV-0176, 2009 WL 3165541, at *2 (N.D.N.Y. Sept. 29,

2009) (Homer, M.J.) ("[A] complaint containing conclusory allegations without factual support fails to meet even the liberal standard of Rule 12(b)(6).").

Finally, even liberally construed, the remaining allegations contained in plaintiff's response are insufficient to state a claim for municipal liability. For example, plaintiff does not allege that he requested and was refused medical care for his EBS condition on multiple occasions; moreover, even assuming that he did, he does not contend that, as a result of a policy, custom, ordinance, or regulation promulgated by defendant County, CCCF prison officials denied him the requested medical care. Rather, plaintiff alleges that he was incarcerated at CCCF only between May and July of 2009, and his allegations regarding his requests for medical care are vague. Although the court is mindful of the deference owed to *pro se* litigants when construing a pleading, here, even the most generous construction does not save plaintiff's section 1983 municipal liability claim against defendant County.

For the foregoing reasons, I find that plaintiff's complaint fails to state a claim for municipal liability against defendant County.

Although the court has some difficulty in finding that the defects

discerned in connection with this claim are tantamount to mere failures to fulfill formal requirements, rather than being indicative of an inability to state a cognizable *Monell* claim based upon the circumstances presented, I remain mindful of the special solicitude afforded *pro se* civil rights litigants. *Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994). As a result, I recommend that plaintiff be afforded an opportunity to cure the perceived deficiencies, and that his section 1983 municipal liability claim against defendant County be therefore dismissed with prejudice unless he files an amended complaint that corrects the pleading defects in that claim, as described in this part, within thirty days of the date of any decision and order by the assigned district judge adopting this recommendation.

In the event that plaintiff chooses to renew his motion for leave to amend, he is reminded that the local rules of practice for this court require, among other things, that the amended complaint be wholly integrated and complete, and must not rely upon or incorporate by reference his original complaint or any document previously filed with the court. N.D.N.Y. L.R. 7.1(a)(4). Stated differently, any amended complaint must replace the original complaint in its entirety, as well as any documents filed by the plaintiff with his original complaint. In addition, plaintiff is reminded that he

must specifically include "the proposed amendments and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means." *Id.*

### 4.    Plaintiff's Punitive Damage Claim

As relief, plaintiff's complaint seeks recovery of $25 million. Complaint (Dkt. No. 1) at 4. Defendant County has construed this demand to include a request for an award of punitive damages, and seeks dismissal of that claim. Dkt. No. 48, Attach. 1 at 22.

It is well established that, as a municipal entity, defendant County is not subject to exposure to punitive damages, including for claims brought under 42 U.S.C. § 1983 and the ADA. *Ciraulo v. City of New York*, 216 F.3d 236, 238 (2d Cir. 2000) (holding that the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), precludes an award of punitive damages under section 1983 against a municipality); *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) (Stevens, J. concurring) ("[A]n analysis of the text and legislative history of . . .Title II of the Americans with Disabilities Act of 1990 . . . indicates that Congress did not intend to authorize a punitive damages remedy for violations of [the] statute[.]"); *SJB v. New York City Dep't of Educ.*, 03-CV-6653, 2004 WL

1586500, *8 (S.D.N.Y. July 14, 2000) ("Punitive damages for private claims are not available under either the Rehabilitation Act or the Americans with Disabilities Act."); *Taylor v. Phoenixville School Dist.*, 113 F. Supp. 2d 770, 777 (E.D. Pa. 2000) ("It is clear that punitive damages under the ADA are not available against a municipality.").  Because plaintiff's complaint asserts only claims arising under section 1983 and the ADA against defendant County, I recommend that any punitive damage claim that may be considered as having been asserted against defendant County in plaintiff's complaint be dismissed with prejudice.

> B.    Plaintiff's Motions for Leave to Amend

On February 16, 2012, plaintiff submitted an "Amended Complaint" ("February motion").  Dkt. No. 45.  I have construed that submission as a motion for leave to file an amended complaint, which plaintiff requested of the court during a telephone conference held on January 18, 2012.  Text Minute Entry dated Jan. 18, 2012.  Without waiting for the court to respond to this motion, plaintiff filed a second motion for leave to file an amended complaint ("May motion") on May 29, 2012.  Dkt. No. 74.

Plaintiff's February motion was filed without any supporting motion papers, despite a directive issued by the court during a telephone

conference held on January 18, 2012, that such supporting papers be included with any motion for leave to amend. Dkt. No. 45. In addition, plaintiff's February motion fails to indicate whether, pursuant to court order, he provided defense counsel with his proposed amended complaint before filing it with the court. *Id*. Plaintiff's failure to comply with these court orders alone provides a proper basis to deny his February motion.

Plaintiff's February and May motions are also subject to denial based upon their failure to comply with the local rules of the court. More specifically, Local Rule 7.1 requires that, when a litigant moves for leave to file an amended complaint, the motion "*must* set forth specifically the proposed amendments and identify the amendments in the proposed pleading, either through submission of a red-lined version of the original pleading or other equivalent means." N.D.N.Y. L.R. 7.1(a)(4) (emphasis added). Courts in this district have frequently denied motions for leave to amend for failure to comply with this local rule. *See Kent v. New York*, 11-CV-1533, 2012 WL 6024998, at *15 (N.D.N.Y. Dec. 4, 2012) (D'Agostino, J.) (denying the plaintiffs permission to file an amended complaint because of their failure to comply with Local Rule 7.1(a)(4)); *Donohue v. New York*, 11-CV-1530, 2012 WL 6020058, at *16 (N.D.N.Y. Dec. 3,

2012) (D'Agostino, J.) (same); *Fahs Const. Group, Inc. v. Gray*, 11-CV-1533, 2012 WL 2873532, at *6 (N.D.N.Y. July 12, 2012) (Suddaby, J.) (same); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009) (Suddaby, J.) ("Indeed, Plaintiff's failure to comply with Local Rule 7.1(a)(4) constitutes an independent ground upon which to deny his motion."). Neither plaintiff's February motion nor his May motion meet these requirements. *See generally* Dkt. Nos. 45, 74.

For all of these reasons, plaintiff's motions for leave to file an amended complaint are denied, without prejudice to resubmission in compliance with these requirements. If plaintiff chooses to file a renewed motion for leave to file an amended complaint, however, he is reminded of his obligations to comply with any court order and the local rules of the court, including Local Rule 7.1, governing motions for leave to amend.

C.    Plaintiff's Motions for Injunctive Relief

Plaintiff has filed seven motions seeking various forms of injunctive relief, all unrelated to one another, and some bearing no relationship to his underlying claims. Dkt. Nos. 46, 56, 60, 67, 68, 87. For the reasons stated below, I recommend that all seven motions be denied.

1.    Docket Number 46

In one of his motions, plaintiff requests that the court issue a "restraining order" against the State of New York.  Dkt. No. 46 at ¶ 7.  Liberally construed, in that motion, plaintiff appears to seek a court order enjoining the State of New York from returning him to the CCCF because the two correctional officers at that facility who allegedly assaulted him on June 10, 2009, had not, as of the date of his motion, been prosecuted for the alleged assault.  *Id.* at ¶¶ 1-2, 4.  Plaintiff seeks this preliminary injunctive relief "until these two men are pro[se]cuted or [f]ired from their jobs."  *Id.* at ¶ 7.

Plaintiff was not incarcerated at the time he filed his motion, nor does his motion allege that his return to prison is inevitable.  Dkt. No. 46 at 2.  Indeed, it appears that plaintiff has again been released from prison, and there is nothing in the record to suggest that he is destined to return.  Dkt. No. 86.  For these reasons, I find that plaintiff's request for a preliminary injunction prohibiting the State of New York from returning plaintiff to the CCCF is moot.  *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time

the complaint is filed.  A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated." (internal quotation marks and citations omitted)).

Even if plaintiff's motion was found to be ripe for review, it would fail because the court may not issue an injunction against a non-party.  Fed. R. Civ. P. 65(d) ("The [injunction] order . . . binds only . . . the parties[.]"); *see also United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988) ("[A] court may not issue an order against a nonparty."); *Gantt v. Lape*, No. 10-CV-0083, 2012 WL 4033729, at *2 (N.D.N.Y. July 31, 2012) (Suddaby, J.) ("[E]xcept in limited circumstances . . ., a court may not order injunctive relief as to non-parties to an action."); *Lewis*, 2010 WL 1268024, *2. Because the State of New York is not a party to this action, the court is precluded from issuing an order enjoining its conduct.

For these reasons, I recommend that plaintiff's motion for a preliminary injunction against the State of New York be denied.

## 2. Docket Number 56

In another of his motions, plaintiff requests an injunction effectively ordering the CCCF to pay for any mail sent by him to the court. Dkt. No. 56 at 1.

As discussed above, because plaintiff is no longer incarcerated, plaintiff's request does not present an actual controversy, and the motion is moot. *See Prins*, 76 F.3d at 506 ("In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed. A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated." (internal quotation marks and citations omitted)). For this reason, I recommend that plaintiff's motion for an injunction mandating that the CCCF provide him postage for his legal mail be denied.

## 3. Docket Number 60

Plaintiff next requests that the court issue an injunction preventing the United States from deporting an inmate named Aldo Contreras, who allegedly was, at one time, incarcerated at the CCCF. Dkt. No. 60 at ¶ 3. Plaintiff argues that, because he intends to call Mr. Contreras as a witness

at trial, the United States should wait to deport him until after he testifies. *See id.* ("I want him to be able to stay in America until he testifies, . . . then you can deport him.").

As was discussed above, "a court may not issue an order against a nonparty." *Regan*, 858 F.2d at 120; *see also* Fed. R. Civ. P. 65(d) ("The [injunction] order . . . binds only . . . the parties[.]"); *Gantt*, 2012 WL 4033729, at *2 ("[E]xcept in limited circumstances . . ., a court may not order injunctive relief as to non-parties to an action."); *Lewis*, 2010 WL 1268024, *2. Because neither the United States nor Mr. Contreras is a party to this action, the court has no authority to issue the injunction requested by plaintiff. For this reason, I recommend that plaintiff's request for an injunction preventing the deportation of Mr. Contreras be denied.

### 4. Docket Number 67

Liberally construed, plaintiff further requests that the court issue an order enjoining law enforcement from enforcing the criminal laws regulating marijuana use and possession against him. Dkt. No. 67 at 5.

"To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." *McKinnon v.*

*Tresman*, No. 30-CV-2305, 2004 WL 78091, at *1 (D. Conn. Jan. 9, 2004) (citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("It is self-evident that [the plaintiff]'s motion for temporary relief has nothing to do with preserving the district court's decision-making power over the merits of [his] 42 U.S.C. § 1983 lawsuit.")); *see also Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("Thus, a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action.").

Here, plaintiff's complaint asserts five causes of action, including (1) violation of plaintiff's rights under the ADA; (2) excessive force, in violation of his Eighth Amendment rights; (3) deliberate indifference to his serious medical needs, in violation of his Eighth Amendment rights; (4) retaliation, in violation of his First Amendment rights; and (5) municipal liability against defendant County. *See generally* Complaint (Dkt. No. 1). Even when liberally construed, plaintiff's motion for an order enjoining law enforcement from enforcing the laws regulating the use and possession of marijuana against him does not relate to any of these claims.[8]

---

[8] To help illustrate this point, the court highlights just one of plaintiff's arguments in support of his motion, in which he contends that if a woman may legally

Accordingly, I recommend that plaintiff's motion be denied.

### 5.    Docket Number 68

In his next motion for injunctive relief, plaintiff requests that the court issue an order enjoining the enactment of the Leahy-Smith America Invents Act because he has "an [i]dea" but does not wish to patent it at this time, and the Leahy-Smith America Invents Act will protect a person who chooses to patent plaintiff's idea before him because of its first-to-patent provision.  Dkt. No. 68 at 2-3; *see also* Dkt. No. 73.

I recommend denial of this motion because, even liberally construed, it does not relate to any of the underlying claims asserted in plaintiff's complaint.  *See e.g., McKinnon*, 2004 WL 78091, at *1 ("To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint.").

### 6.    Docket Number 87

Plaintiff's last application for injunctive relief includes two separate requests.  First, plaintiff seeks an order enjoining the State of New York from "sponsoring a state [sanctioned] torture."  *Id.* at ¶¶ 16(a), 18.

---

obtain an abortion in the United States, he is entitled to immunity from the laws governing marijuana.  Dkt. No. 67 at 3.

Second, plaintiff petitions the court to commission the USDOJ to conduct an investigation. *Id.* at ¶ 18. As was discussed above, the court is precluded from issuing an injunction against a non-party. Fed. R. Civ. P. 65(d) ("The [injunction] order . . . binds only . . . the parties[.]"); *see also Regan*, 858 F.2d at 120 ("[A] court may not issue an order against a nonparty."); *Gantt*, 2012 WL 4033729, at *2 ("[E]xcept in limited circumstances . . ., a court may not order injunctive relief as to non-parties to an action."); *Lewis*, 2010 WL 1268024, *2. Because neither the State of New York nor the USDOJ is a party to this action, I recommend that these requests be denied.

D.    Plaintiff's Motions for Appointment of Counsel

Also pending before the court are three motions filed by plaintiff for appointment of *pro bono* counsel to represent him in this action, as well as the appointment of an investigator to assist that attorney. Dkt. Nos. 55, 66, 74. These motions represent renewals of a previous, unsuccessful effort by him to obtain appointment of *pro bono* counsel. Dkt. No. 12.

"Broad discretion lies with the district judge in deciding whether to appoint counsel[.]" *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir. 1986). For good reason, however, a court should not grant an application

by a *pro se* party for appointment of *pro bono* counsel indiscriminately, and each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, J.). Although the constitution guarantees indigent litigants "meaningful access" to the courts, "no court has yet held 'meaningful access' to mean that indigents must always be supplied with counsel in civil as well as criminal cases." *Hodge,* 802 F.2d at 61.

In deciding whether to appoint *pro bono* counsel, a court should consider "the merits of the plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d. Cir. 1989). The Second Circuit has identified "the merits of the plaintiff's case" as a significant factor, and has held that, "[e]ven where the [plaintiff's] claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." *Cooper*, 877 F.2d at 172 (internal quotation marks omitted). Only after a court gives serious consideration to this factor may it consider the "secondary criteria" listed above (*i.e.*, the plaintiff's ability to pay for counsel, efforts at obtaining a

lawyer, availability of counsel, and the plaintiff's ability to represent himself). *Id.*

When a court exercises its discretion to appoint counsel, the attorney assigned is called upon to donate his time *pro bono*, to the benefit indigent litigants and the court. Accordingly, because this service is available in only limited quantities, and the number of indigent litigants seeking counsel far exceeds these available resources, the court must exercise good judgment and restraint must be exercised in making *pro bono* appointments. *Cooper, Inc.,* 877 F.2d at 172; *see also Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir. 1961) (finding that the district court did not abuse its discretion in denying the plaintiff's request for counsel where "the chances of any measure of success . . . [were] so dubious that a judge cannot properly ask a member of the bar to assume the thankless burden").

Here, plaintiff has been persistent in his quest for appointment of counsel, having now applied four times for such relief. Dkt. Nos. 10, 55, 66, 74. The Second Circuit has noted that

> [a]vailable volunteer-lawyer time should not be allocated . . . on the basis of the aggressiveness and tenacity of the claimant. *Pro bono publico* suggests meaningfully that distribution of this resource should

> be made with reference to public benefit.  The
> ancient adage about the 'squeeky wheel' may well be
> an accurate statement of the law of nature; it should
> not be adopted also as a law of prescription.

*Cooper*, 877 F.2d at 172.  Accordingly, when reviewing plaintiff's requests

for appointment of counsel, I have not considered the sheer number of

applications made for that relief.

Turning to the merits of plaintiff's application for counsel, I have

considered the factors the Second Circuit has said should inform a court's

determination in such matters, including the merits of plaintiff's case and

his chances of success.  *Cooper*, 877 F.2d at 172.  At the outset, I note

that, although plaintiff initiated this action in July 2010, it has just barely

advanced beyond the pleading stage.  As a result, and based on the

record currently before the court, I cannot predict that plaintiff will

succeed.  In addition, I have taken into consideration that plaintiff's claims

in this case are not overly complex, involving principally an alleged failure

to accommodate a disability under Title II of the ADA, and an assault by

corrections officers.  I have also considered the fact that plaintiff appears

to have capably navigated the court system based on his prolific and

persistent court filings.[9]  Finally, I note that, because plaintiff is now

released from prison, he is free to investigate and pursue his claims

without the obvious impediments associated with incarceration.  For all of

these reasons, plaintiff's applications for appointment of counsel and an

investigator are denied.[10]

_____

[9]       The court emphasizes that this observation in no way endorses plaintiff's prolific filings with the court.  Instead, I use this opportunity to remind plaintiff that he would be well served to limit his focus to the facts of this case, without straying to matters unrelated to his claims.

          In addition, the court finds that some of plaintiff's filings are frivolous and vexatious.  For example, plaintiff's motions for injunctive relief relating to the enforcement of criminal marijuana laws, Dkt. No. 67, and the Leahy-Smith America Invents Act, Dkt. No. 68, are entirely unrelated to the claims asserted in plaintiff's complaint.  In addition, plaintiff's motion requesting an injunction enjoining law enforcement from enforcing the criminal laws regulating marijuana against plaintiff contain inflammatory comments that serve no useful purpose.  *See* Dkt. No. 67 at ¶ 10 ("What are you all going to do, have me beat up again and robbed???"), ¶ 11 ("I am illegally smoking marijuana right now!").  As a result, plaintiff is hereby warned that any future frivolous or vexatious filings will result in the issuance of sanctions that potentially could include the issuance of an anti-filing injunction and/or a bar order. *See Viola v. U.S.*, 307 F. App'x 539, 539 (2d Cir. 2009) (explaining that "[t]he procedure for imposing leave-to-file sanctions involves three stages: (1) the court notifies the litigant that future frivolous filings might result in sanctions; (2) if the litigant continues this behavior, the court orders the litigant to show cause as to why a leave-to-file sanction order should not issue; and (3) if the litigant's response does not show why sanctions are not appropriate, the court issues a sanctions order" (citing *Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 529 (2d Cir. 2005))).

[10]      In the event that this action survives dispositive motion practice and is set down for trial, in all likelihood, the court will follow its custom and practice of assigning an attorney to represent the plaintiff at trial, should he desire the services of counsel at that juncture.

E.    Plaintiff's Motion for Recusal

Plaintiff seeks my recusal as the assigned magistrate judge in this case.  Dkt. No. 82.  Such recusal requests are governed by 28 U.S.C. §§ 144 and 455.  Under section 144, a judge may be required to recuse himself based on "personal bias or prejudice against [a party] or in favor of any adverse party."  28 U.S.C. § 144.  Generally, section 455 warrants recusal "in any proceeding in which [a judge's] impartiality might be reasonably questioned," 28 U.S.C. § 455(a), or where a judge has "a personal bias or prejudice concerning a party," 28 U.S.C. § 455(b)(1).  These two sections are complementary, and the grounds for disqualification are the same under both statutes.  *Jemzura v. Publ. Serv. Comm'n*, 961 F. Supp. 406, 410 (N.D.N.Y. 1997) (McAvoy, C.J.) (citing *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987)).

A party may request that a judge be recused from a case and another substituted in his stead by filing an affidavit stating "the facts and the reasons for the belief that bias or prejudice exists[.]"  28 U.S.C. § 144.  Whether an appearance of impartiality exists is an objective question "based on what a reasonable person knowing all the facts would conclude."  *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120,

127 (2d Cir. 2003). The Supreme Court has emphasized that, where grounds for recusal are comprised of "judicial rulings [and] routine trial administration efforts," recusal is generally not warranted, absent proof that those rulings either rely upon knowledge acquired outside such proceedings or "display deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994); *see also Kampfer v. Gokey*, 955 F. Supp. 167, 170 (N.D.N.Y. 1997) (Scullin, J.).

In his motion, plaintiff does not explicitly allege that I am biased against him. Rather, he appears to base his request upon the court's delays in reaching the merits of his case and suggests, as one plausible explanation, that the court is not doing its job. Although this is not an adequate basis for recusal, and the court could summarily deny plaintiff's motion, as a gesture of courtesy to plaintiff as a *pro se* litigant, I offer the following brief response.

This case has been pending for two and one-half years. During its lifetime, however, the case has been the subject of considerable procedural activity, attributable primarily to plaintiff's constant filing of motions, including two motions to amend his complaint, which, if granted,

would have resulted in further delay.

It is no secret that this district has an extremely large number of pending cases, including many initiated by prison inmates, and that the average time to disposition of cases in this court far exceeds the national average. The court understands that this is a matter of frustration for some litigants, as it is for the court itself. With its limited resources, however, the court is doing everything within its power to address this case, as well as the hundreds of other assigned, pending actions. Nonetheless, the delay in this case is not undue, in comparison with other actions in this court, including those assigned to other magistrate judges.

Recognizing the importance of considerations such as "the cost in judicial resources of recusal and reassignment of the case to different judges, and the interest of the parties and the public in a swift resolution of [a] dispute," the Second Circuit has cautioned that "'[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is.'" *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136,140 (2d Cir. 2007) (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)). In this instance, with no expectation that it would lead to a more prompt disposition, I decline to shift the

burden of addressing this case to another judge.  Plaintiff's motion for recusal is therefore denied.

### F.    Plaintiff's Motions To Compel Discovery

To date, the court has entertained several motions by the plaintiff to compel discovery in this action.  Dkt. Nos. 28, 31, 36, 40 and 44.  Those applications have resulted in the issuance of two orders, the first dated January 20, 2012 ("the January order"), rejecting most of plaintiff's discovery requests, but ordering the production of certain information, including the identity of specific individuals stationed at the CCCF, in order to assist plaintiff in identifying the defendants named only as "John Doe(s) Corrections Guards."  Dkt. No. 42.  The second order, dated March 22, 2012 ("the March order"), directed defendants to produce the full names of physicians, mental health workers, and intake specialists seen by the plaintiff during his period of incarceration at the CCCF, and additionally to produce to plaintiff all medical records associated with this incarceration at the facility.[11]  Dkt. No. 50.

Currently pending before the court are six additional motions to compel discovery filed by plaintiff.  Dkt. Nos. 59, 64, 77, 78, 81, and 85.

---

[11]    The March order has since been stayed pending resolution of defendants' motion for reconsideration.  Text Order Dated April 5, 2012; Dkt. No. 62.

For the reasons set forth the below, all of these motions are denied.

        1.    Docket Number 59

In his first motion to compel, plaintiff requests copies of a videotape taken at the CCCF on April 21, 2012, when a fellow inmate at the CCCF was allegedly assaulted, and another from February 5, 2012, when yet another CCCF inmate was allegedly punched. Dkt. No. 59. Because there is no indication in plaintiff's submission that the officers involved in those two alleged assaults were the same as those involved in his assault, I find that the materials sought are not relevant to any of the claims or defenses in the action. That application is therefore denied.

        2.    Docket Number 64

Liberally construed, plaintiff's second motion to compel requests that the court order defendants to obtain the records that pertain to plaintiff from various municipalities and agencies in New Hampshire. *See generally* Dkt. No. 64. Plaintiff argues that he is entitled to these records because they are relevant to demonstrate his mental health status. *Id.* at ¶¶ 4-5.

This request is denied for two reasons. First, there is no indication that records from a New Hampshire municipality or agency are within the

possession, custody, or control of the defendants in this action. Fed. R. Civ. P. 34(a)(1). Second, plaintiff has not demonstrated that these records are relevant to any of his claims. Plaintiff's Title II ADA claim is based on his EBS condition, which is a physical condition that allegedly affects only his skin, not his mental health. In addition, plaintiff does not contend that his mental health status is related, in any way, to his section 1983 causes of action. Accordingly, that request is denied.

### 3. Docket Number 77

Plaintiff's third motion to compel seeks information concerning an incident that occurred in May 2012, allegedly in retaliation for having commenced this action. Dkt. No. 77. Because plaintiff has not supplemented or amended his complaint to include those later events, I find that the materials sought by plaintiff are not relevant to any of the claims or defenses in this action. Accordingly that request is denied.

### 4. Docket Number 78

Plaintiff's fourth motion to compel is duplicative of an earlier motion to compel filed by plaintiff, Dkt. No. 40, which I addressed in my January order. More specifically, plaintiff renews his request for the court to issue an order compelling defendants to produce the videotape that allegedly

recorded his alleged assault at the CCCF on June 9, 2010. Dkt. No. 78 at ¶ 6.

In response to plaintiff's first motion to compel production of that videotape, defendant County submitted an affidavit from Jail Administrator Michael Smith averring that the videotape is no longer available due to CCCF's custom and practice that requires videotapes to be held only for ninety days. Dkt. No. 35, Attach. 6 at ¶ 10. Based on that affidavit, I denied plaintiff's motion to compel production of the requested videotape. Dkt. No. 42.

Because plaintiff's pending motion to compel this same videotape contains no new evidence that either contradicts Smith's affidavit or suggests the videotape actually exists, that motion is denied.

     5.     Docket No. 81

In his fifth motion to compel, plaintiff requests a videotape from August 12, 2012, a day on which he allegedly filed a grievance concerning verbal abuse unrelated to the claims in this action. Dkt. No. 81. In this motion, when liberally construed, plaintiff appears to argue that this video will show that grievances filed by him at the CCCF disappear. *Id.* at ¶ 5. Because plaintiff's application does not seek information relevant to any of

the claims or defenses in this case, this application is denied.

### 6.    Docket Number 85

Plaintiff's sixth motion to compel, filed on November 2, 2012, again seeks a videotape that allegedly recorded an incident on September 23, 2012, unrelated to plaintiff's claims in this action, in which an inmate at CCCF was assaulted. Dkt. No. 85 at ¶ 3. Because there is no indication that this incident is in any way related to or involves the same officers as the alleged assault in this case, plaintiff's request is denied.

### G.    Plaintiff's Motion for Contempt

Also pending before the court is plaintiff's motion seeking an order from the court finding defendant County in contempt for failing to comply with the March order, which ordered defendants to produce certain discovery.[12] Dkt. No. 80. The motion also requests the court sanction

---

[12]    The papers in support of this motion contain extremely alarming and inappropriate language, including the following statement:

> As an extra sanction I would like to cut the thro[a]ts of 100 of Clinton County's children and ask the court to issue the death sentence for the defendants' sickness.

Dkt. No. 80 at ¶ 4. This statement could be regarded as a threat, the utterance of which could constitute a crime under New York State law. *See* N.Y. Penal Law § 490.20 ("A person is guilty of making a terrorist threat when with intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, . . . he or she threatens to commit or cause to be committed a specified offense and thereby causes a reasonable expectation or fear of the imminent commission of such offense."). Any future submissions containing statements of this

defendant County $1 million. *Id*. Because the March order has been stayed by text order issued on April 5, 2012, and because, as discussed more completely below, I have chosen to vacate the March order, I recommend that plaintiff's application for sanctions based upon defendants' failure to comply with that order is denied.[13]

## H. Plaintiff's Request to Vacate His Conviction

On November 29, 2012, the court received an extensive submission from the plaintiff. Dkt. No. 87. Although difficult to discern, it appears to contain three requests. The first two requests seek injunctive relief, and were addressed above. The third request asks the court to vacate plaintiff's criminal conviction. *Id.* at ¶¶ 16(c), 18.

The proper means of requesting a court to vacate a criminal

_____

nature will be reported to appropriate law enforcement authorities, including, but not limited to, plaintiff's probation or parole officer, if applicable. Parenthetically, the court notes that such threats are not protected by the First Amendment. *See U.S.v. Chatelain*, 360 F.3d 114, 125 (2d Cir. 2004) ("Threats, whether explicit or implicit, are not protected speech.").

[13] The issuance of a contempt finding based upon a party's failure to obey a court order exceeds my jurisdiction as a magistrate judge. *See NXIVM Corp. v. Bouchey*, 11-MC-0058, 2011 WL 5080322, at *3 (Peebles, M.J.) (finding that, pursuant to 28 U.S.C. § 636(e), "in a case other than one over which the magistrate judge presides with a consent of the parties . . ., a magistrate judge is not authorized to issue a final contempt order"); *see also Wallace v. Kmart Corp.*, 687 F.3d 86, 90 (3d Cir. 2012). For this reason, I have formatted the portion of the decision that addresses plaintiff's request for a contempt finding as a recommendation to the assigned district judge.

conviction is through a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, not through a civil rights action pursuant to 42 U.S.C. §

1983.[14] *Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973), *accord*,

*Beasly v. Rosenblum*, 05-CV-1381, 2005 WL 1984461, at *2 (E.D.N.Y.

Aug. 17, 2005).  For this reason, plaintiff's motion is denied.

I.      Motion for Reconsideration

The last motion to be addressed by the court is defendants'

application for reconsideration of the March order, in which I directed

defendants to produce to plaintiff "the full names of the two physicians,

any nurses, all mental health workers and all intake specialists seen by

the plaintiff during his period of incarceration at Clinton County

Correctional Facility."  Dkt. No. 50 at 2.  That directive was intended to

assist plaintiff in identifying certain signatures on relevant documents, and

to locate potential witnesses.  On April 4, 2012, defendants moved for

reconsideration, arguing that the safety of the individuals whose full

names the court ordered defendants to disclose would be at risk if

defendants were required to comply.  Dkt. No. 62.  That concern stems

---

[14]      The court notes that, like the plaintiff in *Beasly*, because plaintiff in this case has been released from prison, he may not be able to satisfy the "in custody" requirement for habeas relief.  *Beasly*, 2005 WL 1984461, at *2 n.1 (citing *Billiteri v. U.S. Bd. of Parole*, 541 F.2d 938, 948 (2d Cir. 1976)).

from plaintiff's arrest, which has since ripened into a conviction, for making a terroristic threat in violation of New York Penal Law § 490.20. Dkt. No. 51, Attach. 1 at 2. Plaintiff was arrested for writing and sending a letter to a local newspaper, in which he noted his right to bear arms against an oppressive government, and stated the following:

> So if I am to return to the jail it will be for killing your children so I can face by abusers again, if these men are not arrested soon I will come back to your home to do just that, , [sic] kill your children because the constitution says I have a right to bare [sic] arms against an impressive government . . . .

*Id.* at 1.

The defendant's motion for reconsideration is governed by both Rule 60(b) of the Federal Rules of Civil Procedure and Northern District of New York Local Rule 7.1(g).[15] "Generally, the court recognizes three possible

---

[15] Rule 60(b) directly addresses the standard to be applied when a party seeks relief from a final judgment or order, and provides, in relevant part, that

> [o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C-TC 9th Ave. P'ship*, 182 B.R. 1, 3 (N.D.N.Y. 1995) (McAvoy, C.J.); *see also Cayuga Indian Nation of New York v. Pataki*, 188 F. Supp. 2d 223, 244 (N.D.N.Y. 2002) (McCurn, S.J.) (citing *Sumner v. McCall*, 103 F. Supp. 2d 555, 558 (N.D.N.Y. 2000) (Kahn, J.)).

Applications for reconsideration are subject to a "clearly erroneous" standard of review, and it has been described as "a demanding standard" to satisfy. *Sumner*, 103 F. Supp. 2d at 558. A motion for reconsideration is not a vehicle through which a losing party may raise arguments that could have been presented earlier but for neglect, nor is it a device

---

(4)     the judgment is void;

(5)     the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Local Rule 7.1(g), on the other hand, merely details a procedure to govern motions for reconsideration, without setting out an applicable standard for determining such applications. N.D.N.Y. L.R. 7.1(g).

"'intended to give an unhappy litigant one additional chance to sway the judge.'" *Brown v. City of Oneonta, N.Y.*, 858 F. Supp. 340, 342 (N.D.N.Y. 1994) (McAvoy, C.J.) (quoting *Durkin v. Taylor*, 444 F. Supp. 879, 889 (E.D. Va. 1977)). To succeed on its motion, the movant must "point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F. 3d 255, 257 (2d Cir. 1995).

Here, the court finds that defendant County has met its burden. In its letter motion, defendant County has stated that it was not previously aware of plaintiff's letter to the local newspaper in Clinton County at the time the court was considering plaintiff's motion to compel. Dkt. No. 51. This is supported by the fact that plaintiff was arrested on March 23, 2012, Dkt. No. 51, Attach. 1 at 2, and the March order was issued on March 22, 2012, Dkt. No. 50. Had the court known of plaintiff's history of making violent threats against Clinton County citizens, it would not have permitted the disclosure of the full names of physicians, nurses, mental health workers and/or all intake specialists who treated plaintiff during his incarceration at CCCF. This is especially true now, in light of plaintiff's

more recent threats contained in his court submissions, Dkt. No. 80 at ¶ 4, and the fact that plaintiff is now released from prison. As a result, the court has reason to believe that providing plaintiff with the full names of Clinton County medical and mental health staff may place those persons in danger. When balancing this risk of danger against the relatively minimal relevance of the information sought, I conclude that a protective order should issue, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, precluding plaintiff from obtaining the information in issue.

Finally, the court notes that, because plaintiff did not oppose defendant County's motion, defendant County's burden with regard to its legal argument has been lightened such that, in order to succeed, it need only show the facial merit of the legal argument. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein[.]"); *see also*, *e.g.*, *Beers v. GMC*, No. 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. Mar. 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary

judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(b)(3) ); *cf. Niles v. Nelson*, 72 F. Supp. 2d 13, 22 (N.D.N.Y.1999) (McAvoy, C.J.) (holding that when a party does not respond to a portion of the opposing party's motion, they indicate that they consent to the granting of summary judgment with respect to that portion of the motion or have abandoned the claim); *Frink Am., Inc. v. Champion Road Mach., Ltd.*, 48 F. Supp. 2d 198, 209 (N.D.N.Y.1999) (McAvoy, C.J.) ("Plaintiff does not address these claims in his opposition papers, leading the Court to conclude that it has abandoned them.") (collecting cases); *see also Di Giovanna v. Beth Isr. Med. Ctr.*, 08-CV-2750, 2009 WL 2870880, at *10 n.108 (S.D.N.Y. Sept. 8, 2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment motion as to why certain claim should be dismissed constitutes abandonment of claim).  Defendant County has, at least, met its lightened burden with respect to its argument for reconsideration.

For all of these reasons, defendant County's motion to vacate the March order is granted.

J.    The Court's Filing Injunction, Dated Dec. 3, 2012

The court *sua sponte* vacates its filing injunction issued on December 3, 2012, Text Order dated Dec. 3, 2012, requiring that plaintiff seek advance permission from the court before submitting any further filings because, as of that date, the court had not yet provided plaintiff notice that any future filing of frivolous or vexatious submissions with the court would result in sanctions.  *See Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998) ("The unequivocal rule in this circuit is that the district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *see also Viola*, 307 F. App'x at 539 (extending *Moates*' "unequivocal rule" to instances where a court considers imposing "leave-to-file sanctions" against litigants).  However, as explained above, the plaintiff is now on notice that any future frivolous or vexatious filings will result in sanctions, which could include a bar order requiring advance permission from the court to make filings in this action, or an anti-filing injunction precluding plaintiff from bringing any further actions in this court without advance permission.

IV.   SUMMARY AND CONCLUSION

Addressing first defendant County's pending motion for judgment on the pleadings, I conclude that plaintiff's complaint states a claim under Title II of the ADA, but that it fails to state a claim under Title I of the ADA and for municipal liability pursuant to section 1983.  In addition, I find that plaintiff is precluded from asserting a punitive damage claim against defendant County.

Turning next to the many pending motions brought by plaintiff, I find that they are all subject to denial for the reasons set forth above. Accordingly, by this decision, I deny those motions that seek non-dispositive relief, and recommend denial of all other motions.

Lastly, as it relates to defendant County's motion for reconsideration of the March order, that motion is granted based upon my finding that defendant has met its burden of proof.  Therefore, I now vacate the portion of that order requiring defendant County to identify physicians, nurses, mental health workers, and intake specialists seen by the plaintiff while incarcerated at CCCF.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendant County's motion for judgment on the pleadings (Dkt. No. 48) be GRANTED in part and DENIED in part, as follows:

(1)    Plaintiff's Title II ADA claim should survive;

(2)    Plaintiff's Title I ADA claim should be dismissed, with prejudice;

(3)    Plaintiff's municipal liability claim, pursuant to section 1983, should be dismissed, without prejudice to plaintiff's right to file an amended complaint that corrects the pleading defects in that claim, as described in this report, within thirty days of the date of any decision and order by the district judge adopting this report and recommendation; and

(4)    Plaintiff's punitive damage claim against defendant County should be dismissed with prejudice; and it is further

RECOMMENDED that plaintiff's motions for injunctive relief (Dkt. Nos. 46, 56, 60, 67, 68 and 87) be DENIED; and it is further

RECOMMENDED that plaintiff's motion for contempt and sanctions (Dkt. No. 80) be DENIED; and it is further

RECOMMENDED that plaintiff's motion for an order vacating his criminal conviction (Dkt. No. 87) be DENIED; and it is further

ORDERED that plaintiff's motions for leave to amend his complaint (Dkt. Nos. 45, 74) are DENIED, without prejudice to refiling in this action in accordance with the local rules of practice of this court; and it is further

ORDERED that plaintiff's motions for appointment of counsel (Dkt. Nos. 55, 66, 74) are DENIED; and it is further

ORDERED that plaintiff's motion for recusal (Dkt. No. 82) is DENIED; and it is further

ORDERED that plaintiff's motions to compel discovery (Dkt. Nos. 59, 64, 77, 78, 81, 85) are DENIED; and it is further

ORDERED that defendant County's motion for reconsideration (Dkt. No. 62) is GRANTED; and it is further

ORDERED that the portion of the March order (Dkt. No. 50) ordering defendant County to identify physicians, nurses, mental health workers, and intake specialits seen by plaintiff while incarcerated at CCCF is VACATED, and an protective order is hereby entered precluding plaintiff

from obtaining this requested information; and it is further

ORDERED that the stay of discovery and motion filing deadlines previously imposed by the court is hereby LIFTED, and those deadlines are reset, as follows:

| Task | Date |
| --- | --- |
| Discovery Deadline | March 31, 2013 |
| Motion Filing Deadline | May 31, 2013 |

David E. Peebles
U.S. Magistrate Judge

Dated:    December 28, 2012
             Syracuse, New York


Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)

(Cite as: 2010 WL 3835182 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Jose (Joseph) A. PADILLA, Jr., Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF LABOR,
Defendant.
No. 09 Civ. 5291(CM)(RLE).

Sept. 13, 2010.
**DECISION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS**

McMAHON, District Judge.
### INTRODUCTION
**\*1** Plaintiff Jose Padilla ("Plaintiff") brings this action
under the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101 *et seq.,* against his former employer,
defendant the New York State Department of Labor
("DOL" or "Defendant"). Plaintiff alleges that the DOL
discriminated against him by not paying him during
disability leave, and that when he filed internal
complaints, it retaliated against him by instituting
disciplinary proceedings and, ultimately, firing him.
Defendant has moved to dismiss Plaintiff's Complaint
pursuant to Federal Rules of Civil Procedure 12(b)(1) and
12(b)(6). For the reasons set forth below, Defendant's
motion is granted.

### BACKGROUND

Plaintiff alleges that on June 7, 2004, he returned to
work at the DOL after being absent "on leave, a period of
disability," since November 2003. (Compl. at 8.) [FN1] He
alleges that Defendant discriminated against him by
refusing to pay him for the period of his leave running
from March 25, 2004 through the date of his return; by
bringing him up on disciplinary charges of unauthorized

leave for that same period; and by transferring him to
another unit upon his return.

> FN1. For purposes of this motion to dismiss, the
> Court assumes the truth of the allegations in
> Plaintiff's Complaint and the documents attached
> thereto.

Plaintiff filed an internal complaint of discrimination.
He alleges that Defendant retaliated by engaging in hostile
conduct and attempting to intimidate him so that he would
not file further complaints. On November 15, 2004,
Plaintiff filed a second internal complaint.

Plaintiff alleges that in the ten months after returning
to work from his "leave for a period of disability" (*id.*), the
DOL brought seven disciplinary charges against him, six
of which were brought after he filed his second complaint
of discrimination. He contested each disciplinary charge
by filing grievances.

On February 16, 2006, the DOL terminated Plaintiff's
employment. After receiving his Right to Sue Letter from
the Equal Employment Opportunity Commission, Plaintiff
timely commenced this action on May 19, 2009.

The Complaint does not specify under which Title(s)
of the ADA Plaintiff's claims arise. The Court (like
Defendant) construes the Complaint as asserting claims
under Title I (employment discrimination) and Title V
(retaliation). The Complaint seeks "such relief as may be
appropriate, including injunctive orders, damages, costs,
and attorney's fees." (*Id.* at 5.)

Pending before the Court is Defendant's motion to
dismiss the Complaint pursuant to Rules 12(b)(1) and
12(b)(6). The DOL argues that the Court lacks
subject-matter jurisdiction over both of Plaintiff's claims
because they are barred by Eleventh Amendment
sovereign immunity, and that the Complaint fails to state
a claim under Title I.

### DISCUSSION

Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)

(Cite as: 2010 WL 3835182 (S.D.N.Y.))

## I. Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(1) or 12(b)(6), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. *Morrison v. Nat'l Austl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (Rule 12(b)(1)); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104, 115 (2d Cir.2008) (Rule 12(b) (6)). However, jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison,* 547 F.3d at 170 (internal quotations and citations omitted). When deciding jurisdictional issues, the court "may consider evidence outside the pleadings." *Id.*

**\*2** To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly,* 550 U.S. at 556.) "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotations, citations and alterations omitted). Unless a plaintiff's well-pleaded allegations of fact have "nudged [its] claims across the line from conceivable to plausible, the [plaintiff's] complaint must be dismissed." *Id .* at 570; *Iqbal,* 129 S.Ct. at 1950–51.

Finally, it is well established that where, as here, the plaintiff is *pro se,* his submissions "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotations and citation omitted); *see Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) ("Even after *Twombly,* [courts] remain obligated to construe a *pro se* complaint liberally." (*citing Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam))).

## II. Title I Claim

Title I of the ADA prohibits discrimination against individuals with disabilities in the terms and conditions of their employment. *See* 42 U.S.C. § 12112(a). Plaintiff's Title I claim must be dismissed, both because it is barred by sovereign immunity, and because the Complaint fails to plead a "disability" within the meaning of the statute.

### A. Plaintiff's Title I Claim Is Barred by the Eleventh Amendment

The Eleventh Amendment provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In this Circuit, a finding that the defendant is entitled to sovereign immunity means the court lacks subject-matter jurisdiction. *See McGinty v. New York,* 251 F.3d 84, 101 (2d Cir.2001).

The Supreme Court has held that Eleventh Amendment immunity applies to a state sued by its own citizens, *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), and that it extends to state agencies, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The sovereign immunity bar applies regardless of the nature of the relief sought. *See Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst,* 465 U.S. at 100–01. There are three exceptions to the general rule that a state and its officers are immune from suit in federal court under the Eleventh Amendment: (1) a state may waive its Eleventh Amendment defense, *see Coll. Sav. Bank v. Fla. Prepaid Postsec. Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); (2) Congress may abrogate the states' sovereign immunity through the enactment of a statute, *see Kimel,* 528 U.S. at 80; and (3) pursuant to the *Ex parte Young* doctrine, the Eleventh Amendment does not bar a "suit against a state *official* when that suit seeks only prospective injunctive relief," *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (emphasis added).

**\*3** Here, Plaintiff asserts a claim under Title I of the ADA against the DOL, which is an agency of the State of

Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)

(Cite as: 2010 WL 3835182 (S.D.N.Y.))

New York, *see Jackson v. N.Y. State Dep't of Labor,* No. 09 Civ. 6608, 2010 U.S. Dist. LEXIS 43200, at *13 (S.D.N.Y. Apr. 26, 2010); *Rosquist v. N.Y. Univ. Med. Ctr.,* No. 97 Civ. 8566, 1998 U.S. Dist. LEXIS 15808, at *41 (S.D.N.Y. Oct. 7, 1998). It is well established that Congress did not validly abrogate states' Eleventh Amendment immunity for claims brought under Title I of the ADA. *See Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 368, 374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that Title I can only "be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under *Ex parte Young*"); *see also Darcy v. Lippman,* 356 F. App'x 434, 436 (2d Cir.2009). The *Ex parte Young* exception has no application here, as Plaintiff has not sued any individual state officers. *See, e.g., Santiago v. N.Y. State Dep't of Corr. Servs.,* 945 F.2d 25, 32 (2d Cir.1991); *Harris v. N.Y. State Educ. Dep't,* 419 F.Supp.2d 530, 534 (S.D.N.Y.2006). Nor is there any suggestion that the DOL has waived its Eleventh Amendment defense to Title I claims.

Plaintiff's affidavit in opposition to Defendant's motion offers only meritless procedural objections. He claims, for example, that Defendant failed to afford him proper notice of its motion in accordance with Local Rule 12.1. (*See* Aff. in Opp'n to Notice of Mot., Feb. 1, 2010 (Docket No. 11).) But Local Rule 12.1 only applies when a represented party moves to dismiss a *pro se* complaint and "refers in support of the motion to matters outside the pleadings," Local Civ. R. 12.1. The DOL has not referred to any matters outside Plaintiff's Complaint in moving to dismiss. Thus, Local Rule 12.1 does not apply. The other contentions in Plaintiff's affidavit are equally meritless.

Accordingly, Plaintiff's Title I claim is dismissed with prejudice for lack of subject-matter jurisdiction because it is barred by the Eleventh Amendment.

**B. The Complaint Fails to State a Claim Under Title I of the ADA**

Even if Plaintiff's Title I claim were not barred by sovereign immunity, it would fail because the Complaint does not adequately allege one of the most basic elements of a Title I claim—a disability. To plead a Title I violation, a plaintiff must allege that (1) the defendant is subject to the ADA; (2) he is "disabled" within the meaning of the statute or perceived to be so by his employer; (3) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he was subject to an adverse employment action because of his disability. *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008); *Giordano v. City of N.Y.,* 274 F.3d 740, 747 (2d Cir.2001). The ADA defines a disabled individual as one who has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1).

**\*4** Here, the Complaint makes only three vague, conclusory references to Plaintiff's purported disability: it alleges that Plaintiff was "on leave, a period of disability," and that he took leave for "a period of disability," (Compl. at 8–9.) Such allegations fall well short of pleading a "disability" within the meaning of the ADA. *See, e.g., Emmons v. City Univ. of N.Y.,* No. 09 Civ. 537, 2010 U.S. Dist. LEXIS 54140, at *22–25 (E.D.N.Y. June 2, 2010); *Swiskey v. Palumbo,* No. 07 Civ. 6624, 2009 U.S. Dist. LEXIS 24832, at *32–34 (S.D.N.Y. Mar. 9, 2009); *Kitchen v. Phipps Houses Groups of Cos.,* No. 08 Civ. 4296, 2009 U.S. Dist. LEXIS 12559, at *12–13 (S.D.N.Y. Feb. 5, 2009).

Thus, Plaintiff's Title I claim, which is barred by the Eleventh Amendment, also fails for the independent reason that the Complaint does not sufficiently allege a disability.

**III. Title V Claim**

Title V of the ADA prohibits an employer from retaliating against an employee for engaging in activity protected by the statute's substantive provisions. *See* 42 U.S.C. § 12203. Defendant argues that Plaintiff's Title V claim, like his Title I claim, is barred by the Eleventh Amendment.[FN2]

> FN2. Defendant does not argue that Plaintiff's failure to plead a disability also warrants dismissal of his Title V claim, and with good reason, as an ADA plaintiff need not allege a disability to sustain a *retaliation* claim. *See*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)

(Cite as: 2010 WL 3835182 (S.D.N.Y.))

*Emmons v. City Univ. of N.Y.,* No. 09 Civ. 537, 2010 U.S. Dist. LEXIS 54140, at *25 (E.D.N.Y. June 2, 2010).

The Supreme Court has instructed that states' immunity to suits under the ADA is to be determined title by title. *See United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650, 156–59 (2006). Neither the Supreme Court nor the Second Circuit has decided whether Congress validly abrogated states' sovereign immunity in passing Title V of the ADA.

However, every district court in this Circuit to consider the issue has concluded that sovereign immunity bars Title V claims. *See, e.g., Emmons,* 2010 U.S. Dist. LEXIS 54140, at *21; *Moshenko v. State Univ. of N.Y. at Buffalo,* No. 07 Civ. 0116, 2009 U.S. Dist. LEXIS 125069, at *6–8 (W.D.N.Y. Sept. 16, 2009); *Chiesa v. N.Y. State Dep't of Labor,* 638 F.Supp.2d 316, 323 (N.D.N.Y.2009); *Salvador v. Lake George Park Comm'n,* No. 98 Civ.1987, 2001 U.S. Dist. LEXIS 23465, at *7–10 (N.D.N.Y. Mar. 28, 2001), *aff'd,* 35 F. App'x 7 (2d Cir.2002), *cert. denied,* 537 U.S. 1002, 123 S.Ct. 487, 154 L.Ed.2d 398 (2002). The district court in *Chiesa* reasoned as follows:

> Immunity under Title V has not yet been decided, but the past decisions on state employers suggest very limited liability to be appropriate.... If a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination.

638 F.Supp.2d at 323; *see Salvador,* 2001 U.S. Dist. LEXIS 23465, at *9–10 ("There is no indication that Congress, in passing §§ 12203(a) and (b) of [Title V of] the ADA, was concerned with a pattern or practice of states interfering with others' compliance with the mandates of the ADA. Those sections of the ADA, therefore, cannot apply to the states for to do so would unlawfully abrogate their sovereign immunity.").

Outside of this Circuit, the only Court of Appeals that has addressed the issue reached the same conclusion. *See Demshki v. Monteith,* 255 F.3d 986 (9th Cir.2001). In *Demshki,* the Ninth Circuit "recognize[d] that [the

Supreme Court's decision in] *Garrett* arose in the context of Title I, but ... nevertheless conclude[d] that the Court's holding necessarily applies to claims brought under Title V of the ADA, at least where, as here, the claims are predicated on alleged violations of Title I." *Id.* at 988–89 (noting that "[t]here is nothing in the ADA'S legislative findings demonstrating a pattern of discrimination by states against employees who oppose unlawful employment discrimination against the disabled," and that "[a]bsent a history of such evil by the states, Congress may not abrogate the states' Eleventh Amendment immunity from Title V claims").

**\*5** Furthermore, multiple district courts in other circuits have also concluded that states and their agencies are immune from suit under Title V of the ADA. *See, e.g., Cisneros v. Colorado,* No. 03–cv–02122–WDM–CBS, 2005 U.S. Dist. LEXIS 40045, at *19–20 (D.Colo. July 22, 2005); *Shabazz v. Tex. Youth Comm'n,* 300 F.Supp.2d 467, 472–73 (D.Tex.2003); *Scott v. State Dep't of Workforce Dev.,* No. 06–C–308–C, 2006 U.S. Dist. LEXIS 93240, at *4–5 (W.D.Wise. Dec. 22, 2006). Indeed, the Court has located only three decisions finding that a Title V claim was *not* barred by sovereign immunity, and each of those decisions was based on circumstances not present here. In two of the three cases, the court found that the asserted Title V claim was not barred by sovereign immunity because it alleged retaliation predicated on underlying violations of *Title II,* not Title I. *See Demby v. Md. Dep't of Health & Mental Hygiene,* No. CCB–06–1816, 2009 U.S. Dist. LEXIS 12619, at *3–4 (D.Md. Feb. 13, 2009); *Sarkissian v. W. Va. Bd. of Governors,* No. 1:05CV144, 2007 U.S. Dist. LEXIS 32881, at *28–29 (N.D.W.Va. May 3, 2007). Plaintiff's Complaint here has nothing to do with Title II, which concerns disabled individuals' participation in and receipt of benefits from services, programs and activities of public entities. *See* 42 U.S.C. § 12132. In the third case, the court declined to apply sovereign immunity to a Title V claim because it was closely linked to *First Amendment* violations asserted in the plaintiff's complaint. *Roberts v. Pa. Dep't of Pub. Welfare,* 199 F.Supp.2d 249, 254 (E.D.Pa.2002).

This Court finds the reasoning of the Ninth Circuit in *Demshki,* and of the district court decisions from this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)

(Cite as: 2010 WL 3835182 (S.D.N.Y.))

Circuit cited above, to be persuasive. Accordingly, the Court concludes that Plaintiff's Title V claim is barred by the Eleventh Amendment. Plaintiff's Title V claim is therefore dismissed with prejudice for lack of subject-matter jurisdiction.

### *CONCLUSION*

For the reasons set forth above, the Court grants Defendant's motion, and dismisses the Complaint with prejudice. The Clerk of the Court is directed to close this case.

S.D.N.Y.,2010.

Padilla v. New York State Dept. of Labor
Not Reported in F.Supp.2d, 2010 WL 3835182 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

**H**

United States District Court,

S.D. New York.
Carletta THOMPSON, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF
PROBATION, Defendant.
No. 03 Civ.4182 JSR JCF.

Dec. 12, 2003.
*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

   **\*1** Carletta Thompson brings this employment discrimination action *pro se,* alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* She claims that her employer, the New York City Department of Probation, discriminated against her on the basis of disability. The defendant has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. For the reasons that follow, I recommend that the motion be denied.

*Background* FN1

   FN1. This summary of facts is taken from the Complaint and the plaintiff's statement attached to the Complaint and dated June 9, 2003. The Complaint was prepared on a form provided by the *Pro Se* Office of this Court. In considering the defendant's motion, I have also reviewed the facts alleged in the plaintiff's opposition papers, *see Ullah v. NYDOCS,* No. 00 Civ 9506, 2002 WL 1424590, at \*4 (S.D.N.Y. June 28, 2002) (*pro se* plaintiff's memorandum of law can be treated as part of complaint for purposes of deciding motion to dismiss), as well as the exhibits attached to the Complaint and to the plaintiff's opposition papers. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (complaint deemed to include all attachments to complaint and documents incorporated by reference).

   The plaintiff alleges that her disabilities are carpal tunnel syndrome and other "back and neck" ailments. (Complaint ("Compl.") at 3). She alleges that the defendant: (1) failed to accommodate her disability, (2) subjected her to unequal terms and conditions of employment, (3) retaliated against her, and (4) refused to pay her medical bills for chiropractic services. (Compl. at 3).

   On or about November 13, 1995, the plaintiff was hired by the New York City Department of Probation and assigned to the K.S.I.R. Unit FN2 in Brooklyn. (Statement of Carletta Thompson dated June 9, 2003, attached to Complaint ("6/9/03 Statement"), at 1). The plaintiff worked without an "ergonomic workstation" at this assignment and experienced lower back pain. (6/9/03 Statement at 1). She also received "telephone harassment" from co-workers. (6/9/03 Statement at 1).

   FN2. The record does not indicate the full name of the K.S.I.R. Unit.

   On or about January 6, 1997, the plaintiff was transferred to the Nova Ancora Program in Manhattan. (6/9/03 Statement at 1). She was diagnosed with carpal tunnel syndrome on March 11, 1998, and her employer subsequently provided her with two ergonomic chairs and a headset to accommodate her condition. (6/9/03 Statement at 1). The plaintiff requested a transfer to a unit that "would not further aggravated [sic][her] carpal tunnel syndrome." (6/9/03 Statement at 2). On April 9, 1998, she submitted a claim for workers' compensation benefits. (6/9/03 Statement at 2). The plaintiff received further telephone harassment from her co-workers. (6/9/03 Statement at 2).

   On or about September 28, 1998, the plaintiff was transferred to Manhattan Family Intake & Services and assigned to the Investigation Unit. (6/9/03 Statement at 2). Her job required a significant amount of writing and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

sitting, which aggravated her carpal tunnel condition. (6/9/03 Statement at 2). Ms. Thompson submitted four transfer requests, each of which was denied. (6/9/03 Statement at 2). She was provided with an "Executive talk voice processing system" to use for her job. (6/9/03 Statement at 2). Beginning January 1, 1999, the plaintiff was assigned 14 cases per month, the same caseload carried by non-disabled employees. (6/9/03 Statement at 2). During this assignment, the plaintiff was called names such as "gay," "Jap," and "tramp," and on one occasion, the harassment began after the plaintiff complained about co-workers playing loud music. (6/9/03 Statement at 2). The plaintiff filed a charge with the New York State Division of Human Rights ("NYSHDR") on February 16, 1999. (6/9/03 Statement at 2).

**\*2** From October 8 to October 22, 1999, the plaintiff was absent from work due to severe headaches. (6/9/03 Statement at 3). She was denied use of her sick leave benefits for this period, and her paycheck was reduced to reflect the missed time. (6/9/03 Statement at 3). On November 9, 1999, the plaintiff filed a grievance through her union, but the grievance was subsequently denied. (6/9/03 Statement at 3–4).

On or about January 28, 2000, the plaintiff was transferred to Linden House in Brooklyn. (6/9/03 Statement at 3). At this assignment, she was referred to as "gay" and continued be harassed by co-workers. (6/9/03 Statement at 4). In May 2001, the plaintiff requested an ergonomic keyboard, which she later received. (6/9/03 Statement at 4–5). However, her ergonomic chair and a headset were stolen from her. (6/9/03 Statement at 5 & Exh. 5ii).

On or about January 4, 2002, the plaintiff was transferred to the Manhattan Alternative to Detention Program, then to the Kings Family Service, E.O.P. Unit[FN3] on or about December 9, 2002. (6/9/03 Statement at 5). On or about April 11, 2002, the plaintiff submitted a second claim for workers' compensation benefits, but she was denied payment for the medical bills of Dr. Handt, her chiropractor. (6/9/03 Statement at 5). In March 2003, the mouse for her ergonomic keyboard was stolen. (6/9/03 Statement at 5).

FN3. Again, there is no indication in the record what the acronym "E.O.P." stands for.

The NYSHDR determined that the plaintiff's rights had not been violated, and the United States Equal Opportunity Commission ("EEOC") adopted the state agency's findings and issued a right to sue letter on May 21, 2003. The plaintiff then submitted her complaint to this Court on or about June 9, 2003.

*Discussion*

In considering a motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the court must accept as true all factual allegations in the complaint and must draw all inferences in favor of the plaintiff. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993); *York v. Association of the Bar of the City of New York,* 286 F.3d 122, 125 (2d Cir.2002); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). Accordingly, the complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957) (footnote omitted). These principles are even more strictly applied where the plaintiff alleges civil rights violations, *see Hernandez,* 18 F.3d at 136; *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991), or where the plaintiff proceeds *pro se, see Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000). In considering a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. The Board of Education of the State of New York,* 287 F.3d 138, 146 (2d Cir.2002); *see also Cruz,* 202 F.3d at 597.

A. *Sufficiency of the Pleadings*

**\*3** Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement is intended only to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47. The United States Supreme Court recently held that, to comply with Rule 8(a)(2), a plaintiff in an employment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

discrimination action need not plead specific facts establishing a prima facie case of discrimination. *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002). At the pleading stage, "before the reception of any evidence either by affidavit or admissions, ... [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id* . at 511 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

1. *Definition of "Disability"*

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A "disability" is defined in part as "a physical or mental impairment that substantially limits one or more ... major life activities." 42 U.S.C. § 12102(2)(A). Under the EEOC regulations implementing the ADA, the term "major life activities" is further defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).[FN4] Other "major life activities" include "sitting, standing, lifting, [and] reaching." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir.1998) (quoting EEOC's Americans with Disabilities Act Handbook I–27 (1992)). To be "substantially limited" means to be: (1) "unable to perform" a major life activity that an "average person in the general population can perform," or (2) "significantly restricted" in the "condition, manner, or duration" of performing a major life activity, as compared to an "average person in the general population." 29 C.F.R. § 1630.2(j)(1).

> FN4. The EEOC's regulations are accorded "great deference," since the agency is charged with administering the ADA. *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997).

The defendant contends that the plaintiff's pleadings are insufficient because Ms. Thompson fails to allege a "disability" within the meaning of the ADA. [FN5] In her Complaint, the plaintiff identifies her disability as "carpal tunnel syndrome" and other "back and neck" ailments. (Compl. at 3). Under the ADA, these conditions qualify as "physical impairments," as they are "physiological disorder[s]" affecting the "musculoskeletal" system. 29 C.F.R. § 1630.2(h).

> FN5. I note that proof of a "disability within the meaning of the ADA" is an element of the prima facie case for employment discrimination based on disability. *See* *Ryan,* 135 F.3d at 870 (citations omitted). While the failure to establish a prima facie case may not be grounds for dismissal, *see* *Swierkiewicz,* 534 U.S. at 508, the ADA itself requires proof of disability as it is defined therein, and a failure to offer facts in support of this element would require dismissal because, in the absence of a qualifying disability, "no set of facts ... would entitle [the plaintiff] to relief." *Conley,* 355 U.S. at 45–46. Under the ADA definition of "disability," merely pleading a physical impairment without specifying that it "substantially limits" a "major life activity" may be insufficient to state a claim for relief. *See, e.g.,* *Harewood v. Beth Israel Medical Center,* No. 02 Civ 5511, 2003 WL 21373279, at *1, 5 (S.D.N . Y. June 13, 2003) (citing *Swierkiewicz,* 534 U.S. at 508); *Sacay v. Research Foundation of the City University of New York,* 44 F.Supp.2d 496, 501–02 (E.D.N.Y.1999) (collecting cases); *cf. Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 195 (2002) (carpal tunnel syndrome is not per se disability without evidence of substantial limitation to major life activity); *Weixel,* 287 F.3d at 146–47 (under Title II of ADA, complaint is sufficient if it alleges: (1) disability within meaning of ADA, (2) plaintiff's qualification to receive benefit, and (3) denial of benefit because of disability). *Contrast* *Benjamin v. New York City Department of Health,* No. 99 Civ 12345, 2002 WL 485731, at *8 (S.D.N.Y. Mar. 29, 2002) (impairment alone sufficient in light of *Swierkiewicz* ); *Magee v. Nassau County Medical Center,* 27 F.Supp.2d 154, 162 (E.D.N.Y.1998) (impairment alone sufficient for *pro se* complaint).

While the plaintiff's pleadings do not specify the major life activity limited by her disability, they can be liberally read as alleging a limitation in the plaintiff's ability to work. For instance, the plaintiff states that work activities requiring excessive writing and sitting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

"aggravated my Carpal Tunnel Syndrome and caused ... severe lower back, neck and shoulder pains and severe daily headaches." (6/9/03 Statement at 2). She also states that on one occasion in 1999, the daily headaches caused her to miss work for two weeks. (6/9/03 Statement at 3). Aside from working, the plaintiff states in her opposition papers that she is limited in "sitting, standing, lifting, ... [and] reaching," and in an attached medical report, she claims difficulties in performing "household chores or other manual activities." (Plaintiff's Opposition to Defendant's Motion ("Pl.Opp.") at 2 & Exh. 11). The plaintiff also alleges limitations in walking and provides specific examples. (Pl. Opp. at 2). These allegations clearly identify qualifying "major life activities" under the ADA.

**\*4** Moreover, the plaintiff alleges facts suggesting that she is "substantially limited" in performing the major life activities identified. For instance, the plaintiff states that, if she sleeps on her back or right side, she has difficulty walking the following morning. (Pl. Opp. at 2). She also states that she has difficulty walking after sitting continuously for several hours, and that she has difficulty climbing two flights of stairs. (Pl. Opp. at 2). These allegations are supported by a medical report that the plaintiff attached to her complaint. (Report of William L. King, M.D ., attached as Exh. D of Exh. 2i to 6/9/03 Statement). Regardless of whether the plaintiff will "ultimately prevail," *Scheuer,* 416 U.S. at 236, in proving that these limitations are significant as compared to the "average person in the general population," 29 C.F .R. § 1630.2(j)(1), her allegations state a claim to that effect and are sufficient to give fair notice to the defendant.[FN6]

> FN6. In light of the plaintiff's allegations regarding her ability to walk, I need not reach the issue of whether her alleged work restrictions are "substantial" because she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

2. *Hostile Work Environment*

The defendant also contends that the plaintiff's allegations concerning "harassment or other discriminatory conduct" are insufficient as they fail to allege a causal connection between the alleged conduct and the plaintiff's disability. (Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint ("Def.Memo.") at 10 n. 7). Several courts in this district have recognized ADA claims based on harassment or a "hostile work environment." *See, e.g., Scott v. Memorial Sloan–Kettering Cancer Center,* 190 F.Supp.2d 590, 599 (S.D.N.Y.2002) (equating ADA standard for hostile environment claims to that of Title VII); *Disanto v. McGraw–Hill, Inc./Platt's Division,* No. 97 Civ. 1090, 1998 WL 474136, at \*5 (S.D.N.Y. Aug. 11, 1998). As the ADA only prohibits discrimination "because of" a disability, 42 U.S.C. § 12112(a), proof of causation is required. However, in meeting the pleading requirements of Rule 8(a), a plaintiff need not "append to each allegation of harassment the conclusory declaration 'and this was done because of my [disability]." ' *Gregory v. Daly,* 243 F.3d 687, 694 (2d Cir.2001). "[W]hat is needed is the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of her [disability]." *Id.*

In her pleadings, the plaintiff cites numerous instances of "telephone harassment" and other verbal abuse that she allegedly received from her co-workers. (6/9/03 Statement at 1–4). With respect to the content of the verbal harassment, the plaintiff states that she was called names such as "gay," "Jap," and "tramp," none of which appears to make direct reference to her disability. The plaintiff states that on one occasion, the harassment began when she complained about "coworkers playing loud music." (6/9/03 Statement at 2). In her most recent allegations, the plaintiff states that a co-worker stole her ergonomic chair, headset, and computer mouse, all of which were items provided to accommodate her carpal tunnel syndrome. (6/9/03 Statement at 5).

**\*5** While this case presents a close call, the plaintiff's allegations are sufficient to permit the inference that the alleged incidents of harassment were motivated by her disability. It is not necessary that the harassing words or conduct refer specifically to the plaintiff's handicap. *See Gregory,* 243 F.3d at 694–95 (comment that plaintiff was "stupid and incompetent" could demonstrate harassment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

based on sex). Moreover, the later incidents do appear related to the plaintiff's disability. When considering the long history of disputes between the plaintiff and her employer concerning accommodations for her carpal tunnel syndrome, it cannot be said the plaintiff can show "no set of facts," *Conley,* 355 U.S. at 45, to prove that her disability was related to the alleged harassment.

3. *Retaliation*

It is unclear whether the defendant, by its reference to "harassment or other discriminatory conduct" (Def. Memo at 10 n. 7), also seeks to challenge the plaintiff's retaliation claim as inadequately alleging facts to support causation. The pleadings, in any case, are explicit in this regard. The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this [Act]." 42 U.S.C. § 12203(a). A retaliation claim can be premised on an individual's request for reasonable accommodations. *See Sacay,* 44 F.Supp.2d at 504. Here, the plaintiff alleges that in June 1998, she requested a transfer to prevent a further aggravation of her carpal tunnel syndrome. (6/9/03 Statement at 2). She states that, "in retaliation," she was then assigned to the Investigation Unit and given job tasks that only worsened her condition. (6/9/03 Statement at 2).

In addition, while the defendant is correct that this Court lacks jurisdiction over claims for workers' compensation benefits, *see* N.Y. Workers' Comp. § 11, the plaintiff's pleadings can be liberally construed as alleging that the employer's interference with her receipt of benefits, as well as its rejection of her union grievance, resulted from the plaintiff's requests for accommodation or the complaints she filed with government agencies. For instance, the plaintiff alleges that during her assignment with the Investigation Unit, she made four transfer requests (which were denied), then filed a charge with the NYSDHR. (6/9/03 Statement at 2). Subsequently, Philip Dobbs, the Branch Chief of the Investigation Unit, denied the plaintiff use of her sick leave benefits to cover a two-week absence, a dispute that became the subject of her union grievance. (6/9/03 Statement at 3). Mr. Dobbs also commented to the plaintiff that she had "stepped on someone [sic] toes high up." (6/9/03 Statement at 3). Additionally, the plaintiff alleges that she was denied payment for her chiropractor's bills when she filed her

second workers' compensation claim in 2002. (6/9/03 Statement at 5). However, she experienced no such denial of coverage when she filed her the first claim in April 1998 before transferring to the Investigation Unit. (6/9/03 Statement at 2). FN7

> **FN7.** While the plaintiff does not specify the manner in which her employer allegedly interfered with her receipt of benefits, the timing of the second denial of coverage is sufficient to raise the inference that some form of interference did occur. The defendant, in any case, does not raise any issue other than causation in challenging the sufficiency of the pleadings with respect to the retaliation claim.

**\*6** Broadly construed, the pleadings therefore state sufficient facts to support the causation element of the plaintiff's retaliation claim. The plaintiff's allegations pertaining to her workers' compensation claim and union grievance should be construed as part of this claim. *See, e.g., Muller v. Costello,* No. 94 Civ. 842, 1996 WL 191977, at \*6 n. 16 (N.D.N.Y. April 16, 1996) ("discriminatory manipulation of [plaintiff's] employment benefits," including sick leave and workers' compensation, can form basis of ADA retaliation claim).

B. *Timeliness*

The defendant contends that certain portions of the Complaint should be dismissed because they are time-barred. As a prerequisite to a civil suit under the ADA, a plaintiff is required to file a charge with the EEOC within 300 days of the alleged unlawful acts. *See* 42 U.S.C. §§ 2000e–5(e)(1), 12117(a). Here, the plaintiff filed a charge with the NYSDHR on February 16, 1999. FN8 Accordingly, the defendant argues that any claims based on acts occurring more than 300 days prior to that date—i.e., prior to April 22, 1998—should be dismissed.

> **FN8.** The defendant concedes that the plaintiff's charge was accepted by the NYSDHR on behalf of the EEOC. (Def. Memo. at 11 n. 8).

However, the plaintiff's pleadings do not appear to allege any pre-April 22, 1998 acts pertaining to her failure-to-accommodate or retaliation claim. The plaintiff

Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106

(Cite as: 2003 WL 22953165 (S.D.N.Y.))

states that she was hired by the defendant on November 13, 1995, and that she worked without an "ergonomic workstation" at her first work assignment. (6/9/03 Statement at 1). She does *not* allege that she made any requests for accommodations during her first assignment, nor does she allege that the defendant refused such requests or retaliated against her for making them. Instead, the plaintiff states that she was diagnosed with carpal tunnel syndrome on March 11, 1998, and appears to allege that she requested accommodations at that time. (6/9/03 Statement at 1). Accordingly, no portion of the failure-to-accommodate or retaliation claim can be dismissed on the basis of untimeliness.[FN9]

> **FN9.** Despite the absence of any factual allegations, the plaintiff indicates in her form complaint that the defendant's discriminatory conduct commenced in February 1998. (Compl. at 3). To the extent that the defendant wishes to clarify whether any of the plaintiff's claims arise from acts occurring prior to April 22, 1998, it can do so through the use of interrogatories or deposition. *See Burch v. Beth Israel Medical Center,* No. 02 Civ. 3798, 2003 WL 253177, at *6 (S.D.N.Y. Feb. 5, 2003).

With respect to her hostile work environment claim, the plaintiff alleges that she was the victim of "telephone harassment" during her first work assignment, which lasted from November 13, 1995 to January 5, 1997. Under *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 118 (2002), a plaintiff asserting a hostile work environment claim need only file a timely EEOC charge with respect to any one act that forms a part of the claim. As a consequence, the entire period of the claim, including acts falling outside the filing period, may be considered for purposes of determining liability. *Id.* at 117. Here, the plaintiff alleges numerous acts of harassment that occurred after April 22, 1998, and as to these acts, her EEOC charge was timely. Accordingly, the allegations of "telephone harassment" occurring prior to April 22, 1998 should be considered as part of her hostile work environment claim.

C. *Suable Entities*

Finally, the defendant contends that the Complaint should be dismissed because it names as a defendant only the New York City Department of Probation, which is not a suable entity. New York City Charter § 396 states that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency." This provision precludes employment discrimination actions brought against city agencies. *See, e.g., Manessis v. New York City Department of Transportation,* No. 02 Civ. 359, 2003 WL 289969, at *1 n. 2 (S.D.N.Y., Feb. 10, 2003) (ADA action); *Weiss v. The City of New York,* 96 Civ. 8281, 2001 U.S. Dist. LEXIS 15404, at *19 (S.D.N.Y. May 7, 2001) (same); *but see Robinson v. City of New York,* No. 00 Civ. 0426, 2002 WL 188353, at *2 (S.D.N.Y. Feb. 6, 2002) (police department can be sued in its role as employer in Title VII action). In consideration of the plaintiff's *pro se* status, the Complaint should be deemed amended to name the City of New York as the sole defendant. *Manessis,* 2003 WL 289969, at *1 n. 2.
*Conclusion*

**\*7** For the reasons set forth above, I recommend that the defendant's motion to dismiss be denied and that the Complaint be deemed amended to name the City of New York as the sole defendant. Pursuant to 28 U .S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.
S.D.N.Y.,2003.

Thompson v. New York City Dept. of Probation
Not Reported in F.Supp.2d, 2003 WL 22953165 (S.D.N.Y.), 27 NDLR P 106
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 5464467 (E.D.Cal.)

(Cite as: 2012 WL 5464467 (E.D.Cal.))

Only the Westlaw citation is currently available.

United States District Court,

E.D. California.
Amanda U. AJULUCHUKU, Plaintiff,
v.
MACY'S, Defendant.
No. 2:12–cv–1855 GEB DAD PS.

Nov. 7, 2012.

Amanda U. Ajuluchuku, Beverly Hills, CA, pro se.

*FINDINGS AND RECOMMENDATIONS*

DALE A. DROZD, United States Magistrate Judge.

**\*1** Plaintiff Amanda Ajuluchuku is proceeding in this action pro se. This matter was referred to the undersigned in accordance with Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1). Plaintiff has requested leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915.

Plaintiff's in forma pauperis application makes the showing required by 28 U.S.C. § 1915(a)(1). However, a determination that a plaintiff qualifies financially for in forma pauperis status does not complete the inquiry required by the statute. " 'A district court may deny leave to proceed in forma pauperis at the outset if it appears from the face of the proposed complaint that the action is frivolous or without merit.' " *Minetti v. Port of Seattle,* 152 F.3d 1113, 1115 (9th Cir.1998) (quoting *Tripati v. First Nat. Bank & Trust,* 821 F.2d 1368, 1370 (9th Cir.1987)). *See also Smart v. Heinze,* 347 F.2d 114, 116 (9th Cir.1965) ("It is the duty of the District Court to examine any application for leave to proceed in forma pauperis to determine whether the proposed proceeding has merit and if it appears that the proceeding is without merit, the court is bound to deny a motion seeking leave to proceed in forma pauperis."). Moreover, the court must dismiss an in forma pauperis case at any time if the allegation of poverty is found to be untrue or if it is determined that the action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks

monetary relief against an immune defendant. *See* 28 U.S.C. § 1915(e)(2). A complaint is legally frivolous when it lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Franklin v. Murphy,* 745 F.2d 1221, 1227–28 (9th Cir.1984). Under this standard, a court must dismiss a complaint as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. *Neitzke,* 490 U.S. at 327; 28 U.S.C. § 1915(e).

To state a claim on which relief may be granted, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering whether a complaint states a cognizable claim, the court accepts as true the material allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Hosp. Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989). Pro se pleadings are held to a less stringent standard than those drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, the court need not accept as true conclusory allegations, unreasonable inferences, or unwarranted deductions of fact. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

The minimum requirements for a civil complaint in federal court are as follows:

**\*2** A pleading which sets forth a claim for relief ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ..., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

Fed.R.Civ.P. 8(a).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5464467 (E.D.Cal.)

(Cite as: 2012 WL 5464467 (E.D.Cal.))

Here, plaintiff's amended complaint does not contain a short and plain statement of plaintiff's claim showing that she is entitled to relief. In this regard, the amended complaint merely alleges in conclusory fashion that plaintiff has been discriminated against based upon her race, skin color and disability. (Am.Compl.(Doc. No. 4) at 2.)

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a) (1). Though the amended complaint identifies plaintiff's race, skin color and disability, it does not allege any facts explaining how defendant discriminated against plaintiff based thereon.

Although the Federal Rules of Civil Procedure adopt a flexible pleading policy, a complaint must give the defendant fair notice of the plaintiff's claims and must allege facts that state the elements of each claim plainly and succinctly. Fed.R.Civ.P. 8(a)(2); Jones v. Community Redev. Agency, 733 F.2d 646, 649 (9th Cir.1984). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancements.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 557). A plaintiff must allege with at least some degree of particularity overt acts which the defendants engaged in that support the plaintiff's claims. Jones, 733 F.2d at 649.

Moreover, the amended complaint does not allege that defendant Macy's employed plaintiff and, in fact, from its allegations it would appear that defendant did not do so. Title VII protects only employment relationships: "The operative term for purposes here is 'employment.' That is, the clause presumes the existence of an employer-employee relationship ... in contrast to, for example, an independent contracting relationship." Bender v. Suburban Hosp. ., Inc., 159 F.3d 186, 189 (4th Cir.1998). There must be some interference with an employment relationship, as opposed to an independent

contractual relationship, for Title VII protections to apply. Mitchell v. Frank R. Howard Mem. Hosp., 853 F.2d 762, 767 (9th Cir.1988). Here, plaintiff's amended complaint alleges simply that defendant's salespeople refused to give plaintiff a gift set she believed she was entitled to after she purchased more than $24 worth of Elizabeth Arden's Red Door perfume. (Am.Compl.(Doc. No. 4) at 2.)

**3** Finally, to the extent plaintiff purports to state a claim under the Americans with Disabilities Act ("ADA") plaintiff in her amended complaint fails to allege that she is disabled as defined by the ADA. The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Plaintiff's amended complaint does not allege facts establishing any of those elements. Nor does the amended complaint allege what provision of the ADA plaintiff purports to sue under or any valid basis for an ADA claim since plaintiff does not allege any connection between her purported disability (recurring deafness and dizziness) and the conduct that she alleges occurred at defendant's store.

Thus, plaintiff's amended complaint fails to state a claim on which relief may be granted. The court has carefully considered whether plaintiff may amend her complaint to state a claim upon which relief can be granted. "Valid reasons for denying leave to amend include undue delay, bad faith, prejudice, and futility." California Architectural Bldg. Prod. v. Franciscan Ceramics, 818 F.2d 1466, 1472 (9th Cir.1988). See also Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1293 (9th Cir.1983) (holding that while leave to amend shall be freely given, the court does not have to allow futile amendments). In light of the obvious deficiencies noted above, the court finds that it would be futile to grant plaintiff leave to amend.[FN1]

FN1. "Moreover, the court notes that this complaint appears to be one of several hundred frivolous complaints that plaintiff has filed all over the country. Ajuluchuku v. Apple, Inc., No. 2:12–cv–2494–GEB–EFB–PS, 2012 WL 5035944, at *3–4 (E.D.Cal. Oct.17, 2012).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5464467 (E.D.Cal.)

(Cite as: 2012 WL 5464467 (E.D.Cal.))

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's July 13, 2012 application to proceed in forma pauperis (Doc. No. 2) be denied;

2. Plaintiff's September 24, 2012 amended complaint (Doc. No. 4) be dismissed without leave to amend; and

3. This action be closed.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with these findings and recommendations, plaintiff may file written objections with the court. A document containing objections should be titled "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may, under certain circumstances, waive the right to appeal the District Court's order. *See Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

E.D.Cal.,2012.

Ajuluchuku v. Macy's
Slip Copy, 2012 WL 5464467 (E.D.Cal.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Derrick ANDERSON, Plaintiff,
v.
Ms. CONNELL, Superintendent, Oneida Correctional
Facility; P. Naughton, Deputy of Security, Oneida
Correctional Facility; B. Sharpstene, Correction Officer,
Oneida Correctional Facility; D.S. Hull, Correctional
Officer, Oneida Correctional Facility; and Sgt. Frey,
Sergeant, Oneida Correctional Facility, Defendants.
No. 08–CV–176 (DNH/DRH).

Aug. 3, 2009.
Derrick Anderson, Buffalo, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**REPORT–RECOMMENDATION AND ORDER**FN1

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

*1 Plaintiff pro se Derrick Anderson ("Anderson"),
formerly an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging that
while he was incarcerated, the five defendants, all DOCS
employees, violated his constitutional rights under the
First, Fourth, and Fourteenth Amendments. Am. Compl.
(Docket No. 29). Presently pending is defendants' motion
to dismiss the amended complaint pursuant to
Fed.R.Civ.P. 12(b)(6). Docket No. 31. Anderson opposes
the motion. Docket No. 34. For the following reasons, it

is recommended that defendants' motion be granted in part
and denied in part.

**I. Background**

The facts are related herein in the light most favorable
to Anderson as the nonmoving party. *See* subsection II(A)
*infra.*

On November 11, 2007, while incarcerated at Oneida
Correctional Facility ("Oneida"), Anderson was approached
by defendant Frey, a sergeant, and agreed to resolve a
grievance in return for Frey's promise to that his officers
would cease "harassing [Anderson, verbally abusing
[Anderson], ... tampering with [Anderson's] mail [and]
food, and writing [Anderson] falsified misbehavior
reports." Am. Compl. ¶ 1. Shortly after Frey left the cell,
defendants Sharpstene and Hull, corrections officers,
searched Anderson's cell for twenty-five minutes. *Id.* ¶¶
2–3. Sharpstene and Hull left without indicating that they
had found any contraband but returned an hour later with
a contraband receipt noting that an "unauthorized
organization" letter had been found in Anderson's cell. *Id.*
¶ 3. Despite the alleged violation of DOCS rules,
Anderson was not charged with any violation. *Id.* ¶ 4.
However, Anderson was charged with disciplinary
violations in two other misbehavior reports from the
officers which were unrelated to the cell search or
contraband. *Id.*

As a result of the misbehavior reports, Anderson
underwent a disciplinary hearing over which defendant
Naughton, Deputy of Security, presided. Am. Compl. ¶ 5.
During the hearing, Naughton interrupted Anderson,
refused to require Frey to answer Anderson's questions,
scolded Anderson for being loud, cursed at Anderson, and
threatened to impose a Special Housing Unit ("SHU")FN2
penalty. *Id.* ¶ 7. Additionally, while the hearing was
pending, Naughton was also investigating complaints by
Anderson regarding Frey, Sharpstene, and Hull. *Id.* ¶ 5.
Anderson was found guilty of the charges by Naughton
and was sentenced to 120 days in SHU. *Id.* This action
followed.

> FN2. SHUs exist in all maximum and certain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))

medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

## II. Discussion

In his amended complaint, Anderson alleges that defendants violated his First Amendment rights by filing false misbehavior reports against him in retaliation for grievances Anderson had previously filed. Additionally, liberally construing the amended complaint, Anderson contends that the cell search conducted by Sharpstene and Hull and authorized by Frey violated his Fourth Amendment rights. Lastly, Anderson contends that Naughton's actions violated Anderson's due process rights. Defendants contend that Anderson has failed to allege defendant Connell's involvement and that Anderson's claims lack merit.

### A. Legal Standard

**\*2** Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, a complaint containing conclusory allegations without factual support fails to meet even the liberal standard of Rule 12(b)(6). *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of N.Y.,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).[FN3]

> FN3. Here, evidence outside the amended complaint has been submitted by defendants but not considered. Defendants claim that these papers are so necessary to Anderson's amended complaint that they may properly be considered by the Court on the present motion without converting the motion to one for summary judgment. *See Int'l Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995). However, while the documents may be relevant to Anderson's claims, they are not necessary and mere relevance is insufficient to permit a document to be considered on a motion to dismiss. Moreover, Anderson is entitled to explore the authenticity of the documents in discovery and to discovery and submit other relevant documents if he so chooses. Accordingly, the documents submitted by defendants on this motion have not been considered.

### B. Personal Involvement

Defendants contend that Anderson has failed sufficiently to allege that Connell was personally involved in any of the alleged constitutional deprivations.

" '[P]ersonal involvement of defendants in alleged

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))

constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

**\*3** (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

Connell, Superintendent of the DOCS Office of the Inspector General, has been named as a defendant here due to her supervisory capacity. Am. Compl. ¶ 5; Docket No. 34 at 15–16. However, a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright,* 21 F.3d at 501. Thus, Connell cannot be held liable solely because she held a supervisory position over other corrections officials.

Anderson's internal complaint was delegated to Connell for investigation. However, receiving a complaint is insufficient to establish personal involvement. *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not

personally liable for ignoring plaintiff's letter of protest and request for an investigation). Moreover, Anderson does not allege that Connell was personally involved in the investigation into his complaints but merely that due to the DOCS Inmate Grievance Program, Connell should have known of Anderson's complaints. Docket No. 34 at 15. This presumed knowledge, without more, is also insufficient to establish personal involvement as there exists no allegation that Connell took any action. *See Bodie,* 342 F.Supp.2d 193, 203 (S . D.N.Y.2004) (citations omitted) (finding personal involvement where a supervisory official received, reviewed, and responded to a prisoner's complaint). Moreover, there exists no allegation that Connell created an unconstitutional policy or custom or was grossly negligent in supervising.

Accordingly, defendants' motion on this ground should be granted and Connell dismissed from the action.

### C. Retaliation

Anderson contends that Sharpstene and Hull filed false misbehavior reports in retaliation for the grievances filed by Anderson. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*4** Here, Anderson has sufficiently alleged facts to support a retaliation claim. First, construing the facts alleged in the light most favorable to Anderson, he was engaged in filing grievances, an activity protected by the First Amendment. Second, viewing the facts in the light

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))

most favorable to Anderson, Sharpstene and Hull have no other reason to file the two disciplinary reports except to retaliate. Sharpstene and Hull found a contraband letter in Anderson's cell, which constituted a disciplinary infraction but failed to charge Anderson with this violation. Am. Compl. ¶ 3. Other disciplinary charges were brought directly after the cell search yielding the contraband letter and shortly after Anderson negotiated a mutual cease-and-desist with Frey. These circumstances. if proven, could support a finding that the disciplinary charges were brought to retaliate in violation of Anderson's First Amendment rights.

Accordingly, defendants' motion on this ground should be denied.

### D. Fourth Amendment

The Fourth Amendment protects an individual's right "to be secure in [his or her] persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. CONST. amend. IV. Searches and seizures may be conducted if there exists probable cause to believe that a crime has been committed and that evidence of that crime is present on the person or premises to be searched. *Id.* However, the Fourth Amendment is inapplicable to the unwarranted search of an inmate's prison cell, as inmates have no reasonable expectation of privacy in such a place. *See Hudson v. Palmer,* 468 U.S. 517, 526 (1984) ("hold[ing] that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell ..." and thus the Fourth Amendment does not apply to cell searches); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.") (citations omitted). However, "[s]uch an unwarranted search could become a constitutional violation ... only if it was conducted in retaliation for Plaintiff's exercise of a First Amendment right." *Brown v. Goord,* No. 04–CV–785, 2007 WL 607396, at *14 (N.D.N.Y. Feb. 20, 2007).

Thus, because prisoners do not have a legitimate expectation of privacy in their prison cells, a cognizable claim exists here only if Anderson has alleged facts sufficient to support a retaliation claim. As discussed *supra,* at this stage in the case, viewing the facts alleged in the light most favorable to Anderson, he has proffered

facts sufficient to state a retaliation claim. Accordingly, defendants' motion on this ground should be denied.

### E. Fourteenth Amendment

#### 1. Due Process

Anderson contends that defendants violated their due process rights by filing, convicting, and sentencing him on false misbehavior reports and having a biased hearing officer.

**\*5** As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Defendants assert that because Anderson received a disciplinary hearing, any defects in the issuance of disciplinary reports are nullified. However, while Anderson possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," Anderson is still entitled "not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted in its decision in this case, an inmate's allegation that he has been found guilty of false disciplinary charges may

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))

support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections....")..

Prisoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

**\*6** Reading the complaint in the light most favorable to Anderson, he alleges that Naughton was biased during the hearing because of a conflict created by his participation in an investigation of the complaining corrections officers at the request of the inmate who was the subject of the hearing. In the context of prison disciplinary hearings, however, such circumstances fail to demonstrate bias cognizable under the Due Process Clause. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009 (Suddaby, J.) (holding that no claim was stated where the hearing officer both conducted the inmate's disciplinary hearing and the inmate's grievance against the complaining corrections officer). Thus, no due process violation can be stated on this ground.

Additionally, Anderson states that he was unable to question a witness at the hearing as Naughton instructed him not to answer Anderson's questions. Viewing the facts in the light most favorable to Anderson, this inability to elicit exculpatory information suffices to survive a motion to dismiss. *See Brewer v. Kamas,* 533 F.Supp.2d 318, 330 (W.D.N.Y.2008) (holding that an inmate has stated a claim where he or she "is unfairly denied the right to rebut the charges by presenting evidence or calling witnesses in

defense of the charges") (citations omitted). Hearing officers "may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted); see also *Richardson,* 833 F.Supp. at 152. However, Frey issued the disciplinary charge and directed Sharpstene and Hull to search Anderson's cell. These allegations raise questions of fact whether the testimony precluded from Frey was irrelevant or unnecessary.

At this stage, then, Anderson has alleged which facts which, if proven, could establish a violation of his right to due process. Thus, defendants' motion on this ground should be denied.

### 2. False Misbehavior Reports

Anderson alleges that defendants issued false misbehavior reports in violation of his constitutional rights. As discussed *supra,* an inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman,* 808 F.2d at 951. "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. Accordingly, while Anderson's retaliation claim based on allegedly false misbehavior reports survives this motion for the reasons discussed *supra,* his claim of a violation of his right to due process based simply on those allegedly false reports cannot. Defendants' motion on this ground should be granted.

### III. Conclusion

**\*7** For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Docket No. 31) be:

1. **GRANTED** as to defendant Connell and the amended complaint be **DISMISSED** as to her;

2. **GRANTED** as to Anderson's due process claim based on (a) a biased hearing officer and (b) false misbehavior reports; and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)

(Cite as: 2009 WL 3165541 (N.D.N.Y.))

2, **DENIED** in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### DECISION and ORDER

DAVID N. HURD, District Judge.

Plaintiff, Derrick Anderson, brought this civil rights action in February 2008, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated August 3, 2009, the Honorable David R. Homer, United States Magistrate Judge, recommended that defendants' motion to dismiss (Docket No. 31) be granted as to Connell and the amended complaint be dismissed as to her; granted as to Anderson's due process claim based on (a) a biased hearing officer and (b) false misbehavior reports and denied in all other respects. No objections to the Report–Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Homer, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. The defendants' motion to dismiss is GRANTED as to defendant Ms. Connell;

2. The amended complaint is DISMISSED as to defendant Ms. Connell;

3. The defendants' motion to dismiss is GRANTED as to the due process claim based on (a) a biased hearing officer, and (b) false misbehavior reports;

4. The defendants' motion to dismiss is DENIED in all other respects; and

5. A conference has been scheduled for November 30, 2009, at 12:30 p.m. at the United States Courthouse in Utica, New York, to issue a trial date.

IT IS SO ORDERED.

N.D.N.Y.,2009.

Anderson v. Connell
Not Reported in F.Supp.2d, 2009 WL 3165541 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
SJB, a minor, Siem John BERKHOUT and Catherine
Berkhout as the Parents and Natural Guardians of SJB,
Plaintiffs,
v.
THE NEW YORK CITY DEPARTMENT OF
EDUCATION, Defendant.
No. 03 Civ. 6653(NRB).

July 14, 2004.
MEMORANDUM and ORDER

BUCHWALD, J.

**\*1** Plaintiffs SJB, a minor, and Siem John Berkhout
and Catherine Berkhout as the parents and natural
guardians of SJB ("plaintiffs" or "SJB") initiated this
action against defendant New York City Department of
Education ("defendant" or "DOE") claiming that the DOE
violated SJB's rights under the Individuals with
Disabilities Education Act, the Rehabilitation Act, and the
Americans with Disabilities Act by failing to deliver the
home-based educational services to which he was entitled.
The plaintiffs seek damages for violations of these rights
under 42 U.S.C. § 1983, the Rehabilitation Act, and the
Americans with Disabilities Act. Defendant has moved to
dismiss plaintiffs' Complaint pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction and
pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a
claim for which relief can be granted. For the reasons that
follow, defendant's motion to dismiss is denied in part and
granted in part.

### BACKGROUND

For purposes of this motion, the following facts,
drawn from the plaintiffs' complaint unless otherwise
noted, are taken as true, and all inferences are drawn in the
plaintiffs' favor. *See Burnett v. Carothers,* 192 F.3d 52, 56
(2d Cir.1999).

SJB was identified as having autistic traits and
significant developmental delays in the spring of 1997
when he was two years old .FN1 He first obtained special
education services through the New York State
Department of Health's Early Intervention Program during
the 1997-1998 school year at the William O'Connor
School in Brooklyn, New York. In June 1998, SJB's
parents met with DOE representatives to discuss a
proposed Individualized Education Program ("IEP") for
SJB for the 1998-1999 school year. Believing that SJB
needed more home-based services than the DOE
recommended, his parents sought an appeal of the IEP in
an impartial hearing pursuant to the Individuals with
Disabilities Education Act ("IDEA").FN2 In September
1998, hearing officer Michael Lazan ordered the DOE to
place SJB in a day program for developmentally disabled
children and to provide him with significant home-based
services, including twenty hours per week of Applied
Behavioral Analysis therapy, ninety minutes per week of
occupational therapy, and seven hours per week of speech
therapy for the 1998-1999 school year. Notwithstanding
the hearing officer's decision, the DOE failed to provide a
substantial portion of the ordered home-based services.

> FN1. The parties do not dispute that SJB is a
> child with a disability within the meaning of the
> IDEA.

> FN2. *See* 20 U.S.C. § 1415(f)(1)(granting
> parents the right to seek an impartial due process
> hearing). The IDEA, generally, is codified at 20
> U.S.C. § 1400, et seq.

Because of the DOE's failure to provide required
services during the 1998-1999 school year, SJB's parents
requested an impartial hearing to ensure compliance for
the 1999-2000 school year. *See* Pl.'s Compl., Ex. B., part
1 at 2-3. Another impartial hearing was held in August
1999 in front of hearing officer Denise Washington. At the
hearing, the DOE admitted that it had not provided a
substantial portion of the home-based services required for
the 1998-1999 school year. Hearing officer Washington
ordered the DOE to provide supplemental services to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

make up for the previous year's deficiencies, continued to require home-based services, and ordered SJB's placement in a center-based program. *See id.* at 3. Both parties raised questions about the hearing officer's decision, and the hearing was re-opened in October 1999. *See* Pl.'s Compl., Ex. B., part 2 at 2. The DOE reported that it was unable to find an appropriate day program placement for SJB, and in a decision issued on November 24, 1999, hearing officer Washington created an interim services plan increasing SJB's level of home-based services and ordered the DOE to continue searching for a center-based program for him. The DOE and SJB's parents were unable to agree on a center-based program for him, and in February 2000 hearing officer Washington ordered that SJB's IEP be modified to reflect the terms of the interim services plan and ordered the DOE to issue Related Service Authorization letters to permit SJB's parents to contract directly with providers for SJB's services. Despite the successive hearings, plaintiffs allege that SJB did not receive a significant portion of the home-based services to which he was entitled during the 1999-2000 school year.

**\*2** In July 2000 SJB's parents located the Bancroft NeuroHealth School, a center-based program they believed appropriate for SJB in New York. They requested another impartial hearing, and hearing officer Dora Lassinger ordered the DOE to fund SJB's placement in the Bancroft program and furthered ordered it to provide him with twenty hours per week of home-based special education instruction, seven hours per week of home-based speech therapy, and two hours per week of home-based occupational therapy. Nevertheless, the plaintiffs allege that the DOE failed to provide "virtually all" of the required home-based services during the 2000-2001 school year. As a result of the DOE's failure to provide required services, SJB suffered significant setbacks in his educational and life skills achievement levels, including a deterioration in his ability to speak, a loss of the ability to recognize letters and numbers, and a plateau in his use of new vocabulary under the Picture Exchange Communication System. After the 2000-2001 school year ended, the plaintiffs moved out of New York City because of their frustrations in obtaining services for SJB.

On September 3, 2003, plaintiffs filed the instant complaint seeking damages under § 1983, the Rehabilitation Act, and the Americans with Disabilities Act for the DOE alleged violations of SJB's rights under the IDEA,[FN3] § 504 of the Rehabilitation Act,[FN4] and the Americans with Disabilities Act.[FN5] Specifically, the plaintiffs first claim that the DOE's failure to provide SJB with home-based services to which he was entitled under his IEP amounts to a failure to provide him with a free and appropriate public education as required by the IDEA. Plaintiffs also claim that the DOE discriminated against SJB on the basis of his disability in violation of the Rehabilitation Act and the Americans with Disabilities Act. Plaintiffs seek compensatory and punitive damages, as well as costs and fees,[FN6] from the defendant. The DOE moved to dismiss the complaint.

FN3. 20 U.S.C. § 1400(d)(1)(A)

FN4. 29 U.S.C. § 792

FN5. 42 U.S.C. § 12132

FN6. Plaintiffs seek costs and fees pursuant to 20 U.S.C. § 1415(e) and 42 U.S.C. § 1988.

*DISCUSSION*

I. *Standard of Review for Motion to Dismiss*

To withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(1), the plaintiff need only make a prima facie showing of subject matter jurisdiction. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). Similarly, in assessing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court is obligated to accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993). Defendant's motion is to be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996) (citing *Conley v. Gibson,* 355 U.S. 41, 48 (1957)).

II. *IDEA Exhaustion Requirement*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

**\*3** The IDEA, successor to the Education for all Handicapped Children Act, mandates that states provide every disabled child with a "free appropriate public education" (FAPE). *See* 20 U.S.C. § 1400(c), (d)(1)(A). The IDEA's primary mechanism for achieving this goal is the requirement that educators collaborate with parents to devise IEPs for disabled children. A child's IEP should specify, among other things, what services he or she should receive and the frequency, location, and duration of those services. *See* 20 U.S.C. § 1414(d). If a parent disagrees with the services called for in the child's IEP, he or she has the right to appeal the IEP in a due process hearing. *See* 20 U.S.C. § 1415(f).

The IDEA generally requires plaintiffs with claims related to the education of disabled children that could be brought under the IDEA to exhaust their administrative remedies before bringing suit in federal court, even if their claims also arise under a statute other than the IDEA, *see* 20 U.S.C § 1415(l), and they seek relief unavailable under the IDEA. *See Polera v. Bd. of Educ.,* 288 F.3d 478, 487-88 (2d Cir.2002) ("The fact that [a plaintiff] seeks damages, in addition to relief that is available under the IDEA, does not enable her to sidestep the exhaustion requirement of the IDEA."). Failure to exhaust deprives the court of subject matter jurisdiction. *Id.* at 490. The Second Circuit Court of Appeals has, however, recognized a "futility exception" to the IDEA's exhaustion requirement. Under the futility exception, the exhaustion requirement does not apply "in situations in which exhaustion would be futile because administrative procedures do not provide adequate remedies." *Heldman v. Sobol,* 962 F.2d 148, 158 (2d Cir.1992). The defendant argues that the plaintiffs did not exhaust the administrative remedies available to them and that it would not have been futile for them to do so.

Specifically, the defendant asserts that SJB could have received adequate relief administratively had he appealed to a state review officer or requested another impartial hearing following the DOE's alleged failure to provide services ordered by a hearing officer for the 2000-2001 school year. Under the IDEA, the states establish the administrative processes that must be exhausted before suit can be brought in federal court. *See* 20 U.S.C. § 1415(a). Ordinarily, exhaustion of administrative remedies in New York would include

appeal of an impartial hearing officer's (IHO) decision to a state review officer (SRO). *See* N.Y. Educ. Law § 4404(2); N.Y. Comp.Codes R. & Regs. tit. 8, § 200.5(j). In this case, however, plaintiffs did not need to appeal to a state review officer because they had already received a favorable ruling from an impartial hearing officer. As plaintiffs sought in July 2000, the hearing officer ordered SJB's placement in Bancroft NeuroHealth School and the continued provision of home-based services. In short, there was nothing for plaintiffs to appeal to an SRO, so it would have been futile for them to do so. *See R.B. v. Bd. of Educ.,* 99 F.Supp.2d 411, 415-16 (S.D.N.Y.2000) (deciding that it would have been futile for a plaintiff who received a favorable ruling from IHO to appeal to an SRO).

**\*4** Even if the plaintiffs did not need to appeal to an SRO to exhaust, the defendant argues alternatively that the plaintiffs were required to request another impartial hearing after the DOE failed to provide the home-based services ordered in the August 2000 IHO ruling. In New York, if a school district fails to "effectuate" an IEP, "parents or persons in parental relationship shall notify the board of education of this situation and the board shall appoint an impartial hearing officer to hear the appeal." N.Y. Educ. Law § 4404(1). SJB properly requested an impartial hearing for the 2000-2001 school year that resulted in the August 2000 IHO ruling. The DOE essentially claims that exhaustion of the administrative processes of § 4404 required the plaintiffs to seek yet another hearing to enforce the decision made in the first hearing, even though "[t]he decision of the hearing officer shall be binding upon both parties unless appealed to the state review officer." *Id.* Whether a plaintiff is required to seek an additional impartial hearing when a school district has failed to effectuate a recent decision of an impartial hearing officer has never been directly addressed in this Circuit. Upon considering the goals of the IDEA and the IHO process, this Court is not persuaded that the plaintiffs were required to seek another impartial hearing in order to exhaust his administrative remedies.

The language of § 4404(1) itself does not require the plaintiffs to seek a second impartial hearing to enforce the results of a first hearing, and defendants do not cite to any case law indicating that exhaustion requires repeated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

impartial hearings. Moreover, the limited authority in this Circuit has not required plaintiffs to go through a second impartial hearing before filing a complaint in federal court. *See, e.g., R.B.,* 99 F.Supp.2d at 415-16 (permitting a plaintiff who received a favorable ruling from an IHO to seek relief in federal court without appealing to an SRO or another IHO); *See also D.D. v. New York City Bd. of Educ.,* No. 03 Civ. 2489(DGT), 2004 WL 633222 at *21 (E.D.N.Y. March 30, 2004) (finding that the defendant's failure to immediately implement orders given by IHOs for two of the three named plaintiffs was one reason, along with the plaintiffs' request for class-wide certification, for finding that exhaustion of administrative remedies would have been futile).

Further, the defendant argues, somewhat ironically, that the IDEA's purpose of bringing "immediate educational benefit" to disabled students is best served by requiring plaintiffs to seek a second impartial hearing to enforce an earlier favorable decision. According to the defendant, impartial hearings can bring swifter benefit to a child than drawn-out proceedings in federal court, and it is to the benefit of both district and child for the parties to work together to "get it right."

Although the DOE's assertion has theoretical merit, a hearing's efficacy depends on the binding IHO decision being adhered to by the parties. It is disingenuous for the DOE to argue that the only remedy SJB can seek in response to the DOE's failure to give effect to a "binding" IHO order is to seek a second "binding" order from an IHO.[FN7] Limiting the actions plaintiffs might take to force implementation of an IHO's decision can only reduce the urgency school districts would attribute to the implementation of an IHO's decision and thereby lessen the credibility of the IHO process. To uphold the IDEA's purpose of providing educational services to disabled children, parents must be able to choose litigation if they believe that is necessary to effectively enforce orders given by IHOs.

FN7. Indeed, if the DOE did not believe that the IHO's order was practicable, it could have appealed the ruling to an SRO pursuant to § 4404(2). Had the DOE exercised its administrative remedies in the manner required

by statute, this dispute might have been resolved administratively.

**\*5** Furthermore, as the Second Circuit has stated, the primary reason for an exhaustion requirement is to utilize the expertise of administrators. *See Polera,* 288 F.3d 478, 487 ("The IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply administrator's expertise in the area and promptly resolve grievances."); *Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 791 (2d Cir.2002) ("exhaustion generally may be advantageous because it 'facilitates the compilation of a fully developed record by a factfinder versed in the educational needs of disabled children' ") (*quoting Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 61 (1st Cir.2001). In this case, the hearing officer's expertise had already produced a binding plan for the education of SJB. All that remained was for the defendant to implement it. Where the hearing officer's expertise and factfinding skills have already been embodied in a ruling, nothing is gained by forcing the hearing officer to act as the enforcer of her own decision. At this stage the IHO's expertise plays no role; the enforcement of the IHO's decision can be done by a court without sacrificing the benefits of the administrative process.

Even if the defendant's argument that a second hearing is sometimes required to exhaust was accepted, we would nevertheless find that a second hearing in this instance would have been futile. As the Second Circuit made clear in *Polera,* where an IEP-related claim is based on a district's failure to implement services already spelled out in an IEP, exhaustion is excused. *See Polera,* 288 F.3d at 489; *Heldman,* 962 F.2d at 158 n. 11 ("[T]here are certain situations in which it is not appropriate to require the exhaustion of [IDEA] administrative remedies before filing a civil lawsuit. These include complaints that ... an agency has failed to provide services specified in the child's individualized educational program [IEP] ...") (quoting 131 Cong. Rec. 21392-93 (1985)). The facts that kept Polera from successfully framing her complaint as an implementation claim are in the plaintiffs' favor here. In *Polera,* the Circuit found that the defendant's failure to provide services was "much more than a failure of implementation." *Polera,* 288 F.3d at 489. Polera's IEPs

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

"failed to spell out the services [to be] provided." *Id.* Although Polera's IEPs included "long lists of abstract goals," they were "virtually silent as to what materials or services the school should provide." *Id.* In contrast, the IHO's order in this case specified what services should have been provided to SJB and for how long. We are not left to speculate about what should have been provided to SJB. Rather, the DOE is alleged to have failed to implement services that were specified in the decision.[FN8]

> FN8. The defendant cites *Polera* for the proposition that "the futility exception does not apply in cases where the administrative process, if invoked, 'could have provided appropriate and expeditious relief.' ' This is an incorrect interpretation of that case. While the Second Circuit did find that the administrative process could have provided Polera appropriate relief, the court did not indicate at any time that the futility exception could not be invoked in cases of implementation even if the administrative process could have provided some remedy. While the defendant does suggest that a related service authorization letter would be available administratively and would be an adequate remedy, such a line of reasoning would keep the plaintiffs out of federal court for as long as the defendant can conceive of yet another remedy that could be offered in the next impartial hearing. Such an interpretation would make the implementation exception to the exhaustion requirement meaningless. It also assumes that repeated IHO hearings are an adequate tool for forcing the DOE to implement required services, an assumption that the facts alleged in this case do not support.

Viewing the plaintiffs' allegations in a favorable light, as we must, the Court finds that SJB has alleged a failure by the DOE to implement an IHO ruling. Further, because (a) this case presents no questions requiring the further application of administrative expertise; (b) the plaintiffs have followed the administrative process codified in New York statutes; and (c) the IDEA's purpose of ensuring services to disabled students depends on the prompt and effective implementation of IHO orders, the Court finds

that there was no requirement that the plaintiffs further pursue the administrative process and/or that it would have been futile for plaintiffs to seek additional administrative remedies. Accordingly, the defendant's motion to dismiss for lack of subject matter jurisdiction fails.

### III. *Statute of Limitations*

**\*6** The defendant also moves to dismiss any claims SJB may have from the 1998-1999 and 1999-2000 school years as time-barred. The parties agree that the relevant statute is New York state's three-year statute of limitations for personal injury actions. Generally, a plaintiff's claim begins accruing at the time he knows or has reason to know of the injuries that form the basis of the claim, *see Morse v. University of Vermont, 973 F.2d 122, 125 (2d Cir.1992),* and this rule has been held to apply to claims made pursuant to the IDEA. *See M.D. v. Southington Bd. of Educ., 334 F.3d 217, 221 (2d Cir.2003).* As the plaintiffs filed this action on September 3, 2003, all claims accruing prior to September 3, 2000 would ordinarily be barred. These would include SJB's claims for both the defendant's failure to provide him with a FAPE and the defendant's alleged discrimination on the basis of SJB's handicap during the 1998-1999 and 1999-2000 school years.[FN9]

> FN9. The defendant does not assert that SJB's claims for the 2000-2001 school year are time-barred.

The plaintiffs, however, argue that none of their claims are time-barred because the DOE's failure to provide services in all three of SJB's years in New York City public schools constitutes one continuous violation of federal law that lasted through 2001. Plaintiffs analogize to a "hostile work environment" claim in the federal employment law context. *See, e.g., Cornwell v. Robinson, 23 F.3d 694 (2d Cir.1994).* Under *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002),* "the incidents constituting a hostile work environment are part of one unlawful employment practice," and therefore, "[a defendant] may be liable for all acts that are part of [a] single claim," provided that one act within the claim is timely. According to the plaintiffs, using this approach, the DOE's alleged failure to provide required services to SJB for all three years was one continuous violation, and SJB's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

claims for the 1998-1999 and 1999-2000 school years are not time-barred.

The defendant maintains that SJB's claims for the 1998-1999 and 1999-2000 school years are time-barred because the continuing violation doctrine does not apply to violations of federal educational rights under the IDEA. Moreover, the defendant rejects the plaintiffs' assertion that their suit is analogous to an employment law action seeking damages for a hostile work environment. Rather, the defendant contends this suit is closer to an action alleging that an employer committed discrete discriminatory acts.

Few courts have considered the propriety of applying continuing violation doctrine to claims for the infringement of federal educational rights. In *Jeffery Y. v. St. Marys Area Sch. Dist.,* 967 F.Supp. 852, 855-56 (W.D.Pa.1997), the court noted that it could not find a prior example of a federal court discussing the application of continuing violation doctrine to an IDEA suit. Relying on Third Circuit precedent holding that the continuing violation doctrine applies to most federal causes of action, it applied the doctrine in the IDEA context. *See Jeffery Y., 967 F.Supp. at 855.*

**\*7** Similarly, in *Hammond v. District of Columbia,* No. 99-1723(GK), 2001 WL 34360429, at \*4-6 (D.D.C.2001), the D.C. district court held that application of the continuing violation doctrine to IDEA claims is appropriate when parents could not have known at the time of a school district's acts that those acts violated their child's rights. *See Hammond,* at \*4-5. The court further stated that application of the continuing violation doctrine to the plaintiff's claims would prevent parents from rushing into court and would "foster cooperation and non-adversarial resolution of special education disputes." *Id.* at \*5.

Most recently, in *Vandenberg v. Appleton Area Sch. Dist.,* 252 F.Supp.2d 786, 789-793 (E.D.Wis.2003), the court declined to apply a continuing violation approach to an IDEA claim. The court based its decision in part on its view that application of the continuing violation doctrine to IDEA claims would not advance the IDEA's policy of "foster[ing] expeditious review and amelioration of

handicapped students' learning conditions." *Id.* at 788.

This Court is not persuaded that the continuing violation doctrine should be applied in the context of this case. While there may appear to be some inconsistency in the cases, one constant and recurring theme emerges: the concern of the IDEA is the prompt provision of necessary services as determined by knowledgeable professionals to disabled children. Thus, as the Second Circuit held in *Polera,* when it both rejected the availability of damages under the IDEA and insisted on close adherence to the requirement of administrative exhaustion:

The purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy-as contrasted with reimbursement of expenses-is fundamentally inconsistent with this goal. The availability of damages also would undercut the IDEA's carefully structured procedure for administrative remedies, a mechanism that encourages parents to seek relief at the time that a deficiency occurs and that allows the educational system to bring its expertise to bear in correcting its own mistakes.

*Polera,* 288 F.3d at 486.

Similarly, in *M.D.,* the Second Circuit's conclusion that it was not inequitable to retroactively apply Connecticut's two-year limitations period, noted:

[The limitations period] requires parents to provide school districts with sufficiently prompt notice of their concerns so that the school district has an adequate opportunity to fashion remedial measures to help the child, but it is long enough to provide parents with an opportunity to protect the rights of their children to a free and appropriate public education through litigation.

*M.D.,* 334 F.3d at 223; *See also Adler v. Educ. Dep't,* 760 F.2d 454, 460 (2d Cir.1985) (" 'I cannot emphasize enough that delay in resolving matters regarding the education program of a handicapped child is extremely detrimental to his development. The interruption or lack of the required special education and related services can result in a substantial setback to the child's development. Thus, in view of the urgent need for prompt resolution of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)

(Cite as: 2004 WL 1586500 (S.D.N.Y.))

questions involving the education of handicapped children it is expected that all hearings and reviews conducted pursuant to these provisions will be commenced and disposed of as quickly as practicable consistent with fair consideration of the issues involved." ') (quoting 121 Cong. Rec. 37,416 (1975) (remarks of Sen. Williams)).

**8** Moreover, even if we assumed that the continuing violation doctrine applied to claims brought pursuant to the IDEA, we would nevertheless find that SJB's claims are more properly classified as "discrete acts" than as "hostile environment" claims. Hostile environment claims differ from suits for discrete discriminatory acts in that "their very nature involves repeated conduct." *Morgan,* 536 U.S. at 115. "[I]n direct contrast to discrete acts, a single act of harassment may not be actionable on its own. [Hostile environment] claims are based on the cumulative effect of individual acts." *Id.* (internal citation omitted). The defendant's alleged failures to implement different IEPs from different years were each discrete, actionable offenses. The plaintiffs' claims are not based on the accumulation over several years of the DOE's failure to implement services; rather, the plaintiffs have separate claims for each IEP that the DOE failed to implement after receiving orders from an IHO.

Accordingly, we find that SJB's claims for the 1998-1999 and 1999-2000 school year are not timely and must be dismissed. In reaching this conclusion we by no means intend to suggest that SJB's parents have been anything less than diligent and devoted to their child's needs. However, for the reasons stated and consistent with our duty to apply the law as we discern it, we are constrained to dismiss these claims.

IV. *Punitive Damages*

Defendant also asserts that the plaintiffs' punitive damages claims must be dismissed. Punitive damages for private claims are not available under either the Rehabilitation Act or the Americans with Disabilities Act. *Barnes v. Gorman,* 536 U.S. 181, 189 (2002). Punitive damages are also generally unavailable under section 1983 claims against municipalities. *Ciarolo v. City of New York,* 216 F.3d 236, 240 (2d Cir.2000). Therefore, SJB's punitive damage claims are dismissed.

*CONCLUSION*

For the reasons stated above, the defendant's motion to dismiss for lack of subject matter jurisdiction is denied. The defendant's motion to dismiss plaintiffs' claims for the 1998-1999 and 1999-2000 school years as time-barred is granted, and the defendant's motion to dismiss plaintiffs' punitive damages claims is granted.

The parties are directed to appear for a pre-trial conference on August 3, 2004, at 3:30 p.m. in Courtroom 21A, 500 Pearl Street.

IT IS SO ORDERED.

S.D.N.Y.,2004.

SJB ex rel. Berkhout v. New York City Dept. of Educ. Not Reported in F.Supp.2d, 2004 WL 1586500 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Susan KENT as President of the New York State Public
Employees Federation, AFL–CIO, New York State
Public Employees Federation, AFL–CIO, and Karen
Danish, James Carr, Robert H. Harms, Jr., Kenneth R.
Hunter, Mary Reid, Calvin Thayer, and Raymond
Ferraro on Behalf of Themselves and All Others
Similarly Situated, Plaintiffs,
v.
The State of NEW YORK, Andrew M. Cuomo, as
Governor of the State of New York, New York State
Civil Service Department, Patricia A. Hite, in her
official capacity as Acting Commissioner, New York
State Civil Service Department, New York State Civil
Service Commission, Caroline W. Ahl and J. Dennis
Hanrahan, in their official capacities as Commissioners
of the New York State Civil Service Commission,
Robert L. Megna, in his official capacity as Director of
the New York State Division of the Budget, and Thomas
P. DiNapoli, in his official capacity as Comptroller of
the State of New York, and New York State And Local
Retirement System, New York State Governor's Office
of Employee Relations, and Gary Johnson, in his official
capacity as Executive Director of the Governor's Office
of Employee Relations, Defendants.
No. 1:11–CV–1533 (MAD/CRH).

Dec. 4, 2012.
New York State Public Employees, Federation, AFL–CIO,
Rita J. Verga, Esq., of Counsel, Albany, NY, for Plaintiffs.

Public Employees Federation, AFL–CIO, Office of
General Counsel, John F. Kershko, Esq., Lisa M. King,
Esq., of Counsel, Albany, NY, Eric T. Schneiderman,
Attorney General of the State of New York, Charles J.
Quackenbush, Esq., Asst. Attorney General, of Counsel,
Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.
### INTRODUCTION
**\*1** Plaintiffs commenced the within action alleging
that defendants unilaterally increased the percentage of
contributions that plaintiffs, retired employees, are
required to pay for health insurance benefits in retirement
and thereby violated the Contracts Clause and Due
Process Clause of the United States Constitution and state
law and impaired plaintiffs' contractual rights under the
terms of their Collective Bargaining Agreement, and
violated state law. Plaintiffs seek injunctive relief,
declaratory judgments and monetary damages. Presently
before the Court is defendants' motion to dismiss plaintiffs'
complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).
(Dkt. No. 11). Plaintiffs have opposed the motion.[FN1] (Dkt.
No. 16).

> FN1. On December 29, 2011, Chief United
> States District Judge Gary L. Sharpe issued an
> Order pursuant to General Order # 12 of the
> United States District Court for the Northern
> District of New York. The within action was
> deemed "related" to nine other actions filed in
> this Court. (Dkt. No. 4). Defendants filed the
> same motion to dismiss in each action. Each set
> of plaintiffs filed separate briefs in opposition to
> the motion. While the matters involve the same
> defendants and overlapping claims, the Court
> finds that they are sufficiently distinguishable in
> terms of the class of plaintiffs and facts to
> warrant separate Memorandum–Decisions and
> Orders.

### BACKGROUND[FN2]

> FN2. The background information is taken from
> the complaint and is presumed true for the
> purposes of this motion only. This does not
> constitute a factual finding by the Court.

The New York State Public Employees Federation,
AFL–CIO ("PEF") is the collective bargaining

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

representative on behalf of New York State employees serving in positions in the Professional, Scientific and Technical Services Unit ("PS & T Unit") of the State government, many of whom are enrolled in and receive health benefits through the statewide New York State Health Insurance Program ("NYSHIP"). Plaintiff Susan Kent is President of PEF and brings this action on behalf of retired employees who were within the PS & T Unit at the time of their retirement, many of who receive benefits through NYSHIP. Plaintiffs Karen Danish, James Carr, Robert H. Harms, Jr., Kenneth R. Hunter, Mary Reid, Calvin Thayer and Raymond Ferraro are former State employees and former members of PEF now retired and enrolled in and receiving either individual or dependent coverage health benefits through NYSHIP. During the relevant time, defendant Patricia Hite ("Hite") was Acting Commissioner of the Civil Service Department and Acting President of the Civil Service Commission. Defendants Caroline W. Ahl ("Ahl") and J. Dennis Hanrahan ("Hanrahan") were members of the Civil Service Commission. Defendant Robert Megna ("Megna") was the Director of the New York State Division of the Budget. Defendant Thomas P. DiNapoli ("DiNapoli") was the Comptroller of the State of New York responsible for the administration of the New York State and Local Retirement System. The New York State and Local Retirement System is responsible for making monthly pension payments to eligible retired State employees less any deductions for the payment of retiree health insurance. Defendant Gary Johnson ("Johnson") was the Executive Director of the Governor's Office of Employee Relations.

Article XI of the New York State Civil Service Law ("CSL") provides for a statewide health insurance plan for eligible State employees and retired State employees known as NYSHIP or "Empire Plan." New York Civil Service Law § 167(1) assigns the State contribution rate towards the cost of health insurance premium or subscription charges for the coverage of State employees and retired State employees enrolled in NYSHIP. Prior to 1983, the State was required to pay the full cost of premium or subscription charges for the coverage of State employees and retired State employees enrolled in NYSHIP. Chapter 14 of the Laws of 1983 amended Civil Service Law § 167(1)(a) to limit the amount that the State was required to pay towards the cost of premium or subscription charges for the coverage of State employees and retired State employees enrolled in NYSHIP, by providing that the State was required to contribute only ninety percent (90 %) of the cost of such premium or subscription charges for the coverage of State employees and retired State employees retiring on or after January 1, 1983. The State would continue to contribute seventy-five percent (75 %) for dependent coverage for State employees and retired State employees.

**\*2** The Governor's Program Bill Memorandum regarding the 1983 amendment provided that "[t]he State and the employee organizations representing State workers have agreed to a reduction of the State's contribution for the premium or subscription charges for employees enrolled in the statewide health insurance plan."

The Division of the Budget's Report on Bills also acknowledged that "[t]his measure provides the necessary authorization to implement negotiated agreements between the State and the employee organizations representing State employees. This action is appropriate in view of the 'good faith' efforts of the State and the employee organizations to reach agreement on this critical issue."

Between 1983 and 2011, Civil Service Law § 167(8) provided, *inter alia,*

[n]otwithstanding any inconsistent provision of law, where and to the extent that an agreement between the state and an employee organization entered into pursuant to article fourteen of this chapter so provides, the state cost of premium or subscription charges for eligible employees covered by such agreement may be increased pursuant to the terms of such agreement.

As a result of negotiations, PEF and the State of New York executed Collective Bargaining Agreements ("CBAs") effective April 1, 1982 through March 31, 2011. Article 9 of the 2007–2011 CBA is entitled "Health Insurance." [FN3] Section 9.1 of the CBA provides that "[t]he State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on April 1, 2007 with the State health insurance carriers unless specifically modified or replaced pursuant to this agreement." Cplt. at ¶ 66.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

FN3. The CBA is not part of the record herein.

Article Section 9.2(h) of the 2007–2011 PEF CBA provides that [t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of development coverage including drug coverage provided under the Empire Plan. *Id.* at ¶ 67.

Article 9.13(a) of the 2007–2011 PEF CBA provides that "[e]mployees on the payroll and covered by the State Health Insurance Program have the right to retain health insurance coverage after retirement, upon the completion of ten years of State service." *Id.* at ¶ 68.

The same, or substantially similar, contract rights are contained in and consistently maintained throughout the prior (from 1982 through 2007) collectively negotiated agreements.FN4

FN4. These agreements are not part of the record herein.

On August 17, 2011, the legislature passed Chapter 491 of the Laws of 2011 (Chapter 491). Chapter 491 amended § 167(8) and replaced the word "increased" with the word "modified." The amendment further provided as follows:

The president [of the Civil Service Commission], with the approval of the director of the budget, may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision.

On September 21, 2011, defendant Hite requested defendant Megna's approval to extend the modified contribution rates to PEF retirees. On September 22, 2011, defendant Megna approved the extension of modified contribution rates. On October 1, 2011, defendants implemented new reduced State contribution rates, which resulted in a two percent (2 %) reduction in the State contribution rates for Individual coverage, from ninety percent (90 %) to eighty-eight percent (88%), and

Dependent Coverage, from seventy-five percent (75 %) to seventy-three percent (73%), for enrolled State retirees, including PEF retirees, who retired on or after January 1, 1983.

**\*3** Defendants approved and filed emergency regulations to implement the reduction in State contribution rates effective October 1, 2011, and a further reduction in State contribution rates for employees retiring from State service on or after January 1, 2012, including PEF employees. These reductions will result in a six percent (6 %) reduction in the State contribution rates for individual coverage from ninety percent (90 %) to eight-four percent (84 %) and dependent coverage from seventy-five percent (75 %) to sixty-nine percent (69 %) for those retirees retiring from a title Salary Grade 10 or above, from a position equated to Salary Grade 10 or above, or for those who retire from a position which is not allocated or equated to a Salary Grade, based upon the wages or salary paid as compared to the salary schedule set forth in the CSEA Agreement.

On December 28, 2011, plaintiffs filed a complaint (Dkt. No. 1) asserting causes of action for impairment of contract, violation of due process, violation of civil rights pursuant to 42 U.S.C. § 1983 and breach of contract. Plaintiffs also claim that Civil Service Law § 167(8) is unconstitutional as applied and assert that defendants Hite and Megna lacked authority under § 167(8) to approve and implement the reduction in State contribution rates. Plaintiffs seek judgment pursuant to Article 78 of the New York Civil Practice Laws and Rules. Plaintiffs commenced this action against the individual defendants in their official capacities only.

### DISCUSSION

**Standard on a Motion to Dismiss under 12(b)(1)**

In contemplating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Court must "accept as true all material factual allegations in the complaint[.]" *Atl. Mut. Ins. Co. v. Balfour MacLaine Int' Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). The court may consider evidence outside the pleadings, *e.g.,* affidavit(s), documents or otherwise competent evidence. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *Antares Aircraft v. Fed. Rep. of Nigeria,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

948 F.2d 90, 96 (2d Cir.1991). "The standards for considering a motion to dismiss under Rules 12(b)(1) and 12(b)(6) are substantively identical." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir.2003).

Defendants move for dismissal pursuant to Fed.R.Civ.P. 12(b) (1) arguing that the Eleventh Amendment precludes the Court from obtaining subject matter jurisdiction over the following claims: (1) all of plaintiffs' claims against the State of New York and its agencies; (2) plaintiffs' claims against defendants in their official capacities; and (3) plaintiffs' Article 78 cause of action. Defendants also allege that the principals of the *Younger* doctrine require abstention in this matter.

**I. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." State Emp. Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 95 (2d Cir.2007) (citing U.S. Const. amend. XI). The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 90–100 (1984); see also Huminski v. Corsones, 386 F.3d 116, 133 (2d Cir.2004) (citation omitted). Although the plaintiff generally bears the burden of proving subject matter jurisdiction, the entity claiming Eleventh Amendment immunity bears the burden to prove such. See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237 (2d Cir.2006).

*4 Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." Rizzo v. Goode, 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute. See Will v. Mich. Dep't. of State Police, 491 U.S. 58, 71 (1989).

**A. Federal Claims against State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System and New York State Governor's Office of Employee Relations**

Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies. When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining lawsuits against them "regardless of the nature of the relief sought." Pennhurst, 465 U.S. at 100. In this case, the State has neither waived its immunity, nor has Congress exercised its power to override Eleventh Amendment immunity. Accordingly, plaintiffs' claims against the State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System, and New York State Governor's Office of Employee Relations are dismissed. See McGinty v. New York, 251 F.3d 84, 100 (2d Cir.2001) (dismissing the claims against the Retirement System for lack of subject matter jurisdiction based upon the Eleventh Amendment).

**B. Federal Claims Against State Officials in their Official Capacity**

Plaintiffs also assert claims against defendants Cuomo, Hite, Ahl, Hanrahan, Megna, DiNapoli and Johnson in their official capacities. Eleventh Amendment immunity extends to state officials sued in their official capacities for retrospective relief. See Kentucky v. Graham, 473 U.S. 159, 166 (1985). Actions for damages against a state official in his or her official capacity are essentially actions against the state, and will be barred by the Eleventh Amendment unless: (1) Congress has abrogated immunity, (2) the state has consented to suit, or (3) the *Ex parte Young* doctrine applies. See Will, 491 U.S. at 71. In this matter, the issues presented before this Court involve the third exception.

In *Ex Parte Young,* 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. This doctrine provides "a limited exception to the general principle of sovereign immunity [that] allows for a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law under the theory

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that such a suit is not one against the State, and therefore not barred by the Eleventh Amendment." *Ford v. Reynolds,* 316 F.3d 351, 354–55 (2d Cir.2003). Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.,* 945 F.2d 25, 32 (2d Cir.1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

**\*5** In *Edelman v. Jordan,* 415 U.S. 651, 653 (1974), the Supreme Court expanded upon *Ex Parte Young* and held that even when a plaintiff's requested relief is styled as an injunction against a state official, if "the action is in essence one for recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." Retroactive relief is that relief "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials" regardless of how the relief is fashioned. *Id.* at 668. "Prospective relief includes injunctive relief that bars a state actor from engaging in certain unconstitutional acts or abates ongoing constitutional violations as well as the 'payment of state funds as a necessary consequence of compliance in the future with a substantive federal question determination' *Id.* The "general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought, namely, would the relief abate an ongoing violation or prevent a threatened future violation of federal law?" *Id.* In *Edelman,* the majority concluded:

It is one thing to tell [a state official] that he must comply with the federal standards for the future if the state is to have the benefit of federal funds in the program he administers. It is quite another thing to order the [state official] to use state funds to make reparation for the past. The latter would appear to us to fall afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having

any force.

*Id.* at 695 (quotation omitted).

In order to determine whether the *Ex parte Young* exception allows plaintiffs' suit against the officials, this Court must first determine whether the complaint alleges an ongoing violation of federal law and second, whether plaintiffs seek relief properly characterized as prospective. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002). "[T]o successfully avoid the Eleventh Amendment bar, a plaintiff must prove that a defendant's violation of federal law is of an ongoing nature as opposed to a case 'in which federal law has been violated at one time or another over a period of time in the past.' " *Papasan v. Allain,* 478 U.S. 265, 277–78 (1986) (quotation omitted). The inquiry for determining whether an "ongoing violation" exists is, "does the enforcement of the law amount to a continuous violation of plaintiffs constitutional rights or a single act that continues to have negative consequences for plaintiffs." *New Jersey Educ. Ass'n v. New Jersey,* No. 11–5024, 2012 WL 715284, at \*4 (D.N.J. Mar. 5, 2012).

Defendants argue that Eleventh Amendment immunity extends to state officials but fail to address the *Ex Parte Young* exception. Here, plaintiffs argue that a "straightforward inquiry" reveals that plaintiffs have alleged a violation of federal law. Plaintiffs allege that defendant officials are engaged in enforcing Chapter 491 of the Laws of 2011, a law that is contrary to federal law because it impairs their rights under Article I, Section 10 of the U.S. Constitution. Plaintiffs also allege that officials are implementing a state statute that violates federal due process. An allegation that state officials are enforcing a law in contravention of controlling federal law is sufficient to allege an ongoing violation of federal law for the purposes of *Ex parte Young*. *See Chester Bross Const. Co. v. Schneider,* No. 12–3159, 2012 WL 3292849, at \*6 (C.D.Ill. Aug. 10, 2012) (citing *Verizon Md., Inc.,* 535 U.S. at 645). Thus, plaintiffs have satisfied the first prong of *Ex Parte Young.*

**\*6** With respect to nature of the relief sought, plaintiffs' "WHEREFORE" clause contains the following requests:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

(a) Declaring that State defendants' actions imposing, implementing and administratively extending reduced State contribution rates for health insurance to plaintiffs, and all others similarly situated are unconstitutional in violation of the Contract Clause of Article I of Section 10 of the United States Constitution, and permanently enjoining State defendants from implementing same;

(b) Declaring Chapter 491 of the Laws of 2011 unconstitutional, as applied under Civil Service Law § 167(8), to the extent that State defendants administratively extended and implemented reduced State contribution rates to retired State employees which impair the contract rights of plaintiffs and all others similarly situated, to continue health benefits;

(c) Declaring that State defendants' actions in imposing, administratively approving, extending and implementing increases in the contribution rates that retired State employees are required to pay for health insurance benefits in retirement are unlawful and unauthorized pursuant to New York Civil Service Law § 167(8), in excess of jurisdiction, and null and void; FN5

> FN5. *Ex Parte Young* does not extend to state-law claims asserted against state officers. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984). Whether this Court maintains subject matter jurisdiction over plaintiffs' state-law claims will be discussed *infra.*

(d) vacating and annulling the State defendants' actions in administratively approving, extending and implementing increases in the contribution rates that retired State employees are required to pay for health insurance benefits in retirement as unlawful, in excess of jurisdiction, arbitrary, capricious and an abuse of discretion;

(e) enjoining, prohibiting and restraining defendants DiNapoli and the Retirement System from making any deductions from the monthly pension payments of retired State employees, including plaintiffs, and all similarly situated, or passing along any additional costs

or charges as a result of the reduced State contribution rates implemented by State defendants challenged herein;

(f) directing State defendants to reimburse and make whole plaintiffs, and all similarly situated, for any and all additional payments or deductions to pension payments, made as a result of the reduced State contribution rates implemented by State defendants challenged herein;

(g) awarding plaintiffs' reasonable attorneys' fees costs and disbursements of this action.

*See* Cplt. (Dkt. No. 1). The Court will address each request for relief in turn.

**1. Monetary Relief**

Plaintiffs claim that the Eleventh Amendment does not bar ancillary monetary relief. While not cited by plaintiffs herein, plaintiffs in the related actions cite to *Milliken v. Bradley,* 433 U.S. 267 (1977) as support for their claims for monetary damages. In the *Milliken* case, the district court ordered implementation of student assignment plans and educational components in the areas of reading, in-service teacher training, testing and counseling to effectuate desegregation. The Supreme Court discussed the "prospective-compliance" exception which permits federal courts to enjoin state officials to conform their conduct to the requirements of federal law notwithstanding a direct and substantial impact on the state treasury. *Id.* at 289. In *Milliken,* there was no money award in favor of the respondent or any member of his class. The Court explained that the case "simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability." *Id.* Instead, the decree required state officials to eliminate a segregated school system. *Id.* The Court reasoned that

**\*7** [t]hese programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in *Edelman.* Rather, by the nature of the antecedent violation, which on this record caused significant deficiencies in communications skills—reading and speaking—the victims of Detroit's *de jure* segregated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

system will continue to experience the effects of segregation until such future time as the remedial programs can help dissipate the continuing effects of past misconduct. Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained teachers. That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates prospectively to bring about the delayed benefits of a unitary school system. We therefore hold that such prospective relief is not barred by the Eleventh Amendment.

*Id.* at 290.

The facts and relief sought in *Milliken* are clearly distinguishable from those at hand and thus, the Court is not persuaded that the holding supports plaintiffs' claims herein. To the extent plaintiffs seek monetary relief against defendants acting in their official capacity as agents of the State, such claims are barred by the Eleventh Amendment. *See Fulton v. Goord,* 591 F.3d 37, 45 (2d Cir.2009) (holding that "in a suit against state officials in their official capacities, monetary relief (unlike prospective injunctive relief) is generally barred by the Eleventh Amendment") (citation omitted).

**2. Injunctive Relief**

Plaintiffs also seek an order permanently enjoining defendants from implementing the reduced State contribution rates, arguing that the continued effectuation of Chapter 491 will have an impact upon plaintiffs/retirees who are receiving only a portion of their former income. As discussed *supra,* defendants did not address *Ex Parte Young* or the inapplicability/applicability of the doctrine herein. Defendants do not claim that plaintiffs seek improper injunctive relief that is retrospective or designed to compensate for a past violation of federal law. Moreover, defendants did not present any argument regarding the impact such an injunction would have on the state treasury. To the extent that plaintiffs seek prospective injunctive relief against defendants, plaintiffs have sufficiently alleged such claims and thus, based upon the purview of *Ex Parte Young,* dismissal is not warranted. *Finch v. New York State Office of Children & Family Serv.,* 499 F.Supp.2d 521, 538 (S.D.N.Y.2007) (citation

omitted).

**3. Declaratory Judgment**

Declaratory judgments form part of the injunctive relief allowed for under *Ex Parte Young. See Tigrett v. Cooper,* No. 10–2724, 2012 WL 691892, at *6 (W.D.Tenn. Mar. 2, 2012). However, declaratory relief is not permitted under *Ex Parte Young* when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective. *Id.; Green v. Mansour,* 474 U.S. 64, 74 (1985) (holding that the Eleventh Amendment bars retrospective declaratory relief against state officials); *New Jersey Educ. Ass'n,* 2012 WL 715284, at *5 (holding that a request for a declaratory judgment holding that portions of a statute are unconstitutional is "nothing more than an indirect way of forcing the State to abide by its obligations as they existed before the enactment of the Act and therefore, essentially a request for specific performance" and, thus, not permitted).

**8** In this matter, to the extent plaintiffs seek declaratory relief regarding the State defendants' past conduct, such claims must be dismissed because the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *Finch,* 499 F.Supp.2d at 538 (citing *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993)); *see also Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 847–48 (9th Cir.2002) (noting that retrospective declaratory relief would declare that the State Defendants committed constitutional violations in the past; prospective relief would declare that likely future actions are unconstitutional).

However, plaintiffs' request for an order declaring Chapter 491 of the Laws of 2011 unconstitutional is prospective. *See Verizon Md.,* 535 U.S. at 645 ("The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our 'straightforward inquiry' "). As to this request, to the extent that plaintiffs seek prospective declaratory relief, that relief is not barred by the Eleventh Amendment.

To summarize, the Eleventh Amendment deprives this Court of jurisdiction over all of plaintiffs' claims against

Page 8

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

the State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System, New York State Governor's Office of Employee Relations, and plaintiffs' claims for monetary damages against defendants in their official capacities. Jurisdiction remains over plaintiffs' claims for prospective injunctive and declaratory relief and against defendants Cuomo, Hite, Ahl, Hanrahan, Megna, DiNapoli and Johnson in their official capacities.

**C. New York State Law Contractual Impairment Claims Against Defendants in their Official Capacities**

Defendants also move for dismissal of plaintiffs' state law contractual impairment claim asserted against defendants in their official capacity. The jurisdiction of a federal court to entertain supplemental state law claims under 28 U.S.C. § 1367 does not override Eleventh Amendment immunity. "Supplemental jurisdiction under 28 U.S.C. § 1367(a) does not constitute a congressional abrogation of the Eleventh Amendment granting district courts the power to adjudicate pendent state law claims." *Nunez v. Cuomo*, No. 11–CV–3457, 2012 WL 3241260, at *20 (E.D.N.Y. Aug. 7, 2012) (citations omitted). The Eleventh Amendment bars suits in federal courts seeking relief, whether prospective or retroactive, against state officials for their alleged violations of state law. *See Pennhurst*, 465 U.S. 89, 106. The *Ex parte Young* doctrine is inapplicable where the officials are alleged to have violated state law. *Local 851 of Int'l Bhd. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F.Supp.2d 237, 247 (E.D.N.Y.2000) (citing *Pennhurst*, 465 U.S. at 104–06). However, the Eleventh Amendment does not bar a suit when an official has allegedly acted entirely outside her state-delegated authority in a manner that violates federal law. *See Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 696–697 (1982); *Pennhurst*, 465 U.S. at 101, n.11. In *Treasure Salvors, Inc.*, the Supreme Court held as follows:

**\*9** [A]ction of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) that is beyond the officer's statutory authority is not action of the sovereign, a suit for specific relief against the officer is not barred by the Eleventh Amendment. This conclusion follows inevitably from Ex parte Young. If conduct of a state officer taken pursuant to an unconstitutional state statute is deemed to

be unauthorized and may be challenged in federal court, conduct undertaken without any authority whatever is also not entitled to Eleventh Amendment immunity.

*Id.* at 696. A state officer acts *ultra vires* when he acts beyond the scope of his statutory authority, or pursuant to authority deemed to be unconstitutional. *Id.*

In this matter, plaintiffs must establish that defendants acted "without any authority whatsoever" under state law. *Sherwin–Williams Co. v. Crotty*, 334 F.Supp.2d 187, 196 (N.D.N.Y.2004). Plaintiffs have pled that the state claims arise out of *ultra vires* acts by defendants Hite and Megna:

Upon information and belief, defendant Hite, in her capacity as "Acting Commissioner" of the Civil Service Department and "Acting President" of the Civil Service Commission, has not filed an oath of office as Commissioner or President, respectively.

Upon information and belief, defendant Hite, in her capacity as "Acting President" of the Civil Service Commission, has not attended or voted at any official meeting of the Civil Service Commission.

As a result of Hite's lack of authority, defendant Megna lacked authority on September 22, 2011, to approve the extension of modified State contribution rates to retired State employees and unrepresented State employees pursuant to Civil Service Law § 167(8).

Defendant Hite lack authority pursuant to Civil Service Law § 167(8) to approve a resolution on September 27, 2011, adopting regulations at 4 NYCRR §§ 73.3(b) and 73.12, to extend modified State contribution rates to retired State employees and unrepresented State employees.

As a result of defendant Hite's lack of authority pursuant to Civil Service Law § 167(8), defendant Civil Service Department lacked authority to file emergency regulations with the New York Secretary of State's office on September 27, 2011, and published in the State Register on October 14, 2011, to extend modified State contribution rates to retired State employees and unrepresented State employees.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

Am. Cplt. at ¶¶ 144–150.

Plaintiffs also allege that "defendants' unilateral and retroactive imposition of reduced State contribution rates for retirees is not based upon an extension of the terms contained in the CSEA Agreement, and is therefore not authorized pursuant to Civil Service Law § 167(8)" and *ultra vires. Id.* at ¶¶ 190, 193. At this stage of the litigation, plaintiffs have sufficiently pled the *ultra vires* exception to the Eleventh Amendment and, thus, defendants' motion to dismiss plaintiffs' state-law claims, on this basis, is denied.

**D. Federal Claims Against Defendants in their Individual Capacities**

**\*10** Plaintiffs have not asserted any claims against defendants Cuomo, Hite, Ahl, Hanrahan, Megna, DiNapoli or Johnson, individually. However, plaintiffs argue that, "should the Court find that the PEF plaintiffs' monetary relief request is not ancillary to the requested injunctive relief, the PEF plaintiffs request to amend their complaint to seek such damages against the defendants in their individual capacities." *See* Dkt. No. 16, at p. 8. The Court construes this argument as a motion for leave to file an amended complaint.

Suits against state officials in their personal capacity are not barred by the Eleventh Amendment, even for actions required by their official duties, *Hafer v. Melo,* 502 U.S. 21, 27–28 (1991) (holding that state officials may be personally liable for actions taken in their official capacity); however, such actions may be subject to dismissal on other grounds. Here, defendants argue that legislative immunity would divest this Court of jurisdiction over any claims against the individual defendants in their individual capacities. However, legislative immunity is a personal defense that may be asserted in the context of a challenge under Rule 12(b)(6) and is not proper for review as a jurisdictional bar under Rule 12(b)(1). *See State Emp., 494 F.3d at 82 n.4.* Accordingly, that portion of defendants' motion, and plaintiffs' request to amend, will be discussed *infra.*

**II. Judgment Pursuant to Article 78 of the New York Civil Practice Laws and Rules**

Defendants move to dismiss plaintiffs' claims under N.Y.C.P.L.R. Article 78, arguing that, to the extent that plaintiffs are challenging official interpretations of CSL § 167(8), defendants' promulgations or regulations, and the propriety of the Civil Service President's appointment, New York State has not empowered the federal courts to entertain these actions. Plaintiffs contend that the Article 78 claims are predicated on the federal constitutional claims and derive from a common nucleus of operative fact. Therefore, plaintiffs argue that this Court has the discretion to exercise pendent jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Section 1367 provides that a court "may decline to exercise supplemental jurisdiction" if there are "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c), (c)(4). "There does not appear to be a consensus in this Circuit as to whether courts may, in their discretion, hear Article 78 claims under the rubric of supplemental jurisdiction." *Minima v. New York City Emp. Retirement Sys.,* No. 11–CV–2191, 2012 WL 4049822, 8 (E.D.N.Y. Aug. 17, 2012) (citing *Clear Wireless L.L.C. v. Bldg. Dep't of Lynbrook,* No. 10–CV–5055, 2012 WL 826749, at \*9 (E.D.N.Y. Mar. 8, 2012) (noting that "it is doubtful ... that claims under Article 78 are even amenable to a district court's supplemental jurisdiction"); *see also Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 346 (S.D.N.Y.2006) (refusing to exercise jurisdiction over the plaintiffs Article 78 cause of action for an order annulling a Department of Health ruling for an error of law, and as arbitrary and capricious). The "overwhelming majority of district courts confronted with the question ... have found that they are without power to do so or have declined to do so." *Clear Wireless,* 2012 WL 826749, at \*9 (quoting *Coastal Commc'ns Serv., Inc. v. City of New York,* 658 F.Supp.2d 425, 459 (E.D.N.Y.2009)); *see also DeJesus v. City of New York,* No. ID Civ. 9400, 2012 WL 569176, at \*4 (S.D.N.Y. Feb. 21, 2012) (holding that Article 78 is a procedure, not a cause of action).

**\*11** However, "[e]ven assuming that a federal district court could properly exercise supplemental jurisdiction over an Article 78 claim, the court has 'discretion under 28 U.S.C. § 1367(c) to determine whether to hear th[ose] claims.'" *Morningside Supermarket Corp.,* 432 F.Supp.2d at 346 (citing *Briarpatch Ltd ., L.P. v. Phoenix Pictures,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

*Inc.,* 373 F.3d 296, 309 (2d Cir.2004)).

In *Morningside,* the court held that

[f]ederal courts in New York agree that "Article 78 proceedings were designed for the state courts, and are best suited to adjudication there." Moreover, "state law does not permit [these] proceedings to be brought in federal court." These are compelling reasons to decline supplemental jurisdiction over Morningside's third cause of action, and there is nothing exceptional about Morningside's claim that would justify deviation from the well-reasoned and essentially unanimous position of New York district courts on this issue.

*Id.* (internal citations omitted).

Here, plaintiffs seek to have this Court "annul" defendants' actions pursuant to Article 78. The caselaw on this issue is decidedly in defendants' favor. While it is true that the federal claims and state-law issues arise out of the same operative set of facts, this Court declines to exercise supplemental jurisdiction over plaintiffs' Article 78 claim because to do so would require this Court to interpret state law before the New York State courts have an opportunity to analyze and resolve the issues. *See Support Ministries For Persons with AIDS, Inc. v. Vill. of Waterford, N.Y.,* 799 F.Supp. 272, 280 (N.D.N.Y.1992) (holding that "there is no reason for th[e] court to embroil itself in a dispute between the State and a local government and to make this novel and potentially extremely significant interpretation of state law"). The Court has reviewed the holding in *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988), a case cited by the plaintiffs in related cases and finds the holding unpersuasive based upon the facts herein. In *Yonkers,* the Second Circuit noted that the case "presented exceptional circumstances" and opted to exercise jurisdiction over the plaintiffs' Article 78 claim . [FN6] The *Yonkers* holding has been cited as the exception, not the rule. *See Coastal Commc'ns,* 658 F.Supp.2d at 459; *see also Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 407 (S.D.N.Y.2004).

FN6. In *Cartegena v. City of New York,* 257 F.Supp.2d 708, 709 (S.D.N.Y.2003), another case cited by the plaintiffs in the related action,

the district court exercised jurisdiction over the Article 78 claims only after the parties withdrew their jurisdictional objections and consented.

Here, plaintiffs have not persuaded this Court that this case presents such extreme facts. Based upon the circumstances presented herein, the Court finds that this specific, state-created civil action should not be brought in federal court. Accordingly, the Court follows the "essentially unanimous position of the New York district Courts" and declines to exercise jurisdiction over plaintiffs' state-law claims brought under Article 78. *See Morningside,* 432 F.Supp.2d at 347.

**III. *Younger* Doctrine**

A federal court's obligation to adjudicate claims within its jurisdiction is "virtually unflagging." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 359 (1989) (holding that "abstention remains the exception, not the rule"). The *Younger* doctrine "espouse[s] the policy that a federal court should not interfere with a pending state judicial proceeding in which important state interests are at stake." *Wisoff v. City of Schenectady,* No. 07–CV–34, 2009 WL 606139, at *6 (N.D.N.Y. Mar. 9, 2009) (citing, *inter alia, Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431–432 (1982)). In the Second Circuit, courts applying *Younger* abstention "must determine (1) whether there is an ongoing state proceeding; (2) whether an important state interest is involved; and (3) whether the federal plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the proceeding." *Univ. Club v. City of New York,* 842 F.2d 37, 40 (2d Cir.1988) (internal citations omitted).

**\*12** Generally, *Younger* is not applied against those not party to the pending state proceedings. *Hindu Temple Soc'y of N. Am. v. Supreme Court of State of New York,* 335 F.Supp.2d 369, 375 (E.D.N.Y.2004). However, the Second Circuit has held that, "[i]n certain circumstances, *Younger* may apply to the claims of third-parties who are not directly involved in any pending state proceeding." *Spargo v. N.Y. State Comm'n on Judicial Conduct,* 351 F.3d 65, 82 (2d Cir.2003). "[A]lthough plaintiffs should not 'automatically be thrown into the same hopper for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

*Younger* purposes,' there may be 'some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them.' " *Hindu Temple,* 335 F.Supp.2d at 375 (quoting, *inter alia, Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928 (1975)). "Courts have consistently recognized while '[c]ongruence of interests is not enough', by itself, to warrant abstention, where the plaintiffs' interests are so inextricably intertwined that 'direct interference with the state court proceeding is inevitable', *Younger* may extend to bar the claims of plaintiffs who are not parties to the pending state proceeding." *Spargo,* 351 F.3d at 82 (holding that two plaintiffs [political supporters of a state judge, the third plaintiff] presented First Amendment challenges with legal claims that were sufficiently intertwined with the judge's state claims in that the case presented one of the narrow circumstances in which *Younger* applies to those not directly involved in the state court action) (citations omitted). While plaintiffs may seek similar relief or present parallel challenges to the constitutionality of a state statute or policy, absent other factors establishing interwoven legal interests, *Younger* will not bar the federal action. *Id.* at 83. "Where courts have applied *Younger* abstention to non-parties, those courts have limited the doctrine's application to instances where the non-parties 'seek to directly interfere with the pending [state] proceeding.' " *Citizens for a Strong Ohio v. Marsh,* 123 Fed. Appx. 630, 635 (6th Cir.2005) (quoting *Spargo,* 351 F.2d at 85).

In a recent decision from the Eastern District, *Donohue v. Mangano,* No. 12–CV–2568, 2012 WL 3561796 (E.D.N.Y. Aug. 20, 2012), the defendants argued that the *Younger* doctrine mandated abstention based upon an action in Supreme Court, Nassau County for injunctive and declaratory relief that was filed by one of the three sets of plaintiffs. The plaintiffs not involved in the state action argued that *Younger* did not extend to their claims because they were not a party to the ongoing state court proceedings. *See id.* at *12. The court held that while it was unlikely that the plaintiffs' interests were inextricably intertwined for the purposes of *Younger,* it declined to definitively rule on that issue. *See id.* Rather, the court held that the relief sought by the plaintiffs in the state court action was remedial rather than coercive. *See id.* at 13. The court, relying upon holdings in other Circuits,

reasoned that a "coercive" action is a state-initiated enforcement action in which the plaintiff does not have a choice to participate and one in which the federal plaintiff is the state court defendant. *See id.* In contrast, a "remedial" proceeding is one in which the plaintiff initiated an option to seek a remedy for the state's wrongful action and to vindicate a wrong inflicted by the state. With that reasoning, the court held that the Nassau County action was "clearly remedial" and not the type of parallel state court proceeding requiring abstention under *Younger. See id.* at *13–*14.

**\*13** Here, as in *Donohue,* defendants' arguments in support of abstention are imprecise. Defendants argue that the Court should abstain from hearing this matter based upon a civil matter currently pending in Albany County but offer no further analysis or argument in favor of *Younger.* In the Albany County action, the petitioner, Retired Public Employees Association ("RPEA"), filed a petition pursuant to Article 78 against defendants herein. The petitioners, retirees from State service prior to October 1, 2011, petitioned for an order declaring the administrative implementation of an increase in the percentage of contributions by State retirees and/or their dependents based upon CSL § 167(8) invalid, null and void. The petitioners are also seeking an order declaring the emergency regulation filed on October 1, 2011 invalid, null and void, and are further seeking injunctive relief and a refund. On February 24, 2012, the respondents filed a motion to dismiss.[FN7] Defendants argue that the RPEA case involves the same claims/issues presented herein and a facial challenge to CSL § 167(8).

> FN7. Based upon the record and this Court's independent research, the motion to dismiss is still pending.

The Court has reviewed the RPEA pleadings annexed to defendants' motion. Defendants do not dispute that plaintiffs herein are not a party in the state proceeding. Therefore, for the *Younger* doctrine to apply herein, defendants must establish that plaintiffs and the RPEA petitioners' interests are "inextricably intertwined." Defendants have failed to demonstrate that plaintiffs' interests are so closely related that abstention is warranted. In the state action, petitioners have not asserted a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

contractual impairment claim based upon a CBA. Defendants have not established that plaintiffs' interests will interfere with the state court proceeding, nor has it been established that plaintiffs have an adequate opportunity for judicial review of their federal claims in the pending state court action. Courts have made clear that the *Younger* doctrine should be applied sparingly and cautiously to federal plaintiffs not parties to an ongoing state action. Accordingly, this Court finds that the parties and their claims are not "so closely related" to require *Younger* abstention.[FN8]

> [FN8.](#) Because the Court finds that defendants have failed to establish the first *Younger* factor, the Court need not discuss the issue of whether the relief sought by the RPEA petitioners is "remedial" or "coercive."

**Standard on a Motion to Dismiss under 12(b)(6)**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case. *Global Network Commc'ns v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006); *Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Robinson v. Town of Kent, N.Y.,* No. 11 Civ. 2875, 2012 WL 3024766, at *3–4 (S.D.N.Y. July 24, 2012) (citing *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007)).

**\*14** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a)(2), with sufficient facts to 'sho[w] that the pleader is entitled to relief[.]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[.]" *Id.* at 570.

**I. Claims Against Officials in their Individual Capacity and Legislative Immunity**

"[L]egislators are absolutely immune from suit in their individual capacities for all actions taken 'in the sphere of legitimate legislative activity.' " *Bogan v. Scott–Harris,* 523 U.S. 44, 54 (1998). Legislative immunity only protects municipal officers from civil liability when they are sued in their personal capacities, and not when sued in their official capacities. *Baines v. Masiello,* 288 F.Supp.2d 376, 383 (W.D.N.Y.2003) (citations omitted). Legislative immunity may bar claims for money damages, injunctions and declaratory relief brought against state and local officials in their personal capacities. *State Emp.,* 494 F.3d at 82 (citation omitted); *Bogan,* 523 U.S. 44, 54 (1998). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Christian v. Town of Riga,* 649 F.Supp.2d 84, 103–104 (W.D.N.Y.2009) (holding that legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity") (quoting *Bogan,* 523 U.S. at 54).

Two factors are relevant to determining whether a

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

defendant's acts are within that sphere: (1) whether the actions were an integral part of the legislative process; and (2) whether the actions were legislative "in substance" and "bore the hallmarks of traditional legislation." *Bogan,* 523 U.S. at 54–56. Such traditional legislation includes "policymaking decisions implicating budgetary priories and services the government provides to it's constituents." *Id.* Legislative immunity applies to acts within the "legislative sphere" even where the conduct, "if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes ." *Doe v. McMillan,* 412 U.S. 306, 312–13 (1973) (quotation omitted).

**\*15** Before defendants in the instant case can invoke legislative immunity, they have the burden of establishing both of the following: (1) that the acts giving rise to the harm alleged in the complaint were undertaken when defendants were acting in their legislative capacities under the functional test set forth in *Bogan;* and (2) that the particular relief sought would enjoin defendants in their legislative capacities, and not in some other capacity in which they would not be entitled to legislative immunity. *State Emp.,* 494 F.3d at 89; *see also Canary v. Osborn,* 211 F.3d 324, 328 (6th Cir.2000) (holding that the burden is on the defendants to establish the existence of absolute legislative immunity).

Here, defendants argue that by issuing the regulations, they were fulfilling discretionary, policymaking functions implicating State budgetary priorities. As discussed *supra,* plaintiffs have not asserted claims against defendants in their individual capacities.

Motions for leave to amend a complaint should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2). A court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, such as the futility of amendment. *See Fahs Const. Group, Inc. v. Gray,* No. 10–CV–0129, 2012 WL 2873532, at *5 (N.D.N.Y. July 12, 2012).

Here, plaintiffs' opposition to defendants' motion is not a formal cross-motion and fails to (1) attach a copy of the proposed amended complaint, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the amended complaint or other equivalent means, in violation of Local Rule 7.1(a)(4). *See id.* (holding that for this reason alone, the court can deny the plaintiffs' request). The absence of a proposed amended complaint precludes this Court from determining whether the proposed amendment would be futile. Plaintiffs' "motion" for permission to file an amended complaint is denied without prejudice to refile. *See Johnson v. Monsanto Chem. Co.,* 129 F.Supp.2d 189, 197 (N.D.N.Y.2001).

Based upon the aforementioned, the Court cannot determine whether legislative immunity would apply to any potential claims against defendants in their individual capacities. This ruling does not prevent defendants from renewing their motion with respect to the applicability of the doctrine of legislative immunity after plaintiffs move to amend and upon the completion of sufficient discovery and development of the record.

## II. Contract Clause

Article I, Section 10 of the Constitution prohibits states from passing any law "impairing the Obligation of Contracts." While the language of the Contracts Clause is absolute on its face, "[i]t does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.' " *Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 367 (2d Cir.2006) (holding that courts must accommodate the Contract Clause with the inherent police power of the state to safeguard the vital interests of its people) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241 (1978). To state a cause of action for violation of the Contract Clause, a complaint must allege sufficient facts demonstrating that a state law has "operated as a substantial impairment of a contractual relationship." *Nunez v. Cuomo,* No. 11–CV–3457, 2012 WL 3241260, at *6 (E.D.N.Y. Aug. 7, 2012) (citing *Harmon v. Markus,* 412 Fed. Appx. 420, 423 (2d Cir.2011)). In this regard, there are three factors that the Court will consider: (1) whether a contractual relationship exists; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial. *Harmon,* 412 Fed. Appx. at 423. A state law that impairs a contractual obligation will not be deemed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

unconstitutional so long as (1) it serves a demonstrated legitimate public purpose, such as remedying a general social or economic problem; and (2) the means chosen to accomplish the public purpose is reasonable and necessary. *See Buffalo Teachers Fed'n, 464 F.3d at 368.*

**A. Existence of a Contractual Relationship In Vested Rights**

**\*16** Defendants argue that no express or implied contract obligates them to provide "optional health insurance with a perpetually fixed contribution rate." Rather, defendants contend that the CBA provided members with guarantees for the duration of the collective bargaining agreement only. Plaintiffs claim that pursuant to express language in each of the PEF CBAs, the State was obligated to pay 90% (individual) and 75% (dependent) for each former PEF member who retired after January 1, 1983 and continued, under express agreement, to pay 100% of the cost of individual coverage for PEF members who retired before January 1, 1983.

"All courts agree that if a document unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced." *Am. Fed'n of Grain Millers, AFL–CIO v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir.1997)* (citing, *inter alia, UAW v. Yard–Man, Inc., 716 F.2d 1476, 1479 (6th Cir.1983)*). "It is a court's task to enforce a clear and complete written agreement according to the plain meaning of its terms, without looking to extrinsic evidence to create ambiguities not present on the face of the document" and a "mere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity." *New York State Court Officers Ass'n v. Hite, 851 F.Supp.2d 575, 579–80 (S.D.N.Y.2012)* (citations omitted). There is a lack of consensus among the Circuits regarding the interpretation of documents that are ambiguous. *Am. Fed'n, 116 F.3d at 980.* Some Circuits have held that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *See Yard-man, Inc., 716 F.2d at 1479.* While the *Yard-man* "inference" was discussed by the Second Circuit in *Am. Fed'n,* the Court did not specifically adopt the holding. Specifically, the Court noted that

[w]hen documents are ambiguous, other circuits have disagreed as to whether at trial, there should be a presumption that retiree benefits are vested or that retiree benefits are not vested. *Compare Yard–Man, 716 F.2d at 1482 (6th Cir.)* (apparently presuming that retiree benefits are vested), *with Bidlack,* 993 F .2d at 608–09 (7th Cir.) (apparently presuming that retiree benefits are not vested). Because we conclude below that there is no need for a trial as the documents at issue in this case could not reasonably be interpreted as promising vested retiree benefits, we need not decide what presumption, if any, would be appropriate at trial.

*Am. Fed'n, 116 F.3d at 980, n.3.*

Moreover, while extrinsic evidence may be used to interpret ambiguous CBAs, it may not be used to alter the meaning of unambiguous terms. *Am. Fed'n, 116 F.3d at 981* (citations omitted). In *Am. Fed'n,* the Second Circuit concluded that, "to reach a trier of fact, an employee does not have to 'point to unambiguous language to support [a] claim. It is enough [to] point to written language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits.)' " *Id.* at 980 (quotation and other citation omitted). "A district court may not base its finding of ambiguity on the absence of language, and the court may only consider oral statements or other extrinsic evidence after it first finds language in the documents that may reasonably be interpreted as creating a promise to vest benefits. *Id.; see also Parillo v. FKI Indus., Inc., 608 F.Supp.2d 264 (D.Conn.2009).* A single sentence in plan documents can suffice to raise a question that requires resolution by a trier of fact. *See Joyce,* 171 F.3d at 134.

**\*17** In this matter, the CBA creates a contractual relationship between plaintiff-retirees and defendants. *See Nunez, 2012 WL 3241260, at \*6.* Plaintiffs allege that, "[t]he 2007–2011 PEF CBA (including, without limitation, Articles 9.1, 9.2(h) and 9.13(a)) combine to establish fixed and vested contract rights in favor of the plaintiffs, vested at the time of retirement, to continue and retain their health insurance coverage at the same fixed contribution rate in effect at the time of their retirement." Am. Cplt. at ¶ 69. Plaintiffs allege that the three aforementioned provisions, discussed *supra* and outlined

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

in the complaint at Paragraphs 66, 67 and 68, must be read together.

At all relevant times herein, prior to the enactment of Chapter 491 of the Laws of 2011, and the actions of the State defendants challenged by the plaintiffs herein, the State contribution rate towards the cost of health insurance premium or subscription charges for the coverage of State employees and retired (PEF/PS & T) State employees, and their dependents, enrolled in NYSHIP or an optional benefit plan thereunder, was: one-hundred percent (100%) for individual coverage for retired State employees who retired before January 1, 1983; ninety percent (90%) for individual coverage for State employees who retired after January 1, 1983; and, seventy-five percent (75%) for dependent coverage for retired State employees.

*Id.* at ¶ 93.

Plaintiffs further allege that,

[b]y their terms, the PEF CBAs and 1982 MOU contractually obligated the State to continue to provide health insurance under NYSHIP to retired PEF members including the continuation of the State contribution rates as agreed and set forth therein, at the same contribution rates in effect at the time of retirement.

The terms of the PEF CBAs concerning the retention of retirement health insurance benefits by PEF retirees, including the continuation of the State contribution rates as agreed therein, had not been modified or replaced by any successor collective bargaining agreement as of October 1, 2011, the date of imposition of the increased premium rates on PEF and other retirees.

*Id.* at ¶¶ 94–95.

Plaintiffs claim that the plain language of the CBA allegedly provides that "[t]he State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on April 1, 2007 with the State health insurance carriers unless specifically modified or replaced pursuant to this agreement." *Id.* at ¶ 66.

Article Section 9.2(h) of the 2007–201 PEF CBA provides as follows "[t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage including drug coverage provided under the Empire Plan." *Id.* at ¶ 67.

Article 9.13(a) of the 2007–2011 PEF CBA provides that "[e]mployees on the payroll and covered by the State Health Insurance Program have the right to retain health insurance coverage after retirement, upon the completion of ten years of State service."

**\*18** The retired employees allege that they are covered by the terms of the CBA that were in effect at the time of their retirement insofar as it provides for the continuation of their health benefits. *Id.* at ¶¶ 76, 107.

Plaintiffs further allege that, "the State's longstanding practice and established course of conduct further establishes the State's contractual obligation to provide for the continuation of health insurance benefits for PS & T Unit retirees, including a continuation of the State contribution rates as provided for by the CBA in effect at the time a PS & T Unit member retires." *Id.* at ¶ 102.

Based upon the aforementioned, the Court finds that plaintiffs' allegations identify written language capable of reasonably being interpreted as creating a promise to provide plaintiffs with a vested interest in perpetually fixed NYSHIP contribution.

Defendants argue that the aforementioned sections of the CBA apply "for the duration of the CBA." However, the record, as it presently exists, does not support that conclusion. Defendant has not cited to any portion of the CBAs with any such limiting language. Indeed, the record does not contain copies of the relevant CBAs. Defendants fail to submit any further argument in support of dismissal on this issue and cite to one case in support of the proposition that history cannot serve to bind the State to promises that it never made. *See Aeneas McDonald Pol. Benevolent Ass'n v. City of Geneva,* 92 N.Y.2d 326, 333 (1998). However, *Aeneas* is readily distinguishable from the facts at hand.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

In *Aeneas,* the labor relationship between the City and the police department had been governed by collective bargaining agreements. However, none of the agreements addressed the issue of health benefits for retirees. This fact alone sets *Aeneas* apart from the instant case. Here, there is a CBA between defendants and plaintiffs that contains specific language addressing health benefits. *See Della Rocco v. City of Schenectady,* 252 A.D.2d 82, 84–85 (3d Dep't 1998) (distinguishing *Aeneas* because the action before the court contained a "continuum of collective bargaining contracts between defendant and plaintiffs, each containing identical clauses which provided for hospitalization and major medical coverage for retired members and their families").

Defendants also argue that plaintiffs do not have a statutorily implied right to a fixed amount toward retiree health insurance. Defendants cite to a recent Southern District decision in *New York State Court Officers Ass'n v. Hite,* 851 F.Supp.2d 575 (S.D.N.Y.2012).[FN9] Plaintiffs failed to respond to this argument and did not address the *NYSCOA* case in their Memorandum of Law. The *NYSCOA* case was before the court on a motion for a preliminary injunction. The relevant language of their CBA provided, "[e]mployees ... shall receive health and prescription drug benefits ... at the same contribution level ... that applies to the majority of represented Executive Branch employees." *Id.* at 577. The court held that "[t]he contract does not guarantee that Union members will receive health benefits at the rates set by Civil Service Law § 167(1)." *Id.* at 579. Rather, "[i]t guarantees that they will receive benefits at the same rates as the majority of executive branch employees." *Id.* The court concluded that based upon the unambiguous terms of the contract, the plaintiffs contracted for the same health benefits as the executive branch employees. *Id.* The plaintiffs cited to *Buffalo Teachers Fed'n* in support of their claims but the court found that the, "clear contractual obligations ... differ materially from the action at issue here." *Id.* at 580. The court also addressed the plaintiffs' argument that section 167(1) itself created contractual rights. The court rejected that argument and reasoned, "defendants correctly note that courts are hesitant to read contractual rights into statutes because to do so would too easily preclude New York State from changing its policies." *Id.* at 582. The court held that "[r]eading section 167 as a contract would

improperly impair the ability of the Legislature to change its policies regarding its employees' health insurance plans." *Id.* Thus, the court held that because the plaintiffs failed to demonstrate a likelihood of success on the merits, the motion for a preliminary injunction was denied. On August 12, 2012, the Second Circuit affirmed the lower court decision. *New York State Court Officers Ass'n v. Hite,* 475 Fed. Appx. 803 (2d Cir.2012). The Second Circuit reviewed the district court's decision to deny a preliminary injunction and affirmed the order for "substantially the same reasons." However, the Court noted that, "[w]e intimate no views on the ultimate merits as maybe developed upon a full trial." *Id.* at 805 n.3.

FN9. After the Southern District Court issued the decision on the motion for a preliminary injunction, the case was transferred to the Northern District of New York. The matter is presently pending herein under Docket No. 12–CV–532.

**\*19** This Court has carefully reviewed the district court's decision in *NYSCOA* and the complaint in that case and finds that the *NYSCOA* case is distinguishable from this action. Factually, the CBA at issue herein contains specific written language that is reasonably interpreted as a promise to vest the benefits. Procedurally, the *NYSCOA* case is presently pending in this Court and contains three causes of action: (1) violation of the Contracts Clause of U.S. Constitution; (2) violation of the Due Process Clause of the Fourteenth Amendment; and (3) a request for a declaratory judgment that Civil Service Law 167 and the implementing regulations are unconstitutional as applied. *See NYSCOA v. Hite,* 12–CV–532, Dkt. No. 1. In the March 2012 decision, the district court did not dismiss any portion of the plaintiffs' complaint. The court only denied the application for a preliminary injunction. All three originally asserted causes of action are still pending. While the March 2012 decision in *NYSCOA v. Hite* is clearly relevant to the issues presented in this lawsuit, the district court's holding on the motion for a preliminary injunction is not controlling on this motion to dismiss. A motion for a preliminary injunction requires a different standard of proof than a motion to dismiss. *See Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs,* No. 07–CV–2243, 2007 WL 4591845,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

at *13 (E.D.N.Y. Dec. 26, 2007). "[U]nlike a preliminary injunction motion, dismissal pursuant to Rule 12(b)(6) is not based on whether Plaintiff is likely to prevail, and all reasonable inferences must be viewed in a light most favorable to Plaintiff." *Id.* "In opposing a motion to dismiss, Plaintiff is not required to prove her case; she must simply establish that the allegations in the Complaint are sufficient to render her claims plausible." *Id.* (citing *Iqbal,* 490 F.3d at 158) (internal citation omitted). Accordingly, defendants' reliance upon the *NYSCOA* holding is misplaced at this stage of the litigation.

In the alternative, plaintiffs argue that should the Court deem the language of the statute ambiguous, extrinsic evidence demonstrates the parties' intent to contract for vested benefits. Such evidence includes the Bill Jacket to Chapter 14 of the Laws of 1983 and past practices and representations by the State. In addition, plaintiffs cite to various holdings from New York State courts and district court decisions in both this Circuit and others where the courts concluded, as a matter of law, that the subject CBA created vested, lifetime rights to unchanged health insurance benefits. At this juncture, the Court will not consider such extrinsic evidence and further, the Court is not compelled to follow the holdings of the cases cited by plaintiffs. Those actions involved motions for summary judgment and thus, a comprehensive analysis of the record and a vastly different standard of proof on both parties. *See Myers,* 244 A.D.2d at 847; *Joyce,* 171 F.3d at 133–34.

**\*20** As discussed *supra,* the Court has found that plaintiffs have satisfied their burden to identify specific written language that is reasonably susceptible to interpretation as a promise to provide a perpetually fixed contribution rate. On a motion to dismiss, that is all that plaintiffs must establish. Consequently, at this stage of the litigation, plaintiffs have adequately pled the existence of a contractual right in perpetually fixed contributions to survive a motion to dismiss. However, the Court cannot make any conclusions as a matter of law with respect to this issue.

**B. Substantial Impairment**

Even assuming plaintiffs possessed a valid contractual

interest in a perpetual NYSHIP contribution rate, defendants argue that they have not substantially impaired plaintiffs' rights. Defendants contend that the NYSHIP program is still in place and thus, defendants are fulfilling their contractual obligations. Moreover, defendants contend that the adjustment to the subsidy rate was a foreseeable variable and within the parties' reasonable expectations.

An impairment of a contract must be "substantial" for it to violate the Contract Clause. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411 (1983). Impairments that affect the terms upon which the parties have reasonably relied or that significantly alter the duties of the party are substantial. *Allied Structural Steel Co.,* 498 U.S. at 245. The primary consideration in determining whether the state law has, in fact, operated as a substantial impairment is the extent to which reasonable expectations under the contract have been disrupted. *Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 993 (2d Cir.1997) ("Impairment is greatest where the challenged government legislation was wholly unexpected"). "[A] law that provides only one side of the bargaining table with the power to modify any term of a contract after it has been negotiated and executed is perhaps the epitome of a substantial impairment." *Donohue, 2012 WL 3561796, at *26* ("This far-reaching power [ ] can arguably be itself a substantial impairment to a contractual relationship") (citing *Baltimore Teachers Union, Am. Fed'n of Teachers Local 340, AFL–CIO v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1016 (4th Cir.1993)).

In this matter, plaintiffs allege that the new reduced contribution rates resulted in an increase in the cost of health insurance in the amount of twenty percent (20%) for individual coverage and eight percent (8%) for dependent coverage. Am Cplt. at ¶ 132. Plaintiffs further allege that the implementation of the reduced rate results in increases to the cost of health insurance for plaintiffs that is "not limited in duration." *Id.* at ¶ 160. Plaintiffs claim that they obtained fixed and vested benefits as compensation for lost job mobility and possible wage increases and that the benefits accrued after the employee had already given up his or her potential to seek a better job or better wages. *Id.* at ¶¶ 114–115.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

**\*21** Defendants argue that CSL § 167(8) reflected "the lawmakers' understanding" that the cost of NYSHIP coverage was subject to adjustment. In support of this assertion, defendants rely upon extraneous documents not incorporated, mentioned or relied upon in the complaint. Thus, the Court will not consider the documents in the context of the within motion. Moreover, even assuming that the Legislature was aware of the possible changes in coverage and costs, defendants have not established, or even alleged, a similar understanding on the part of plaintiffs. To the contrary, Section 9 .1 allegedly provides that coverage shall be paid, "unless specifically modified or replaced pursuant to this Agreement." *Id.* at ¶ 66. To this end, plaintiffs allege that the fixed and vested rights were duly bargained for in exchange for many years of State service. *Id.* at ¶ 110. Further, plaintiffs state that they "reasonably relied upon the expectation that the State would continue to contribute towards their health insurance costs in retirement at the same contribution rates fixed and vested at the time of retirement and that they would be able to retain and continue those retirement health insurance benefits after their retirement as set forth in the CBAs." *Id.* at ¶¶ 111, 161. Further allegations of plaintiffs' expectations are articulated throughout the complaint. Plaintiffs allege that "the State's longstanding practice and established course of conduct further establishes the State's contractual obligation to provide for the continuation of health insurance benefits for PS & T Unit retirees, including the continuation of ... rates in ... as provided for by the CBA in effect at the time of [retirement]." *Id.* at ¶ 101. Moreover, plaintiffs allege that they reasonably expected their retirement benefits to continue, because they were powerless to negotiate for the continuation of their benefits after they retired. *Id.* at ¶ 121. Based upon the allegations in the complaint, language in the CBA and CSL § 167(8), plaintiffs have sufficiently alleged that the impairment was not reasonably expected.

Further, plaintiffs allege that defendants unilaterally altered the terms of the CBA after it had been negotiated and executed. *Id.* at ¶ 104. Plaintiffs contend that, pursuant to the "Taylor Law, terms and conditions of employment cannot be unilaterally changed by the State defendants absent collective bargaining." *Id.* Based upon the record as it currently exists, plaintiffs have pled sufficient facts

supporting a plausible claim that the impairment to their contractual rights was substantial.[FN10]

> **FN10.** Defendants cite to *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFL–CIO v. Town Bd. of the Town of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994) in support of the argument that the law did not prevent the parties from fulfilling their obligations and thus, there was no substantial impairment. The Court has reviewed the holding and finds the facts vastly dissimilar from those at hand. Moreover, *Local 342* was before the Southern District on a motion for a preliminary injunction which, as discussed *supra,* requires a different standard of proof than a motion to dismiss. Thus, at this stage of the litigation, given the factual and procedural differences, the Court is not compelled to abide by the holding in *Local 342.*

**C. Legitimate Public Purpose and Reasonable and Necessary**

When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law. *See Energy Reserves Group,* 459 U.S. at 411–12. A law that substantially impairs contractual relations must be specifically tailored to "meet the societal ill it is supposedly designed to ameliorate." *Allied Structural Steel,* 438 U.S. at 243. The Second Circuit has held, "[a] legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.' " *Buffalo Teachers Fed'n,* 464 F.3d at 368. "Courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest" however, "the purpose may not be simply the financial benefit of the sovereign." *Id.* (citation omitted). Moreover, "[a]lthough economic concerns can give rise to the [ ] use of the police power, such concerns must be related to 'unprecedented emergencies' such as mass foreclosures caused by the Great Depression." *Id.* "That a contract-impairing law has a legitimate public purpose does not mean there is no Contracts Clause violation. The impairment must also be one where the means chosen are reasonable and necessary to meet the stated legitimate public purpose." *Id.* at 369. On a motion to dismiss, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

court is not bound to accept the legislature's justification for the public purpose. *See Nat'l Educ. Ass'n–Rhode Island by Scigulinsky v. Retirement Bd. of Rhode Island Emp. Retirement Sys.,* 890 F.Supp. 1143, 1162 (D.R.I.1995).

**\*22** The "reasonable and necessary" analysis involves a consideration of whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. *Am. Fed'n of State, County & Mun. Emps. v. City of Benton, Arkansas,* 513 F.3d 874, 879–880 (8th Cir.2008) (citing *Energy Reserves Group, Inc.,* 495 U.S. at 412 (1983)). Before analyzing whether an act is reasonable and necessary, the courts must determine the degree of deference afforded to the legislature. Where the state impairs a public contract to which it is a party, the state's self-interest is at stake and, thus, the court will afford less deference to the state's decision to alter its own contractual obligations. *United Auto,* 633 F.3d at 45; *see also Buffalo Teachers Fed'n,* 464 F.3d at 369 (holding that "[w]hen a state's legislation is self-serving and impairs the obligations of its own contracts, courts are less deferential to the state's assessment of reasonableness and necessity"). "The relevant inquiry for the Court is to ensure that states neither 'consider impairing the obligations of [their] own contracts on a par with other policy alternatives' nor 'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well,' nor act unreasonably 'in light of the surrounding circumstances.' " *Donohue,* 2012 WL 3561796, at *30 (citing *U.S. Trust,* 431 U.S. at 30–31). In this matter, the State is a party to the CBA and, thus, the Court will afford less deference to the state's decisions.

"To be reasonable and necessary under less deference scrutiny, it must be shown that the state did not (1) 'consider impairing the ... contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.' " *Buffalo Teachers Fed'n,* 464 F.3d at 371. Some factors to be considered under this inquiry include: "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored

appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *Donohue,* 2012 WL 3561796, at *30 (citing, *inter alia, Energy Reserves Grp.,* 459 U .S. at 410 n.11).

In a case in this district, Senior United States District Judge Lawrence E. Kahn addressed the issue of reasonableness while affording "less deference" to the State's decisions. *Donohue v. Patterson,* 715 F.Supp.2d 306, 322 (N.D.N.Y.2010). The *Donohue* case involved an emergency appropriations bill which enacted unpaid furloughs, a wage freeze, and a benefits freeze on certain groups of state employees in contravention of a number of CBAs. *Id.* at 313. The "extender bill" expressly imposed the altered terms "[n]ot withstanding any other provisions of this section or of any other law, including article fourteen of this chapter, or collective bargaining agreement or other analogous contract or binding arbitration award." *Id.* at 314. The court assumed there was a legitimate public purpose and directed it's attention to the reasonableness issue. Judge Kahn noted that the defendants failed to present any showing of a substantial record of any legislative consideration of policy alternatives to the challenged bill:

**\*23** Defendants do not, and evidently cannot, direct the Court to any legislative consideration of policy alternatives to the challenged terms in the bill; rather, the only support offered by Defendants for their assertion that the contractual impairment was not considered on par with other alternatives is a list of assorted expenditure decisions made by the State over the past two years, such as hiring freezes and delays of school aid. This will not do. That the State has made choices about funding and that a fiscal crisis remains today surely cannot, without much more, be sufficient justification for a drastic impairment of contracts to which the State is a party. Without any showing of a substantial record of considered alternatives the reasonableness and necessity of the challenged provisions are cast in serious doubt.

*Id.* at 322.

Rather, the court noted that defendants relied upon "generalities" and failed to demonstrate that they "did not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

impose a drastic impairment when a more moderate course was available." *Id.* The court addressed the affidavits submitted by the defendants in support of the motion and held as follows:

> While Defendants have identified a fiscal emergency and note that state personnel comprise a significant source of state spending, their argument equates the broad public purpose of addressing the fiscal crisis with retrieving a specific level of savings attributed to the provisions. The two are not the same. Where reasonable alternatives exist for addressing the fiscal needs of the State which do not impair contracts, action taken that does impair such contracts is not an appropriate use of State power. In its submissions to the Court, the State artificially limits the scope of alternatives for addressing the fiscal crisis to retrieving a certain amount of savings from unionized state employees. According to this view, the reasonableness and necessity of the challenged provisions is demonstrated simply because there is a fiscal crisis and Plaintiffs have not identified alternative sources from their own contracts for the same level of funding as that desired by the State. Plaintiffs are not charged with that responsibility. The desired savings need not come from state personnel in the amount identified by the State. Rather, the State must consider both alternatives that do not impair contracts as well as those which might do so, but effect lesser degrees of impairment.

> *Id.* at 323.

Judge Kahn concluded that,

[m]ost importantly, the Court cannot ignore the conspicuous absence of a record showing that options were actually considered and compared, and that the conclusion was then reached that only the enacted provisions would suffice to fulfill a specified public purpose. While the Court would afford significant deference to a legislative judgment on an issue of this type where the State is not a party to the impaired contract, the Court cannot do so here—not only because the state is a contractual party but, far more critically, because actual legislative findings in support of the provision cannot be located; due to the take-it-or-leave

nature of the extender bill, in conjunction with the Senate's contemporaneous and unanimous statement opposing the challenged provisions, there is no adequate basis before the Court on which it may be established that the provisions are reasonable and necessary.

**\*24** *Id.* at 323.

While a fiscal crisis is a legitimate public interest, defendants cannot prevail on a motion to dismiss the complaint with an argument limited to "emphasizing the State's fiscal difficulties." *See Id.* Broad reference to an economic problem simply does not speak to the policy consideration and tailoring that is required to pass scrutiny under plaintiffs' Contracts Clause challenge. *Id.*

At this stage of the litigation, all that is required is that plaintiffs plead a "cognizable claim for a remedy which may be proved at trial." *See Henrietta D. v. Giuliani,* No. 95–CV–0641, 1996 WL 633382, at *12 (E.D.N.Y. Oct. 25, 1996). Plaintiffs allege that while CSL § 167(8) permitted an increase of state contribution rates to employees not subject to a CBA, nothing in Chapter 491 identified a legitimate State purpose to retroactively reduce the State contribution rate for State retirees, or that the same was necessary and reasonable to accomplish such purpose. Am. Cplt. at ¶¶ 125–126. Plaintiffs allege that the defendants' actions were an abuse of police power and unnecessary to achieve legitimate government purposes and that defendants failed to advance any legitimate rationale for the impairments. *Id.* at ¶¶ 165–166. Plaintiffs assert that the only "rationale" or "purpose" was that it was "necessary to implement the negotiated agreement between the State and the CSEA." *Id.* at ¶ 167. To the contrary, plaintiffs contend that the impairment actually defeats the significant public purpose of ensuring adequate and affordable healthcare for retirees. *Id.* at ¶ 169. On a motion to dismiss, the Court must accept these allegations as true. Thus, the Court finds that plaintiffs have pled sufficient facts suggesting that defendants' actions were not reasonable and necessary.

While defendants rely upon the economic emergency, a resolution of the issues surrounding defendants' fiscal crisis and economic situation will involve questions not appropriately resolved on a motion for dismissal. *See Nat'l*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Educ. Ass'n,* 890 F.Supp. at 1164 (holding that a determination of the reasonableness of the defendants' actions based upon the economic crisis involving the Retirement System was premature on a motion to dismiss). Courts have held that, "[r]esolution of ... whether the contract-impairing enactment was 'reasonable and necessary to serve an important public purpose,' ... is not appropriate in the context of a motion to dismiss." *JSS Realty Co., LLC v. Town of Kittery, Maine,* 177 F.Supp.2d 64, 70 (D.Me.2001). Defendants argue that the amendment to CSL § 167 was for a legitimate public purpose based upon the State's economic emergency and fiscal crisis. Even assuming that the Court accepts that explanation as a legitimate purpose, defendants fail to demonstrate that the means chosen were necessary. Defendants do not explain why the language and provisions of Chapter 491 were selected and rather, rely upon the measures that the State refrained from enacting as a means of demonstrating reasonableness including the State's decision not to eliminate the NYSHIP program or rewrite CSL § 167 to prescribe more severe modifications. These assertions are unsupported by the record. Moreover, as Judge Kahn noted, listing the various ways that the State has attempted to "overhaul" the economy, *i.e.,* prison consolidation, mergers of state agencies, and reforms to the juvenile system, without more, is insufficient justification for impairing State contracts. *See Donohue,* 715 F.Supp.2d at 323.

**\*25** To summarize, although defendants may prove otherwise, upon completion of discovery and a motion for summary judgment, at this stage of the litigation, plaintiffs have met their burden and have alleged a plausible cause of action for a violation of the Contracts Clause. However, the parties are cautioned to appreciate the "distinction" between the Rule 12(b)(6) standard and the summary judgment standard. The burden on the non-movant is significantly different on a motion for summary judgment. "Even if the same relevant documents were considered at each stage, general facts [ ... ] receive consideration at summary judgment, but not in the Rule 12(b)(6) analysis." *Werbowsky v. Am. Waste Serv., Inc.,* No. 97–4319, 1998 WL 939882, at \*5 (6th Cir. Dec. 22, 1998) (holding that the Rule 12(b)(6) ruling was not a final judgment, and did not bind the district court at summary judgment). If presented with a motion for summary judgment, plaintiffs

will face the burden of citing to facts in the record and "must go beyond the pleadings and come forth with genuine issues of fact for trial." *See Connection Training Servs. v. City of Philadelphia,* 358 Fed. Appx. 315, 318 (3d Cir.2009).

**II. Due Process**

Initially, the Court is compelled to point out that both defendants and plaintiffs present nebulous arguments with respect to this claim. Plaintiffs simply claim that defendants violated their Fourteenth Amendment rights to be afforded adequate notice and a reasonable opportunity to be heard before being deprived of property to which they were lawfully entitled. Plaintiffs argue that they possessed sufficient collective bargaining and statutorily created contract rights and that defendants abolished the benefit without proper notice to plaintiffs. Defendants argue that plaintiffs do not have a legitimate claim of entitlement to a property interest in insurance cost percentages and, therefore, cannot sustain a claim under Due Process.

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to demonstrate a violation of either substantive or procedural due process rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought. *Puckett v. City of Glen Cove,* 631 F.Supp.2d 226, 236 (E.D.N.Y.2009) (citing *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999)). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 577 (1972) (holding that the plaintiff must have more than a unilateral expectation; the plaintiff must have a legitimate claim of entitlement to the benefit). The Second Circuit has held that, "[i]n order for a person to have a property interest in a benefit such as the right to payment under a contract, [h]e must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFLCIO v. Town Bd. of the Town of Huntington,* 31 F.3d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

1191, 1194 (2d Cir.1994) (citations omitted). "When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Vill. of Valley Stream,* 22 F.3d 26, 30 (2d Cir.1994).

*26 "Courts have determined that in appropriate circumstances, contractual rights arising from collective bargaining agreement give rise to constitutional property right." *Jackson v. Roslyn Bd. of Educ.,* 652 F.Supp.2d 332, 341 (E.D.N.Y.2009) (citing *Ciambriello v. Cty. of Nassau,* 292 F.3d 307, 314 (2d Cir.2002). A "property interest in employment can be created by ordinance or state law." *Winston v. City of New York,* 759 F.2d 242, 247 (2d Cir.1985) (holding that the plaintiffs' benefits were found in the New York State Constitution and vested in the plaintiffs by the terms of a statutory scheme). The Second Circuit has held that,

> [i]n determining whether a given benefits regime creates a property interest protected by the Due Process Clause, we look to the statutes and regulations governing the distribution of benefits. Where those statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome, a property interest will be found to exist.

*Kapps v. Wing,* 404 F.3d 105, 113 (2d Cir.2005) (internal citations and quotation marks omitted). Courts in this circuit have held that statutory framework may create a property interest. *See Kapps,* 404 F.3d at 104; *Basciano v. Herkimer,* 605 F.2d 605 (2d Cir.1978) (holding that city administrative code created a property right in receipt of accident disability retirement benefits, where the code required officials to give benefits to applicants who met specified criteria); *see also Winston,* 759 F.2d at 242; *Sparveri v. Town of Rocky Hill,* 396 F.Supp.2d 214, 218 (D.Conn.2005) (noting that the plaintiff claimed that her entitlement to the level of pension and healthcare benefits was rooted in the statutory pension scheme established by the Town Charter and Plan ordinance).

In the complaint, plaintiffs' Fifth Cause of Action contains allegations relating to due process. Plaintiffs claim that the health insurance benefits provided by the State constitute vested property rights to which they have

a proprietary interest. Am. Cplt. at ¶¶ 103, 106. Plaintiffs claim that they were deprived of their property without adequate notice or an opportunity to be heard. *Id.* at ¶¶ 213–214. While the Court cannot conclude as a matter of law that plaintiffs' possessed a property interest within the meaning of the Fourteenth Amendment, plaintiffs have sufficiently articulated and pled due process violations to survive a motion to dismiss.

## CONCLUSION

**IT IS HEREBY**

**ORDERED** that defendants' motion to dismiss plaintiffs' complaint (Dkt. No. 11) is **GRANTED IN PART AND DENIED IN PART;** it is further

**ORDERED** that defendants' motion to dismiss plaintiffs' complaint as against the State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System and New York State Governor's Office of Employee Relations is **GRANTED.** All claims against these defendants are dismissed; it is further

*27 **ORDERED** that defendants' motion to dismiss plaintiffs' claims for monetary damages asserted against defendants Hite, Ahl, Hanrahan, Megna, DiNapoli, and Johnson in their official capacity is **GRANTED;** it is further

**ORDERED** that defendants' motion to dismiss plaintiffs' claims for injunctive and declaratory relief asserted against defendants Hite, Ahl, Hanrahan, Megna, DiNapoli and Johnson in their official capacity is **GRANTED** only to the extent that such claims seek retrospective relief; it is further

**ORDERED** that defendants' motion to dismiss plaintiffs' Article 78 claims is **GRANTED;** it is further

**ORDERED** that defendants' motion is denied in all other respects.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6024998 (N.D.N.Y.)

(Cite as: 2012 WL 6024998 (N.D.N.Y.))

Kent v. New York
Slip Copy, 2012 WL 6024998 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Danny DONOHUE, as President of the Civil Service
Employees Association, Inc., Local 1000, Afscme,
AFL–CIO, and Civil Service Employees ASsociation,
Inc., Local 1000, Afscme, AFL–CIO, and Milo Barlow,
Thomas Jefferson, Cornelius Kennedy, Judy Richards,
and Henry Wagoner, on behalf of themselves and
certain other REtirees of the State of New York
formerly in the Csea Bargaining Units, Plaintiffs,
v.
The State of NEW YORK, Andrew M. Cuomo, as
Governor of the State of New York, New York STate
Civil Service Department, Patricia A. Hite as Acting
Commissioner, New York State Civil Service
Department, New York State Civil Service Commission,
Caroline W. Ahl and J. Dennis Hanrahan, as
Commissioners of the New York State Civil Service
Commission, Robert L. Megna, as Director of the New
York State Division of the Budget, Thomas P. Dinapoli
as Comptroller of the State of New York, New York
State and Local Retirement System; Jonathan Lippman
as Chief Judge of the New York State Unified Court
System, and the New York State Unified Court System,
Defendants.
No. 1:11–CV–1530 (MAD/CRH).

Dec. 3, 2012.
Civil Service Employees Association, Inc., Daren J.
Rylewicz, Esq ., Paul S. Bamberger, Esq., Steven A.
Crain, Esq., of Counsel, Albany, NY, for Plaintiffs.

Eric T. Schneiderman, Attorney General of the State of
New York, Charles J. Quackenbush, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

## INTRODUCTION

**\*1** Plaintiffs commenced the within action alleging
that defendants unilaterally increased the percentage of
contributions that plaintiffs, retired employees, are
required to pay for health insurance benefits in retirement
and violated the Contracts Clause and Due Process Clause
of the United States Constitution, impaired plaintiffs'
contractual rights under the terms of their Collective
Bargaining Agreement, and violated state law. Plaintiffs
seek injunctive relief, declaratory judgments and monetary
damages. Presently before the Court is defendants' motion
to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P.
12(b)(1) and 12(b)(6). (Dkt. No. 11). Plaintiffs have
opposed the motion.FN1 (Dkt. No. 15).

> FN1. On December 29, 2011, Chief United
> States District Judge Gary L. Sharpe issued an
> Order pursuant to General Order # 12 of the
> United States District Court for the Northern
> District of New York. The within action was
> deemed "related" to nine other actions filed in
> this Court. (Dkt. No. 5). Defendants filed the
> same motion to dismiss in each action. Each set
> of plaintiffs filed separate briefs in opposition to
> the motion. While the matters involve the same
> defendants and overlapping claims, the Court
> finds that they are sufficiently distinguishable in
> terms of the class of plaintiffs and facts to
> warrant separate Memorandum–Decisions and
> Orders.

## BACKGROUNDFN2

> FN2. The background information is taken from
> the complaint and is presumed true for the
> purposes of this motion only. This does not
> constitute a factual finding by the Court.

Plaintiff, Civil Service Employees Association, Inc.
("CSEA" or "the Union") is the collective bargaining
representative for New York State employees in the
Administrative Services Unit ("ASU"), Institutional
Services Unit ("ISU"), Operational Services Unit
("OSU"), Division of Military and Naval Affairs Unit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

("DMNA") and the New York State Unified Court System ("UCS"). Plaintiff Danny Donohue ("Donohue") is the President of CSEA. Plaintiffs Milo Barlow ("Barlow"), Thomas Jefferson ("Jefferson"), Cornelius Kennedy ("Kennedy"), Judy Richards ("Richards") and Henry Wagoner ("Wagoner") are former employees of the State of New York and covered under collective bargaining agreements in effect at the time of their retirement. Plaintiffs retired after January 1, 1983 but before October 1, 2011 and receive health insurance coverage. During the relevant time, defendant Patricia Hite ("Hite") was Acting Commissioner of the Civil Service Department and Acting President of the Civil Service Commission. Defendants Caroline W. Ahl ("Ahl") and J. Dennis Hanrahan ("Hanrahan") were members of the Civil Service Commission. Defendant Robert Megna ("Megna") was the Director of the New York State Division of the Budget. Defendant Thomas P. DiNapoli ("DiNapoli") was the Comptroller of the State of New York and responsible for the administration of the New York State and Local Retirement System, which issues monthly payment of pensions to eligible State retirees in the Employees Retirement System, less any deductions for the payment of retiree health insurance premiums. Defendant Jonathan Lippman ("Lippman") was the Chief Judge of the Unified Court System; the employer of current and former bargaining unit members represented by CSEA.

From April 1982 to October 2011, CSEA and the State of New York entered into eight consecutive Collective Bargaining Agreements ("CBAs") covering four executive branch bargaining units: ISU, OSU, ASU and DMNA. From 1982 to 2011, there have been eight consecutive contracts between CSEA and UCS with the same duration as the executive branch contracts. Article 9 of the 1982–1985 executive branch contracts between CSEA and the State contained the following language: [FN3]

FN3. The CBA is not part of the record herein.

**\*2** Sub-section 1(b). The State agrees to continue to pay 100 percent of the cost of individual coverage and 75 percent of dependent coverage, provided under the Statewide Plan, subject, however to the limitations of Section 9.10(c) of this Article.

Sub-section 8. The unremarried spouse of [a retiree who predeceases the spouse] shall be permitted to continue coverage in the Health Insurance Program with payment at the same contribution rate as required of active employees.

Sub-section 9. Employees added to the payroll and covered by the State Health Insurance Plan have the right to retain health insurance coverage after retirement, upon completion of 10 years of State service.

Sub-section 10(a). The State and(d) The unremarried spouse of an active employee, who dies after April 1, 1979 and who, at the date of death was vested in the Employee's Retirement System and within ten years of his/her first date of eligibility for retirement shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees.

Article 8 of the 1982–1985 contract between CSEA and UCS contained the following language:

The State shall continue to provide the same health and prescription drug benefits administered by the Department of Civil Service for the State Executive branch managerial and confidential employees ... at the same cost to the State as defined by the contracts in force on March 31, 1982.... Effective April 1, 1980, employees under local option health plans shall be required to pay for any cost increase due to improvement of benefits.

In November 1982, the parties reached a Memorandum of Understanding ("MOU") wherein the parties agreed to implement a ten percent (10%) contribution rate for individual retiree health insurance coverage for future retirees, effective January 1, 1983. [FN4] The parties further agreed that retirees who retired prior to January 1, 1983 would not be affected by the MOU and would continue to receive fully-paid retiree health insurance for individual coverage and would contribute twenty-five percent (25%) toward the cost of dependent coverage. Chapter 14 of the Laws of 1983 amended Civil Service Law § 167(1)(a) to limit the amount that the State

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

was required to pay towards the cost of premium or subscription charges for the coverage of State employees and retired State employees enrolled in the New York State Health Insurance Program (N.Y.SHIP), by providing that the State was required to contribute only ninety percent (90 %) of the cost of such premium or subscription charges for the coverage of State employees and retired State employees retiring on or after January 1, 1983. The State would continue to contribute seventy-five percent (75 %) for dependent coverage for State employees and retired State employees.

> FN4. The MOU is not part of the record herein.

The Governor's Program Bill Memorandum regarding the 1983 amendment indicated that the purpose of the statute was "to effectuate provisions of various memoranda of understanding executed pursuant to the collectively-negotiated agreements between the State and the employee organizations ... dealing with health insurance ." [FN5]

> FN5. The Governor's Program Memorandum is not part of the record herein. The record in the related cases, however, includes a copy of the Memorandum.

**\*3** Between 1983 and 2011, Civil Service Law § 167(8) provided, *inter alia,*

[n]otwithstanding any inconsistent provision of law, where and to the extent that an agreement between the state and an employee organization entered into pursuant to article fourteen of this chapter so provides, the state cost of premium or subscription charges for eligible employees covered by such agreement may be increased pursuant to the terms of such agreement.

Article 9 of the 1985–1988 executive branch CBAs between the State and CSEA contained the following language:

Sub-section 1(f). The State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage provided under the Empire Plan.

Sub-section 14. The unremarried spouse [of a retiree who predeceases the spouse] shall be permitted to continue coverage in the Health Insurance Program with payment at the same contribution rates as required of active employees.

Sub-section 15. Employees added to the payroll and covered by the State health insurance plan have the right to retain health insurance coverage after retirement, upon completion of 10 years of State service.

Each of the six CBAs, for the four executive branch units, between CSEA and the State during the twenty-three (23) years from 1988 through 2011 contained substantially the same language as the 1985–1988 contract.

Article 8.1 of the 2003–2007 and 2007–2011 contracts between CSEA and UCS contained the following language:

The State shall continue to provide health and prescription drug benefits administered by the Department of Civil Service. Employees enrolled in such plans shall receive health insurance and prescription drug benefits to the same extent, at the same contribution level, in the same form and with the same co-payment structure that Executive Branch employees represented by CSEA receive such benefits.

On August 17, 2011, the legislature passed Chapter 491 of the Laws of 2011 ("Chapter 41"). Chapter 491 amended § 167(8) and replaced the word "increased" with the word "modified." The amendment further provided "the president [of the Civil Service Commission], with the approval of the director of the budget, may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision." On September 21, 2011, defendant Hite requested defendant Megna's approval to increase rates toward premiums that are contributed by plaintiffs herein from ten percent (10%) to twelve percent (12%) for individual coverage and from twenty-five percent (25%) to twenty-seven percent (27%) for dependent coverage. On September 22, 2011,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

defendant Megna approved the extension of modified contribution rates.

On October 1, 2011, defendants implemented new reduced State contribution rates which resulted in a two percent (2 %) reduction in the State contribution rates for individual and dependent coverage.

**\*4** On January 5, 2012, plaintiffs filed an Amended Complaint (Dkt. No. 6) asserting causes of action for impairment of contract, violation of due process and breach of contract. Plaintiffs also claim that Civil Service Law § 167(8) violates state law and assert that defendants Hite and Megna lacked authority under § 167(8) to approve and implement the reduction in State contribution rates. Plaintiffs seek judgment pursuant to Article 78 of the New York Civil Practice Laws and Rules. Plaintiffs commenced the action against defendants in their official capacities only.

### DISCUSSION

### Standard on a Motion to Dismiss under 12(b)(1)

In contemplating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Court must "accept as true all material factual allegations in the complaint[.]" *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). The Court may consider evidence outside the pleadings, *e.g.,* affidavit(s), documents or otherwise competent evidence. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *Antares Aircraft v. Fed. Rep. of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991). "The standards for considering a motion to dismiss under Rules 12(b)(1) and 12(b)(6) are substantively identical." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003).

Defendants move for dismissal pursuant to Fed.R.Civ.P. 12(b)(1) arguing that the Eleventh Amendment precludes the Court from obtaining subject matter jurisdiction over the following claims: (1) all of plaintiffs' claims against the State of New York and its agencies; (2) plaintiffs' claims against defendants in their official capacities; and (3) plaintiffs' Article 78 cause of action. Defendants also allege that the principals of the *Younger* doctrine require abstention in this matter.

### I. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *State Emp. Bargaining Agent Coalition v. Rowland,* 494 F.3d 71, 95 (2d Cir.2007) (citing U.S. Const. amend. XI). The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 90–100 (1984); *see also Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir.2004) (citation omitted). Although the plaintiff generally bears the burden of proving subject matter jurisdiction, the entity claiming Eleventh Amendment immunity bears the burden to prove such. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d Cir.2006).

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute. *See Will v. Mich. Dep't. of State Police,* 491 U.S. 58, 71 (1989).

### A. Federal Claims against State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System and New York State Unified Court System

**\*5** Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies. When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining lawsuits against them "regardless of the nature of the relief sought." *Pennhurst,* 465 U.S. at 100. In this case, the State has neither waived its immunity, nor has Congress exercised its power to override Eleventh Amendment immunity. Accordingly, plaintiffs' claims against the State of New York, New York

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System and the New York State Unified Court System are dismissed. *See McGinty v. New York,* 251 F.3d 84, 100 (2d Cir.2001) (dismissing the claims against the Retirement System for lack of subject matter jurisdiction based upon the Eleventh Amendment).

**B. Federal Claims Against State Officials in their Official Capacity**

Plaintiffs also assert claims against defendants Cuomo, Hite, Ahl, Hanrahan, Megna, DiNapoli and Lippman in their official capacities. Eleventh Amendment immunity extends to state officials sued in their official capacities for retrospective relief. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Actions for damages against a state official in his or her official capacity are essentially actions against the state, and will be barred by the Eleventh Amendment unless: (1) Congress has abrogated immunity, (2) the state has consented to suit, or (3) the *Ex parte Young* doctrine applies. *See Will,* 491 U.S. at 71. In this matter, the issues presented before this Court involve the third exception.

In *Ex Parte Young,* 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. This doctrine provides "a limited exception to the general principle of sovereign immunity [that] allows a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law under the theory that such a suit is not one against the State, and therefore not barred by the Eleventh Amendment." *Ford v. Reynolds,* 316 F.3d 351, 354–55 (2d Cir.2003). Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.,* 945 F.2d 25, 32 (2d Cir.1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

**\*6** In *Edelman v. Jordan,* 415 U.S. 651, 653 (1974), the Supreme Court expanded upon *Ex Parte Young* and held that even when a plaintiff's requested relief is styled as an injunction against a state official, if "the action is in essence one for recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." Retroactive relief is that relief "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials" regardless of how the relief is fashioned. *Id* at 668. "Prospective relief includes injunctive relief that bars a state actor from engaging in certain unconstitutional acts or abates ongoing constitutional violations as well as the 'payment of state funds as a necessary consequence of compliance in the future with a substantive federal question determination.' ' *Id.* The "general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought, namely, would the relief abate an ongoing violation or prevent a threatened future violation of federal law?" *Id.* In *Edelman,* the majority concluded:

> It is one thing to tell [a state official] that he must comply with the federal standards for the future if the state is to have the benefit of federal funds in the program he administers. It is quite another thing to order the [state official] to use state funds to make reparation for the past. The latter would appear to us to fall afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any force.

> *Id.* at 695 (quotation omitted).

In order to determine whether the *Ex parte Young* exception allows plaintiffs' suit against the officials, this Court must first determine whether the complaint alleges an ongoing violation of federal law and second, whether plaintiffs seek relief properly characterized as prospective. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002). "[T]o successfully avoid the Eleventh Amendment bar, a plaintiff must prove that a defendant's violation of federal law is of an ongoing nature as opposed to a case 'in which federal law has been violated at one time or another over a period of time in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

past.' " *Papasan v. Allain,* 478 U.S. 265, 277–78 (1986). The inquiry for determining whether an "ongoing violation" exists is, "does the enforcement of the law amount to a continuous violation of plaintiffs constitutional rights or a single act that continues to have negative consequences for plaintiffs." *New Jersey Educ. Ass'n v. New Jersey,* No. 11–5024, 2012 WL 715284, at *4 (D.N.J. Mar. 5, 2012).

Defendants argue that Eleventh Amendment immunity extends to state officials but inexplicably fail to address the *Ex Parte Young* exception. Here, plaintiffs argue that a "straightforward inquiry" reveals that plaintiffs have alleged a violation of federal law. Plaintiffs allege that defendant officials are engaged in enforcing Chapter 491 of the Laws of 2011, a law that is contrary to federal law because it impairs their rights under Article I, Section 10 of the U.S. Constitution. Plaintiffs also allege that officials are implementing a state statute that violates federal due process. An allegation that state officials are enforcing a law in contravention of controlling federal law is sufficient to allege an ongoing violation of federal law for the purposes of *Ex parte Young. See Chester Bross Const. Co. v. Schneider,* No. 12–3159, 2012 WL 3292849, at *6 (C.D.Ill. Aug. 10, 2012) (citing *Verizon Md ., Inc.,* 535 U.S. at 645). Thus, plaintiffs have satisfied the first prong of *Ex Parte Young.*

**\*7** With respect to the nature of the relief sought, plaintiffs' "WHEREFORE" clause contains the following requests:

(a) Declaring that State defendants' actions increasing contribution rates paid by plaintiffs and the class they represent, are unconstitutional in violation of the Contract Clause of Article I, § 10 of the United States Constitution, and permanently enjoining State defendants from implementing same;

(b) Declaring that State defendants' actions increasing contribution rates paid by plaintiffs, and the class they represent, violates the CSEA/State contracts;

(c) Declaring that State defendants' actions increasing contribution rates paid by plaintiffs, and the class they represent are unconstitutional in violation of Article I,

§ 6 and § 3 of the New York State Constitution, and permanently enjoining State defendants from implementing same; FN6

> FN6. *Ex Parte Young* does not extend to state-law claims asserted against state officers. See *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984). Whether this court maintains subject matter jurisdiction over plaintiffs' state-law claims will be discussed *infra.*

(d) Declaring that State defendants' actions increasing contribution rates paid by plaintiffs, and the class they represent are unconstitutional in violation of their Fourteenth Amendment Due Process rights under the United States Constitution, and permanently enjoining State defendants from implementing same;

(e) Declaring Chapter 491 of the Laws of 2011 unconstitutional, as applied under Civil Service Law 167(8), to the extent that State defendants' actions increased contribution rates paid by plaintiffs, and the class they represent, which impairs the plaintiffs' contract rights;

(f) Declaring that State defendants' actions increasing contribution rates paid by plaintiffs, and the class they represent are unlawful, unauthorized pursuant to New York Civil Service Law § 167(1)(a) and § 167(8), in excess of jurisdiction, *ultra vires,* and null and void; FN7

> FN7. *See* Footnote 6.

(g) Enjoining, prohibiting and restraining defendants DiNapoli and the Retirement System from making any deductions from the monthly pension payments of retired State employees, including plaintiffs, and the class they represent, or passing along any additional costs or charges, as a result of the reduced contribution rates implemented by State defendants challenged herein;

(h) Directing State defendants to reimburse and make whole plaintiffs, and the class they represent, for any and all additional payments or deductions to pension payments, made as a result of the reduced State

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

contribution rates implemented by State defendants challenged herein;

(i) Awarding plaintiffs reasonable attorneys' fees costs and disbursements of this action pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law.

*See* Am. Cplt. (Dkt. No. 6). The Court will address each request for relief in turn.

**1. Monetary Relief**

Plaintiffs argue that the Court has jurisdiction over related ancillary damages necessary to effectuate prospective relief. While not cited by plaintiffs herein, plaintiffs in the related actions cite to *Milliken v. Bradley,* 433 U.S. 267 (1977) as support for their claims for monetary damages. In the *Milliken* case, the district court ordered implementation of student assignment plans and educational components in the areas of reading, in-service teacher training, testing and counseling to effectuate desegregation. The Supreme Court discussed the "prospective-compliance" exception which permits federal courts to enjoin state officials to conform their conduct to the requirements of federal law notwithstanding a direct and substantial impact on the state treasury. *Id.* at 289. In *Milliken,* there was no money award in favor of the respondent or any member of his class. The Court explained that the case "simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability." *Id.* Instead, the decree required state officials to eliminate a segregated school system. *Id.* The Court reasoned that

**\*8** [t]hese programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in *Edelman.* Rather, by the nature of the antecedent violation, which on this record caused significant deficiencies in communications skills—reading and speaking—the victims of Detroit's *de jure* segregated system will continue to experience the effects of segregation until such future time as the remedial programs can help dissipate the continuing effects of past misconduct. Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained

teachers. That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates prospectively to bring about the delayed benefits of a unitary school system. We therefore hold that such prospective relief is not barred by the Eleventh Amendment.

*Id.* at 290.

The facts and relief sought in *Milliken* are clearly distinguishable from those at hand and thus, the Court is not persuaded that the holding supports plaintiffs' claims herein. To the extent plaintiffs seek monetary relief against defendants acting in their official capacity as agents of the State, such claims are barred by the Eleventh Amendment. *See Fulton v. Goord,* 591 F.3d 37, 45 (2d Cir.2009) holding that "in a suit against state officials in their official capacities, monetary relief (unlike prospective injunctive relief) is generally barred by the Eleventh Amendment" (citation omitted).

**2. Injunctive Relief**

Plaintiffs also seek an order permanently enjoining defendants from implementing the reduced State contribution rates and enjoining defendants from making further deductions from plaintiffs' monthly pension payments. As discussed *supra,* defendants did not address *Ex Parte Young* or the inapplicability/applicability of the doctrine herein. Defendants do not claim that plaintiffs seek improper injunctive relief that is retrospective or designed to compensate for a past violation of federal law. Moreover, defendants did not present any argument regarding the impact such an injunction would have on the state treasury. To the extent that plaintiffs seek prospective injunctive relief against defendants, plaintiffs have sufficiently alleged such claims and thus, based upon the purview of *Ex Parte Young,* dismissal is not warranted. *Finch v. New York State Office of Children and Family Serv.,* 499 F.Supp.2d 521, 538 (S.D.N.Y.2007).

**3. Declaratory Judgment**

Declaratory judgments form part of the injunctive relief allowed for under *Ex Parte Young. See Tigrett v. Cooper,* No. 10–2724, 2012 WL 691892, at \*6 (W.D.Tenn. Mar. 2, 2012). However, declaratory relief is not permitted under *Ex Parte Young* when it would serve

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective. *Id.; Green v. Mansour,* 474 U.S. 64, 74 (1985) (holding that the Eleventh Amendment bars retrospective declaratory relief against state officials); *New Jersey Educ. Ass'n,* 2012 WL 715284, at *5 (holding that a request for a declaratory judgment holding that portions of a statute are unconstitutional is "nothing more than an indirect way of forcing the State to abide by its obligations as they existed before the enactment of the Act and therefore, essentially a request for specific performance" and, thus, not permitted).

**\*9** In this matter, to the extent plaintiffs seek declaratory relief regarding the State defendants' past conduct, such claims must be dismissed because the Eleventh Amendment "does not permit judgments where state officers declaring that they violated federal law in the past." *Finch,* 499 F.Supp.2d at 538 (citing *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993)); *see also Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 847–48 (9th Cir.2002) (noting that retrospective declaratory relief would declare that the State Defendants committed constitutional violations in the past; prospective relief would declare that likely future actions are unconstitutional).

However, plaintiffs' request for an Order declaring Chapter 491 of the Laws of 2011 unconstitutional is prospective. *See Verizon Md.,* 535 U.S. at 645 ("The prayer for injunctive relief-that state officials be restrained from enforcing an order in contravention of controlling federal law-clearly satisfies our 'straightforward inquiry' "). As to this request, to the extent that plaintiffs seek prospective declaratory relief, that relief is not barred by the Eleventh Amendment.

To summarize, the Eleventh Amendment deprives this Court of jurisdiction over all of plaintiffs' claims against the State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State and Local Retirement System, the New York State Unified Court System, and plaintiffs' claims for monetary damages against defendants in their official capacities. Jurisdiction remains over plaintiffs' claims for prospective injunctive and declaratory relief and against defendants Cuomo, Hite, Ahl, Hanrahan, Megna,

DiNapoli and Lippman in their official capacities.

**C. New York State Law Contractual Impairment Claims Against Defendants in their Official Capacities**

Defendants also move for dismissal of plaintiffs' state law contractual impairment claim asserted against defendants in their official capacity. The jurisdiction of a federal court to entertain supplemental state law claims under 28 U.S.C § 1367 does not override Eleventh Amendment immunity. "Supplemental jurisdiction under 28 U.S.C. § 1367(a) does not constitute a congressional abrogation of the Eleventh Amendment granting district courts the power to adjudicate pendent state law claims." *Nunez v. Cuomo,* No. 11–CV–3457, 2012 WL 3241260, at *20 (E.D.N.Y. Aug. 7, 2012) (citations omitted). The Eleventh Amendment bars suits in federal courts seeking relief, whether prospective or retroactive, against state officials for their alleged violations of state law. *See Pennhurst,* 465 U.S. 89, 106. The *Ex parte Young* doctrine is inapplicable where the officials are alleged to have violated state law. *Local 851 of Int'l Bhd. of Teamsters v. Thyssen Haniel Logistics, Inc.,* 90 F.Supp.2d 237, 247 (E.D.N.Y.2000) (citing *Pennhurst,* 465 U.S. at 104–06). However, the Eleventh Amendment does not bar a suit when an official has allegedly acted entirely outside her state-delegated authority in a manner that violates federal law. *See Florida Dep't of State v. Treasure Salvors, Inc.* 458 U.S. 670, 696–697 (1982); *Pennhurst,* 465 U.S. at 101, n. 11. In *Treasure Salvors, Inc.,* the Supreme Court held as follows:

**\*10** [A]ction of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property)" that is beyond the officer's statutory authority is not action of the sovereign, a suit for specific relief against the officer is not barred by the Eleventh Amendment. This conclusion follows inevitably from *Ex parte Young.* If conduct of a state officer taken pursuant to an unconstitutional state statute is deemed to be unauthorized and may be challenged in federal court, conduct undertaken without any authority whatever is also not entitled to Eleventh Amendment immunity.

*Id.* at 696. A state officer acts *ultra vires* when he acts beyond the scope of his statutory authority, or pursuant to authority deemed to be unconstitutional. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

Here, in order for the exception to apply, plaintiffs must establish that defendants acted "without any authority whatsoever" under state law. *Sherwin–Williams Co. v. Crotty,* 334 F.Supp.2d 187, 196 (N.D.N.Y.2004). Plaintiffs allege that the state claims arise out of *ultra vires* acts by defendants Hite and Megna:

Upon information and belief, defendant Hite has not been nominated by the Governor, has not been confirmed by the Senate and has not filed an oath of office as Commissioner of the Civil Service Department or President of the Civil Service Commission.

Upon information and belief, defendant Hite, in her capacity as "Acting President" of the Civil Service Commission, has not attended or voted at any official meeting of the Civil Service Commission.

Notwithstanding the failure of State defendants to properly appoint defendant Hite to these offices, defendant Hite sent a letter to defendant Budge Director Megna on September 21, 2011 purporting to increase the rates toward premiums that are contributed by plaintiffs-retirees and the class they represent, from ten percent to 12 percent for individual coverage and from 25 to 27 percent for dependent coverage.

Am. Cplt. at ¶¶ 70–72.

Plaintiffs also allege that, "[d]efendant Hite lack authority pursuant to Civil Service Law 167(8) to increase contribution rates for retirees, including plaintiffs-retirees, and the class they represent." *Id.* at ¶ 133. Moreover, plaintiffs state that Hite lack authority to approve a resolution adopting regulations increasing the retiree rates. *Id.* at ¶ 135. Therefore, the regulations result from an abuse of discretion and are null and void. *Id.* at ¶¶ 135–136. At this stage of the litigation, plaintiffs have sufficiently pled the *ultra vires* exception to the Eleventh Amendment and thus, defendants' motion to dismiss plaintiffs' state-law claims, on this basis, is denied.

**D. Federal Claims Against Defendants in their Individual Capacities**

Plaintiffs have not asserted any claims against

defendants Cuomo, Hite, Ahl, Hanrahan, Megna, DiNapoli or Lippman, individually. However, plaintiffs argue that "should the Court find that it does not have jurisdiction to award compensatory relief because defendants were not named in their capacity as individuals," plaintiffs seek to amend the complaint. *See* Dkt. No. 15, at p. 10. The Court construes this argument as a motion for leave to file an amended complaint.

**\*11** Suits against state officials in their personal capacity are not barred by the Eleventh Amendment, even for actions required by their official duties, *Hafer v. Melo,* 502 U.S. 21, 27–28 (1991) (holding that state officials may be personally liable for actions taken in their official capacity); however, such actions may be subject to dismissal on other grounds. Here, defendants argue that legislative immunity would divest this Court of jurisdiction over any claims against the individual defendants in their individual capacities. However, legislative immunity is a personal defense that may be asserted in the context of a challenge under Rule 12(b)(6) and is not proper for review as a jurisdictional bar under Rule 12(b)(1). *See State Emp.,* 494 F.3d at 82 n. 4. Accordingly, that portion of defendants' motion, and plaintiffs' request to amend, will be discussed *infra.*

**II. Judgment Pursuant to Article 78 of the New York Civil Practice Laws and Rules**

Defendants move to dismiss plaintiffs' claims under N.Y.C.P.L.R. Article 78, arguing that, to the extent that plaintiffs are challenging officials' interpretations of CSL § 167(8), defendants' promulgations or regulations, and the propriety of the Civil Service President's appointment, New York State has not empowered the federal courts to entertain these actions. Plaintiffs contend that the Article 78 claims are predicated on the federal constitutional claims and derive from a common nucleus of operative fact. Therefore, plaintiffs argue that this Court has the discretion to exercise pendent jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Section 1367 provides that a court "may decline to exercise supplemental jurisdiction" if there are "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c), (c)(4). "There does not appear to be a consensus in this Circuit as to whether courts may, in their discretion, hear Article 78 claims under the rubric of supplemental jurisdiction." *Minima v. New York City Emp.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

*Retirement Sys.,* No. 11–CV–2191, 2012 WL 4049822, at *8 (E.D.N.Y. Aug. 7, 2012) (citing *Clear Wireless L.L.C. v. Bldg. Dep't of Lynbrook,* No. 10–CV–5055, 2012 WL 826749, at *9 (E.D.N.Y. Mar. 8, 2012)* (noting that "it is doubtful ... that claims under Article 78 are even amenable to a district court's supplemental jurisdiction"); *see also Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 346 (S.D.N.Y.2006) (refusing to exercise jurisdiction over the plaintiffs Article 78 cause of action for an order annulling a Department of Health for an error of law, and as arbitrary and capricious). The "overwhelming majority of district courts confronted with the question ... have found that they are without power to do so or have declined to do so." *Clear Wireless,* 2012 WL 826749, at *9 (quoting *Coastal Commc'ns Serv., Inc. v. City of New York,* 658 F.Supp.2d 425, 459 (E.D.N.Y.2009)); *see also DeJesus v. City of New York,* No. 10–CV–9400, 2012 WL 569176, at *4 (S.D.N.Y. Feb. 21, 2012) (holding that Article 78 is a procedure, not a cause of action).

**\*12** However, "[e]ven assuming that a federal district court could properly exercise supplemental jurisdiction over an Article 78 claim, the court has 'discretion under 28 U.S.C. § 1367(c) to determine whether to hear th[ose] claims.' " *Morningside Supermarket Corp.,* 432 F.Supp.2d at 346 (citing *Briarpatch Ltd ., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 309 (2d Cir.2004)).

In *Morningside,* the court held that

[f]ederal courts in New York agree that "Article 78 proceedings were designed for the state courts, and are best suited to adjudication there." Moreover, "state law does not permit [these] proceedings to be brought in federal court." These are compelling reasons to decline supplemental jurisdiction over Morningside's third cause of action, and there is nothing exceptional about Morningside's claim that would justify deviation from the well-reasoned and essentially unanimous opinion of New York district courts on this issue.

*Id.* (internal citations omitted).

Here, plaintiffs seek to have this Court "annul" defendants' actions pursuant to Article 78. The case law on

this issue is decidedly in defendants' favor. While it is true that the federal claims and state-law issues arise out of the same operative set of facts, this Court declines to exercise supplemental jurisdiction over plaintiffs' Article 78 claim because to do so would require this Court to interpret state law before the New York State courts have an opportunity to analyze and resolve the issues. *See Support Ministries For Persons with AIDS, Inc. v. Vill. of Waterford, N.Y.,* 799 F.Supp. 272, 280 (N.D.N.Y.1992) (holding that "there is no reason for th[e] court to embroil itself in a dispute between the State and a local government and to make this novel and potentially extremely significant interpretation of state law"). The Court has reviewed the holding in *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988), a case cited by the plaintiffs in related cases and finds the holding unpersuasive based upon the facts herein. In *Yonkers,* the Second Circuit noted that the case "presented exceptional circumstances" and opted to exercise jurisdiction over the plaintiffs' Article 78 claim . [FN8] The *Yonkers* holding has been cited as the exception, not the rule. *See Coastal Commc'ns,* 658 F.Supp.2d at 459; *see also Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 407 (S.D.N.Y.2004).

> FN8. In *Cartegena v. City of New York,* 257 F.Supp.2d 708, 709 (S.D.N.Y.2003), another case cited by the plaintiffs in the related action, the district court exercised jurisdiction over the Article 78 claims only after the parties withdrew their jurisdictional objections and consented.

Here, plaintiffs have not persuaded this Court that this case presents such extreme facts. Based upon the circumstances presented herein, the Court finds that this specific, state-created civil action should not be brought in federal court. Accordingly, the Court follows the "essentially unanimous position of the New York district Courts" and declines to exercise jurisdiction over plaintiffs' state law claims brought under Article 78. *See Morningside,* 432 F.Supp.2d at 347.

### III. *Younger* Doctrine

**\*13** A federal court's obligation to adjudicate claims within its jurisdiction is "virtually unflagging." *New Orleans Pub. Serv., Inc. v. Council of City of New*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

*Orleans,* 491 U.S. 350, 359 (1989) (holding that "abstention remains the exception, not the rule"). The *Younger* doctrine "espouse[s] the policy that a federal court should not interfere with a pending state judicial proceeding in which important state interests are at stake." *Wisoff v. City of Schenectady,* No. 07–CV–34, 2009 WL 606139, at *6 (N.D.N.Y. Mar. 9, 2009) (citing, *inter alia, Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431–432 (1982)). In the Second Circuit, courts applying *Younger* abstention "must determine (1) whether there is an ongoing state proceeding; (2) whether an important state interest is involved; and (3) whether the federal plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the proceeding." *Univ. Club v. City of New York,* 842 F.2d 37, 40 (2d Cir.1988) (internal citations omitted).

Generally, *Younger* is not applied against those not party to the pending state proceedings. *Hindu Temple Soc'y of N. Am. v. Supreme Court of State of New York,* 335 F.Supp.2d 369, 375 (E.D.N.Y.2004). However, the Second Circuit has held that, "[i]n certain circumstances, *Younger* may apply to the claims of third-parties who are not directly involved in any pending state proceeding." *Spargo v. N.Y. State Comm' on Judicial Conduct,* 351 F.3d 65, 82 (2d Cir.2003). "[A]lthough plaintiffs should not 'automatically be thrown into the same hopper for *Younger* purposes,' there may be 'some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." *Hindu Temple,* 335 F.Supp.2d at 375 (quoting, *inter alia, Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928 (1975)). "Courts have consistently recognized while '[c]ongruence of interests is not enough,' by itself, to warrant abstention, where the plaintiffs' interests are so inextricably intertwined that 'direct interference with the state court proceeding is inevitable,' *Younger* may extend to bar the claims of plaintiffs who are not parties to the pending state proceeding." *Spargo,* 351 F.3d at 82 (holding that two plaintiffs [political supporters of a state judge, the third plaintiff] presented First Amendment challenges with legal claims that were sufficiently intertwined with the judge's state claims in that the case presented one of the narrow circumstances in which *Younger* applies to those not directly involved in the state court action) (citation omitted). While plaintiffs may seek similar relief or present parallel challenges to the constitutionality of a state statute or policy, absent other factors establishing interwoven legal interests, *Younger* will not bar the federal action. *Spargo,* 351 F.3d at 83. "Where courts have applied *Younger* abstention to non-parties, those courts have limited the doctrine's application to instances where the non-parties 'seek to directly interfere with the pending [state] proceeding." *Citizens for a Strong Ohio v. Marsh,* 123 Fed. Appx. 630, 635 (6th Cir.2005) (quoting *Spargo,* 351 F.2d at 85).

**\*14** In a recent decision from the Eastern District, *Donohue v. Mangano,* No. 12–CV–2568, 2012 WL 3561796 (E.D.N.Y. Aug. 20, 2012), the defendants argued that the *Younger* doctrine mandated abstention based upon an action in Supreme Court, Nassau County for injunctive and declaratory relief that was filed by one of the three sets of plaintiffs. The plaintiffs not involved in the state action argued that *Younger* did not extend to their claims because they were not a party to the ongoing state court proceedings. *See id.* at * 12. The court held that while it was unlikely that the plaintiffs' interests were inextricably intertwined for the purposes of *Younger,* it declined to definitively rule on that issue. *See id.* Rather, the court held that the relief sought by the plaintiffs in the state court action was remedial rather than coercive. *See id.* at * 13. The court, relying upon holdings in other Circuits, reasoned that a "coercive" action is a state-initiated enforcement action in which the plaintiff does not have a choice to participate and one in which the federal plaintiff is the state court defendant. *See id.* In contrast, a "remedial" proceeding is one in which the plaintiff initiated an option to seek a remedy for the state's wrongful action and to vindicate a wrong inflicted by the state. With that reasoning, the court held that the Nassau County action was "clearly remedial" and not the type of parallel state court proceeding requiring abstention under *Younger. See id.* at * 13–* 14.

Here, as in *Donohue,* defendants' arguments in support of abstention are imprecise. Defendants argue that the Court should abstain from hearing this matter based upon a civil matter currently pending in Albany County but offer no further analysis or argument in favor of *Younger.* In the Albany County action, the petitioner, Retired Public Employees Association ("RPEA"), filed a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

petition pursuant to Article 78 against defendants herein. The petitioners, retirees from State service prior to October 1, 2011, petitioned for an order declaring the administrative implementation of an increase in the percentage of contributions by State retirees and/or their dependents based upon CSL § 167(8) invalid, null and void. The petitioners are also seeking an order declaring the emergency regulation filed on October 1, 2011 invalid, null and void, and are further seeking injunctive relief and a refund. On February 24, 2012, the respondents filed a motion to dismiss.[FN9] Defendants argue that the RPEA case involves the same claims/issues presented herein and a facial challenge to CSL § 167(8).

> FN9. Based upon the record and this Court's independent research, the motion to dismiss is still pending.

The Court has reviewed the RPEA pleadings annexed to defendants' motion. Defendants do not dispute that plaintiffs herein are not a party in the state proceeding. Therefore, for the *Younger* doctrine to apply herein, defendants must establish that plaintiffs and the RPEA petitioners' interests are "inextricably intertwined." Defendants have failed to demonstrate that plaintiffs' interests are so closely related that abstention is warranted. In the state action, petitioners have not asserted a contractual impairment claim based upon a CBA. Defendants have not established that plaintiffs' interests will interfere with the state court proceeding, nor has it been established that plaintiffs have an adequate opportunity for judicial review of their federal claims in the pending state court action. Courts have made clear that the *Younger* doctrine should be applied sparingly and cautiously to federal plaintiffs not parties to an ongoing state action. Accordingly, this Court finds that the parties and their claims are not "so closely related" to require *Younger* abstention.[FN10]

> FN10. Because the Court finds that defendants have failed to establish the first *Younger* factor, the Court need not discuss the issue of whether the relief sought by the RPEA petitioners is "remedial" or "coercive."

**Standard on a Motion to Dismiss under 12(b)(6)**

**\*15** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case. *Global Network Commc'ns v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006); *Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Robinson v. Town of Kent, N.Y.,* No. 11 Civ. 2875, 2012 WL 3024766, at \*3–4 (S.D.N.Y. July 24, 2012) (citing *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a)(2), with sufficient facts "to 'sho[w] that the pleader is entitled to relief[.]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

to plausible, the [ ] complaint must be dismissed [.]" *Id.* at 570.

## I. Claims Against Officials in their Individual Capacity and Legislative Immunity

"[L]egislators are absolutely immune from suit in their individual capacities for "all actions taken 'in the sphere of legitimate legislative activity.' " *Bogan v. Scott–Harris,* 523 U.S. 44, 54 (1998). Legislative immunity only protects municipal officers from civil liability when they are sued in their personal capacities, and not when sued in their official capacities. *Baines v. Masiello,* 288 F.Supp.2d 376, 383 (W.D.N.Y.2003) (citations omitted). Legislative immunity may bar claims for money damages, injunctions and declaratory relief brought against state and local officials in their personal capacities. *State Emp.,* 494 F.3d at 82 (citation omitted); *Bogan,* 523 U.S. 44, 54 (1998). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Christian v. Town of Riga,* 649 F.Supp.2d 84, 103–104 (W.D.N.Y .2009) (holding that legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity") (quotation omitted).

**\*16** Two factors are relevant to determining whether a defendant's acts are within that sphere: (1) whether the actions were an integral part of the legislative process; and (2) whether the actions were legislative "in substance" and "bore the hallmarks of traditional legislation." *Bogan,* 523 U.S. at 54–56. Such traditional legislation includes "policymaking decisions implicating budgetary priories and services the government provides to it's constituents." *Id.* Legislative immunity applies to acts within the "legislative sphere" even where the conduct, "if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes ." *Doe v. McMillan,* 412 U.S. 306, 312–13 (1973) (quotation omitted).

Before defendants in the instant case can invoke legislative immunity, they have the burden of establishing both of the following: (1) that the acts giving rise to the harm alleged in the complaint were undertaken when defendants were acting in their legislative capacities under the functional test set forth in *Bogan;* and (2) that the particular relief sought would enjoin defendants in their legislative capacity, and not in some other capacity in which they would not be entitled to legislative immunity. *State Emp.,* 494 F.3d at 89; *see also Canary v. Osborn,* 211 F.3d 324, 328 (6th Cir.2000) (holding that the burden is on the defendants to establish the existence of absolute legislative immunity).

Here, defendants argue that by issuing the regulations, they were fulfilling discretionary, policymaking functions implicating State budgetary priorities. As discussed *supra,* plaintiffs have not asserted claims against defendants in their individual capacities.

Motions for leave to amend a complaint should be freely given "when justice so requires." *Fed.R.Civ.P.* 15(a)(2). A court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, such as the futility of amendment. *See Fahs Const. Group, Inc. v. Gray,* No. 10–CV–0129, 2012 WL 2873532, at *5 (N.D.N.Y. July 12, 2012).

Here, plaintiffs' opposition to defendants' motion is not a formal cross-motion and fails to (1) attach a copy of the proposed Amended Complaint, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the Amended Complaint or other equivalent means, in violation of Local Rule 7.1(a)(4). *See id.* (holding that, for this reason alone, the court can deny the plaintiffs' request). The absence of a proposed amended complaint precludes this Court from determining whether the proposed amendment would be futile. Plaintiffs' "motion" for permission to file an amended complaint is denied without prejudice to refile. *See Johnson v. Monsanto Chem. Co.,* 129 F.Supp.2d 189, 197 (N.D.N.Y.2001).

Based upon the aforementioned, the Court cannot determine whether legislative immunity would apply to any potential claims against defendants in their individual capacities. This ruling does not prevent defendants from renewing their motion with respect to the applicability of the doctrine of legislative immunity after plaintiffs move to amend and upon the completion of sufficient discovery and development of the record.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

## II. Contract Clause

**\*17** Article I, Section 10 of the Constitution prohibits states from passing any law "impairing the Obligation of Contracts." While the language of the Contract Clause is absolute on its face, "[i]t does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.' " Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367 (2d Cir.2006) (holding that courts must accommodate the Contract Clause with the inherent police power of the state to safeguard the vital interests of its people) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978). To state a cause of action for violation of the Contract Clause, a complaint must allege sufficient facts demonstrating that a state law has "operated as a substantial impairment of a contractual relationship." Nunez v. Cuomo, No. 11–CV–3457, 2012 WL 3241260, at \*6 (E.D.N.Y. Aug. 7, 2012) (citing Harmon v. Markus, 412 Fed. Appx. 420, 423 (2d Cir.2011)). In this regard, there are three factors that the Court will consider: (1) whether a contractual relationship exists; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial. Harmon, 412 Fed. Appx. at 423. A state law that impairs a contractual obligation will not be deemed unconstitutional so long as: (1) it serves a demonstrated legitimate public purpose, such as remedying a general social or economic problem; and (2) the means chosen to accomplish the public purpose is reasonable and necessary. See Buffalo Teachers Fed'n, 464 F.3d at 368.

### A. Existence of a Contractual Relationship In Vested Rights

Defendants argue that no express or implied contract obligates them to provide "optional health insurance with a perpetually fixed contribution rate." Rather, defendants contend that the CBA provided members with guarantees for the duration of the collective bargaining agreement only. Plaintiffs claim that the language in the CBAs clearly evidences the parties' intent to lock in the contribution rates that retirees pay for health insurance as vested, lifetime rights.

"All courts agree that if a document unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced." Am. Fed'n of Grain Millers, AFL–CIO v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir.1997) (citing, inter alia, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir.1983)). "It is a court's task to enforce a clear and complete written agreement according to the plain meaning of its terms, without looking to extrinsic evidence to create ambiguities not present on the face of the document" and a "mere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity." New York State Court Officers Ass'n v. Hite, 851 F.Supp.2d 575, 579–80 (S.D.N.Y.2012) (citations omitted). There is a lack of consensus among the Circuits regarding the interpretation of documents that are ambiguous. Am. Fed'n, 116 F.3d at 980. Some Circuits have held that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." See Yardman, Inc., 716 F.2d at 1479. While the Yard-man "inference" was discussed by the Second Circuit in Am. Fed'n, the Court did not specifically adopt the holding. Specifically, the Court noted that

**\*18** [w]hen documents are ambiguous, other circuits have disagreed as to whether at trial, there should be a presumption that retiree benefits are vested or that retiree benefits are not vested. Compare Yard–Man, 716 F.2d at 1482 (6th Cir.) (apparently presuming that retiree benefits are vested), with Bidlack, 993 F .2d at 608–09 (7th Cir.) (apparently presuming that retiree benefits are not vested). Because we conclude below that there is no need for a trial as the documents at issue in this case could not reasonably be interpreted as promising vested retiree benefits, we need not decide what presumption, if any, would be appropriate at trial.

Am. Fed'n, 116 F.3d at 980, n. 3.

Moreover, while extrinsic evidence may be used to interpret ambiguous CBAs, it may not be used to alter the meaning of unambiguous terms. Am. Fed'n, 116 F.3d at 981 (citations omitted). In Am. Fed'n, the Second Circuit concluded that, "to reach a trier of fact, an employee does not have to 'point to unambiguous language to support [a] claim. It is enough [to] point to written language capable

of reasonably being interpreted as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits,' " *Id.* at 980 (citations omitted); *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 78 (2d Cir.1996)*.* A district court may not base its finding of ambiguity on the absence of language, and the court may only consider oral statements or other extrinsic evidence after it first finds language in the documents that may reasonably be interpreted as creating a promise to vest benefits. *Id.; see also Parillo v. FKI Indus., Inc.,* 608 F.Supp.2d 264 (D.Conn.2009)*.* A single sentence in plan documents can suffice to raise a question that requires resolution by a trier of fact. *See Joyce,* 171 F.3d at 134.

In this matter, the CBA creates a contractual relationship between plaintiff-retirees and defendants. *See Nunez,* 2012 WL 3241260, at *6*.* Plaintiffs allege that, "[a]t the time of the retirement of each plaintiff-retiree, he or she contributed ten percent toward the cost of individual coverage and 25 percent toward the cost of dependent coverage which became a vested right for life on the date of each plaintiff-retiree's retirement." Am. Cplt. at ¶ 90. Plaintiffs allege that "CSEA and UCS have not concluded a successor to the 2007–2011 collective bargaining agreement, and are still in negotiations for a new contract; therefore, the 2007–2011 CSEA/UCS contract stays in effect by operation of law, pursuant to Article 14 of the Civil Service Law ('the Taylor Law')." *Id.* at ¶ 78.

In the Amended Complaint, plaintiffs allege that the relevant CBA contains the following language: [FN11]

FN11. The CBAs are not part of the record herein.

Sub-section 1(f). The State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage provided under the Empire Plan.

Sub-section 14. The unremarried spouse [of a retiree who predeceases the spouse] shall be permitted to continue coverage in the Health Insurance Program with payment at the same contribution rates as required of active employees.

**\*19** Sub-section 15. Employees added to the payroll and covered by the State health insurance plan have the right to retain health insurance coverage after retirement, upon completion of 10 years of State service.

*Id.* at ¶ 49.

Plaintiffs also allege, "[e]ach of the six collective bargaining agreements between CSEA and the State during the 23 years from 1988 through 2011, in each of the four executive branch CSEA units contained substantially the same language as the 1985–1988 contract language quoted above, and that language stayed in full force and effect until October 1, 2011." *Id.* at ¶ 51.

Plaintiffs cite to additional contractual language that provides, "[e]mployees added to the payroll and covered by the State Health Insurance Plan have the right to retain health insurance coverage after retirement, upon the completion of 10 years of State service." *Id.* at ¶ 42.

Plaintiffs further allege that,

[o]ver at least the past 29 years, from at least April 1982 to October 1, 2011, CSEA and the State have established a practice based on language in the parties' collective bargaining agreements that each employee who retired with ten or more years of State service and was covered by a CSEA/State collective bargaining agreement on the employee's date of retirement, pays the same unchanged contribution rate toward premiums for retiree health insurance for the life of the retiree.

*Id.* at ¶ 38.

Plaintiffs' allegations identify written language capable of reasonably being interpreted as creating a promise to provide plaintiffs with a vested interest in perpetually fixed NYSHIP contribution.

Defendants argue that the relevant sections apply "for the duration of the CBA." However, the record, as it presently exists, does not support that conclusion. Indeed, the record does not contain a copy of any of the aforementioned CBAs. Defendants fail to submit any

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

further argument in support of dismissal on this issue and cite to one case in support of the proposition that history cannot serve to bind the State to promises that it never made. *See Aeneas McDonald Pol. Benevolent Ass'n v. City of Geneva,* 92 N.Y.2d 326, 333 (1998). However, *Aeneas* is readily distinguishable from the facts at hand.

In *Aeneas,* the labor relationship between the City and the police department had been governed by collective bargaining agreements. However, none of the agreements addressed the issue of health benefits for retirees. This fact alone sets *Aeneas* apart from the instant case. Here, there is a CBA between defendants and plaintiffs that contains specific language addressing health benefits. *See Della Rocco v. City of Schenectady,* 252 A.D.2d 82, 84–85 (3d Dept.1998) (distinguishing *Aeneas* because the action before the court contained a "continuum of collective bargaining contracts between defendant and plaintiffs, each containing identical clauses which provided for hospitalization and major medical coverage for retired members and their families").

**\*20** Defendants also argue that plaintiffs do not have a statutorily implied right to a fixed amount toward retiree health insurance citing to a recent Southern District decision in *New York State Court Officers Ass'n v. Hite,* 851 F.Supp.2d 575 (S.D.N.Y.2012).[FN12] Plaintiffs failed to respond to this argument and did not address the *NYSCOA* case in their Memorandum of Law. The *NYSCOA* case was before the court on a motion for a preliminary injunction. The relevant language of their CBA provided, "[e]mployees ... shall receive health and prescription drug benefits ... at the same contribution level ... that applies to the majority of represented Executive Branch employees." *Id.,* at 577. The court held, "[t]he contract does not guarantee that Union members will receive health benefits at the rates set by Civil Service law § 167(1)." *Id.,* at 579. Rather, "[i]t guarantees that they will receive benefits at the same rates as the majority of executive branch employees." *Id.* The court concluded that based upon the unambiguous terms of the contract, the plaintiffs contracted for the same health benefits as the executive branch employees. *Id.* Plaintiffs cited to *Buffalo Teachers Fed'n* in support of their claims but the court found that the, "clear contractual obligations ... differ materially from the action at issue here." *Id.,* at 580. The court also

addressed plaintiffs' argument that section 167(1) itself created contractual rights. The court rejected that argument and reasoned, "defendants correctly note that courts are hesitant to read contractual rights into statutes because to do so would too easily preclude New York State from changing its policies." *Id.,* at 582. The court held, "[r]eading section 167 as a contract would improperly impair the ability of the Legislature to change its policies regarding its employees' health insurance plans." *Id.* Thus, the court held that because the plaintiffs failed to demonstrate a likelihood of success on the merits, the motion for a preliminary injunction was denied. On August 12, 2012, the Second Circuit affirmed the lower court decision. *New York State Court Officers Ass'n v. Hite,* 475 Fed. Appx. 803 (2d Cir.2012). The Second Circuit reviewed the district court's decision to deny a preliminary injunction and affirmed the order for "substantially the same reasons." However, the Court noted that "[w]e intimate no views on the ultimate merits as maybe developed upon a full trial." *Id.,* at 805 n. 3.

> FN12. After the Southern District Court issued the decision on the motion for a preliminary injunction, the case was transferred to the Northern District of New York. The matter is presently pending herein under Docket No. 12–CV–532.

This Court has carefully reviewed the district court's decision in *NYSCOA* and the complaint in that case and finds that the *NYSCOA* case is distinguishable from this action. Factually, the CBA at issue herein contains specific written language that is reasonably interpreted as a promise to vest the benefits. Procedurally, the *NYSCOA* case is presently pending in this Court and contains three causes of action: (1) violation of the Contracts Clause of U.S. Constitution; (2) violation of the Due Process Clause of the Fourteenth Amendment; and (3) a request for a declaratory judgment that Civil Service Law 167 and the implementing regulations are unconstitutional as applied. *See NYSCOA v. Hite,* 12–CV–532, Dkt. No. 1. In the March 2012 decision, the district court did not dismiss any portion of the plaintiffs' complaint. The court only denied the application for a preliminary injunction. All three originally asserted causes of action are still pending. While the March 2012 decision in *NYSCOA v. Hite* is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

clearly relevant to the issues presented in this lawsuit, the district court's holding on the motion for a preliminary injunction is not controlling on this motion to dismiss. A motion for a preliminary injunction requires a different standard of proof than a motion to dismiss. *See Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs,* No. 07–CV–2243, 2007 WL 4591845, at * 13 (E.D.N.Y. Dec. 26, 2007). "[U]nlike a preliminary injunction motion, dismissal pursuant to Rule 12(b)(6) is not based on whether Plaintiff is likely to prevail, and all reasonable inferences must be viewed in a light most favorable to Plaintiff." *Id.* "In opposing a motion to dismiss, Plaintiff is not required to prove her case; she must simply establish that the allegations in the Complaint are sufficient to render her claims plausible." *Id.* (citing *Iqbal,* 490 F.3d at 158) (internal citation omitted). Accordingly, defendants' reliance upon the *NYSCOA* holding is misplaced at this stage of the litigation.

**\*21** In the alternative, plaintiffs argue that should the Court deem the language of the statute ambiguous, extrinsic evidence demonstrates the parties' intent to contract for vested benefits. Such evidence includes the Bill Jacket to Chapter 14 of the Laws of 1983 and past practices and representations by the State. In addition, plaintiffs cite to various holdings from New York State courts and district court decisions in both this Circuit and others where the courts concluded, as a matter of law, that the subject CBA created vested, lifetime rights to unchanged health insurance benefits. At this juncture, the Court will not consider such extrinsic evidence and further, the Court is not compelled to follow the holdings of the cases cited by plaintiffs. Those actions involved motions for summary judgment and thus, a comprehensive analysis of the record and a vastly different standard of proof on both parties. *See Myers,* 244 A.D.2d at 847; *Joyce,* 171 F.3d at 133–34.

As discussed *supra,* the Court has found that plaintiffs have satisfied their burden to identify specific written language that is reasonably susceptible to interpretation as a promise to provide a perpetually fixed contribution rate. On a motion to dismiss, that is all that plaintiffs must establish. Consequently, at this stage of the litigation, plaintiffs have adequately pled the existence of a contractual right in perpetually fixed contributions to

survive a motion to dismiss. However, the Court cannot make any conclusions as a matter of law with respect to this issue.

**B. Substantial Impairment**

Even assuming plaintiffs possessed a valid contractual interest in a perpetual NYSHIP contribution rate, defendants argue that they have not substantially impaired plaintiffs' rights. Defendants contend that the NYSHIP program is still in place and thus, defendants are fulfilling their contractual obligations. Moreover, defendants contend that the adjustment to the subsidy rate was a foreseeable variable and within the parties' reasonable expectations.

An impairment of a contract must be "substantial" for it to violate the Contract Clause. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411 (1983). Impairments that affect the terms upon which the parties have reasonably relied or that significantly alter the duties of the party are substantial. *Allied Structural Steel Co.,* 498 U.S. at 245. The primary consideration in determining whether the state law has, in fact, operated as a substantial impairment is the extent to which reasonable expectations under the contract have been disrupted. *Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 993 (2d Cir.1997) ( "Impairment is greatest where the challenged government legislation was wholly unexpected"). "[A] law that provides only one side of the bargaining table with the power to modify any term of a contract after it has been negotiated and executed is perhaps the epitome of a substantial impairment." *Donohue,* 2012 WL 3561796, at *26 ("This far-reaching power [ ] can arguably be itself a substantial impairment to a contractual relationship") (citing *Baltimore Teachers Union, Am. Fed'n of Teachers Local 340, AFL–CIO v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1016 (4th Cir.1993)).

**\*22** In this matter, plaintiffs allege that the new rates resulted in a two percent increase in the contribution rates for individual coverage and dependent coverage. Moreover, plaintiffs claim that the effect of this change in the retiree contribution rate was to require plaintiffs-retirees and the class they represent to pay more for their health insurance than they would have paid under

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

the provisions of the contracts in effect on the dates of each plaintiff-retiree's retirement. Am. Cplt. at ¶¶ 79–80. Plaintiffs further allege "[t]he passage and implementation of Chapter 491 of the laws of 2011 raising plaintiffs-retirees' health insurance premium contribution rates from ten percent to 12 percent toward the cost of individual coverage and from 25 percent to 27 percent toward the cost of dependent coverage constitutes an impairment of the aforesaid contracts." *Id.* at ¶ 91.

Defendants argue that CSL § 167(8) reflected "the lawmakers' understanding" that the cost of NYSHIP coverage was subject to adjustment. In support of this assertion, defendants rely upon extraneous documents not incorporated, mentioned or relied upon in the Amended Complaint. Thus, the Court will not consider the documents in the context of the within motion. Moreover, even assuming that the Legislature was aware of the possible changes in coverage and costs, defendants have not established, or even alleged, a similar understanding on the part of plaintiffs. To this end, plaintiffs allege that "[u]ntil October 1, 2011, State employees who were members of all five CSEA units, ... with ten or more years of service, continued to receive fullypaid retiree health insurance for individual coverage and continued to contribute 25 percent toward the cost of dependent coverage for health insurance in retirement as described in the above contracts" and "[s]tate employees who were members of all five CSEA units ..., who retired between January 1, 1983 until October 1, 2011 with ten or more years of service contributed ten percent toward the cost of individual coverage and 25 percent toward the cost of dependent coverage." Am. Cplt. at ¶¶ 59–60. Further allegations of plaintiffs' expectations are articulated. Plaintiffs allege that over the past twenty-nine years, the State established a practice that each employee who retired with ten or more years of State service was covered by a CSEA/State collective bargaining agreement on the employee's date of retirement. *Id.* at ¶ 37. Based upon the allegations in the complaint, language in the CBA and CSL § 167(8), plaintiffs have sufficiently alleged that the impairment was not reasonably expected.

Further, plaintiffs allege that defendants "unilaterally implemented higher contribution rates for 1983–2011 retirees." Plaintiffs also claim that prior to the enactment

of Chapter 491, § 167(8) provided "that the State cost of premium or subscription charges for employees may only be increased pursuant to the terms of a collective bargaining agreement; however, the statute further stated that such increase 'shall not be applied during retirement.' " *Id.* at ¶ 62. Plaintiffs further assert that based upon the Taylor Law, the provisions of the 2007–2011 contract "stay in effect by operation of law." *Id.* at ¶ 78. Based upon the record as it currently exists, plaintiffs have pled sufficient facts supporting a plausible claim that the impairment to their contractual rights was substantial.[FN13]

> FN13. Defendants cite to *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFL–CIO v. Town Bd. of the Town of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994) in support of the argument that the law did not prevent the parties from fulfilling their obligations and thus, there was no substantial impairment. The Court has reviewed the holding and finds the facts vastly dissimilar from those at hand. Moreover, *Local 342* was before the Southern District on a motion for a preliminary injunction which, as discussed *supra,* requires a different standard of proof than a motion to dismiss. Thus, at this stage of the litigation, given the factual and procedural differences, the Court is not compelled to abide by the holding in *Local 342.*

## C. Legitimate Public Purpose and Reasonable and Necessary

**\*23** When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law. *See Energy Reserves Group,* 459 U.S. at 411–12. A law that substantially impairs contractual relations must be specifically tailored to "meet the societal ill it is supposedly designed to ameliorate." *Allied Structural Steel,* 438 U.S. at 243. The Second Circuit has held, "[a] legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.' ' *Buffalo Teachers Fed'n,* 464 F.3d at 368. "Courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest" however, "the purpose may not be simply the financial benefit of the

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

sovereign." *Id.* (citation omitted). Moreover, "[a]lthough economic concerns can give rise to the [ ] use of the police power, such concerns must be related to 'unprecedented emergencies' such as mass foreclosures caused by the Great Depression." *Id.* "That a contract-impairing law has a legitimate public purpose does not mean there is no Contracts Clause violation. The impairment must also be one where the means chosen are reasonable and necessary to meet the stated legitimate public purpose." *Id.* at 369. On a motion to dismiss, the court is not bound to accept the legislature's justification for the public purpose. *See Nat'l Educ. Ass'n–Rhode Island by Scigulinsky v. Retirement Bd. of Rhode Island Emp. Retirement Sys.,* 890 F.Supp. 1143, 1162 (D.R.I.1995).

The "reasonable and necessary" analysis involves a consideration of whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. *Am. Fed'n of State, County & Mun. Emps. v. City of Benton, Arkansas,* 513 F.3d 874, 879–880 (8th Cir.2008) (citing *Energy Reserves Group, Inc.,* 495 U.S. at 412 (1983)). Before analyzing whether an act is reasonable and necessary, the court must determine the degree of deference afforded to the legislature. Where the state impairs a public contract to which it is a party, the state's self-interest is at stake and, thus, the court will afford less deference to the state's decision to alter its own contractual obligations. *United Auto,* 633 F.3d at 45; *see also Buffalo Teachers Fed'n,* 464 F.3d at 369 (holding that "[w]hen a state's legislation is self-serving and impairs the obligations of its own contracts, courts are less deferential to the state's assessment of reasonableness and necessity"). "The relevant inquiry for the Court is to ensure that states neither 'consider impairing the obligations of [their] own contracts on a par with other policy alternatives' nor 'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well,' nor act unreasonably 'in light of the surrounding circumstances.' " *Donohue,* 2012 WL 3561796, at *30 (citing *U .S. Trust,* 431 U.S. at 30–31). In this matter, the State is a party to the CBA and, thus, the Court will afford less deference to the State's decisions.

**\*24** "To be reasonable and necessary under less deference scrutiny, it must be shown that the state did not

(1) 'consider impairing the ... contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.' " *Buffalo Teachers Fed'n,* 464 F.3d at 371. Some factors to be considered under this inquiry include: "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *Donohue,* 2012 WL 3561796, at *30 (citing, *inter alia, Energy Reserves Grp.,* 459 U .S. at 410 n. 11).

In a case in this district, Senior United States District Judge Lawrence E. Kahn addressed the issue of reasonableness while affording "less deference" to the State's decisions. *Donohue v. Patterson,* 715 F.Supp.2d 306, 322 (N.D.N.Y.2010). The *Donohue* case involved an emergency appropriations bill which enacted unpaid furloughs, a wage freeze, and a benefits freeze on certain groups of state employees in contravention of a number of CBAs. *Id.* at 313. The "extender bill" expressly imposed the altered terms "[n]ot withstanding any other provisions of this section or of any other law, including article fourteen of this chapter, or collective bargaining agreement or other analogous contract or binding arbitration award." *Id.* at 314. The court assumed there was a legitimate public purpose and directed it's attention to the reasonableness issue. Judge Kahn noted that the defendants failed to present any showing of a substantial record of any legislative consideration of policy alternatives to the challenged bill:

Defendants do not, and evidently cannot, direct the Court to any legislative consideration of policy alternatives to the challenged terms in the bill; rather, the only support offered by Defendants for their assertion that the contractual impairment was not considered on par with other alternatives is a list of assorted expenditure decisions made by the State over the past two years, such as hiring freezes and delays of school aid. This will not do. That the State has made choices about funding and that a fiscal crisis remains today surely cannot, without much more, be sufficient justification for a drastic impairment of contracts to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

which the State is a party. Without any showing of a substantial record of considered alternatives the reasonableness and necessity of the challenged provisions are cast in serious doubt.

*Id.* at 322.

Rather, the court noted that the defendants relied upon "generalities" and failed to demonstrate that they "did not impose a drastic impairment where a more moderate course was available." *Id.* The court addressed the affidavits submitted by the defendants in support of the motion and held as follows:

**\*25** While Defendants have identified a fiscal emergency and note that state personnel comprise a significant source of state spending, their argument equates the broad public purpose of addressing the fiscal crisis with retrieving a specific level of savings attributed to the provisions. The two are not the same. Where reasonable alternatives exist for addressing the fiscal needs of the State which do not impair contracts, action taken that does impair such contracts is not an appropriate use of State power. In its submissions to the Court, the State artificially limits the scope of alternatives for addressing the fiscal crisis to retrieving a certain amount of savings from unionized state employees. According to this view, the reasonableness and necessity of the challenged provisions is demonstrated simply because there is a fiscal crisis and Plaintiffs have not identified alternative sources from their own contracts for the same level of funding as that desired by the State. Plaintiffs are not charged with that responsibility. The desired savings need not come from state personnel in the amount identified by the State. Rather, the State must consider both alternatives that do not impair contracts as well as those which might do so, but effect lesser degrees of impairment.

*Id.* at 323.

Judge Kahn concluded that,

[m]ost importantly, the Court cannot ignore the conspicuous absence of a record showing that options were actually considered and compared, and that the conclusion was then reached that only the enacted provisions would suffice to fulfill a specified public purpose. While the Court would afford significant deference to a legislative judgment on an issue of this type where the State is not a party to the impaired contract, the Court cannot do so here—not only because the state is a contractual party but, far more critically, because actual legislative findings in support of the provision cannot be located; due to the take-it-or-leave nature of the extender bill, in conjunction with the Senate's contemporaneous and unanimous statement opposing the challenged provisions, there is no adequate basis before the Court on which it may be established that the provisions are reasonable and necessary.

*Id.* at 323.

While a fiscal crisis is a legitimate public interest, defendants cannot prevail on a motion to dismiss the complaint with an argument limited to "emphasizing the State's fiscal difficulties." *See id.* Broad reference to an economic problem simply does not speak to the policy consideration and tailoring that is required to pass scrutiny under plaintiffs' Contracts Clause challenge. *Id.*

At this stage of the litigation, all that is required is that plaintiffs plead a "cognizable claim for a remedy which may be proved at trial." *See Henrietta D. v. Giuliani,* No. 95–CV–0641, 1996 WL 633382, at *12 (E.D.N.Y. Oct. 25, 1996). Plaintiffs assert that

[a]t no time did the State Legislature amend Civil Service Law 167(1)(a) to raise the contribution rates for retiree health insurance above ten percent for individual and 25 percent for dependent coverage.

**\*26** At no time have the State defendants or the State legislature issued a declaration or any other kind of finding stating that it is necessary to raise the contribution rates that retirees contribute toward the cost of their health insurance to serve an important State purpose.

Upon information and belief, raising the contribution rates for retirees was not party of the 2011–2012 State budget.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

Am. Cplt. at ¶¶ 67–69.

Plaintiffs allege that, "the only 'rationale' or 'purpose' asserted by the defendants for substantially impairing the plaintiffs-retirees' contract rights was that it was necessary to implement the negotiated agreements between the State and CSEA. *Id* . at ¶ 95. Indeed, plaintiffs allege that the impairment "actually defeats the significant public purpose of ensuring adequate and affordable health care for retirees who are least able to suffer such a retroactive diminution of their health care benefits. *Id.* at ¶ 97. On a motion to dismiss, the Court must accept these allegations as true. Thus, the Court finds that plaintiffs have pled sufficient facts suggesting that defendants' actions were not reasonable and necessary.

While defendants rely upon the economic emergency, a resolution of the issues surrounding defendants' fiscal crisis and economic situation will involve questions not appropriately resolved on a motion for dismissal. *See Nat'l Educ. Ass'n,* 890 F.Supp. at 1164 (holding that a determination of the reasonableness of the defendants' actions based upon the economic crisis involving the Retirement System was premature on a motion to dismiss). Courts have held that, "[r]esolution of ... whether the contract-impairing enactment was 'reasonable and necessary to serve an important public purpose' is not appropriate in the context of a motion to dismiss." *JSS Realty Co., LLC v. Town of Kittery, Maine,* 177 F.Supp.2d 64, 70 (D.Me.2001). Defendants argue that the amendment to CSL § 167 was for a legitimate public purpose based upon the State's economic emergency and fiscal crisis. Even assuming that the Court accepts that explanation as a legitimate purpose, defendants fail to demonstrate that the means chosen were necessary. Defendants do not explain why the language and provisions of Chapter 491 were selected and rather, rely upon the measures that the State refrained from enacting as a means of demonstrating reasonableness including the State's decision not to eliminate the NYSHIP program or rewrite CSL § 167 to prescribe more severe modifications. These assertions are unsupported by the record. Moreover, as Judge Kahn noted, listing the various ways that the State has attempted to "overhaul" the economy, *i.e.,* prison consolidation, mergers of state agencies, and reforms to

the juvenile system, without more, is insufficient justification for impairing State contracts. *See Donohue,* 715 F.Supp.2d at 323.

To summarize, although defendants may prove otherwise upon completion of discovery and a motion for summary judgment, at this stage of the litigation, plaintiffs have met their burden and have alleged a plausible cause of action for a violation of the Contracts Clause. However, the parties are cautioned to appreciate the "distinction" between the Rule 12(b)(6) standard and the summary judgment standard. The burden on the non-movant is significantly different on a motion for summary judgment. "Even if the same relevant documents were considered at each stage, general facts [ ... ] receive consideration at summary judgment, but not in the Rule 12(b)(6) analysis." *Werbowsky v. Am. Waste Serv., Inc.,* No. 97–4319, 1998 WL 939882, at *5 (6th Cir. Dec. 22, 1998) (holding that the Rule 12(b)(6) ruling was not a final judgment, and did not bind the district court at summary judgment). If presented with a motion for summary judgment, plaintiffs will face the burden of citing to facts in the record and "must go beyond the pleadings and come forth with genuine issues of fact for trial." *See Connection Training Servs. v. City of Philadelphia,* 358 Fed. Appx. 315, 318 (3d Cir.2009).

### III. Due Process

**\*27** Initially, the Court is compelled to point out that both defendants and plaintiffs present nebulous arguments with respect to this claim. Plaintiffs simply claim that defendants violated their Fourteenth Amendment rights to be afforded adequate notice and a reasonable opportunity to be heard before being deprived of property to which they were lawfully entitled. Plaintiffs argue that they possessed sufficient collective bargaining and statutorily created contract rights and that defendants abolished the benefit without proper notice to plaintiffs. Defendants argue that plaintiffs do not have a legitimate claim of entitlement to a property interest in insurance cost percentages and, therefore, cannot sustain a claim under Due Process.

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

Const. amend. XIV, § 1. In order to demonstrate a violation of either substantive or procedural due process rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought. *Puckett v. City of Glen Cove*, 631 F.Supp.2d 226, 236 (E.D.N.Y.2009) (citing *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999)). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972) (holding that the plaintiff must have more than a unilateral expectation; the plaintiff must have a legitimate claim of entitlement to the benefit). The Second Circuit has held that, "[i]n order for a person to have a property interest in a benefit such as the right to payment under a contract, [h]e must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFLCIO v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir.1994) (citations omitted). "When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994).

"Courts have determined that in appropriate circumstances, contractual rights arising from collective bargaining agreement give rise to constitutional property right." *Jackson v. Roslyn Bd. of Educ.*, 652 F.Supp.2d 332, 341 (E.D.N.Y.2009) (citing *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 314 (2d Cir.2002). A "property interest in employment can be created by ordinance or state law." *Winston v. City of New York*, 759 F.2d 242, 247 (2d Cir.1985) (holding that the plaintiffs' benefits were found in the New York State Constitution and vested in the plaintiffs by the terms of a statutory scheme). The Second Circuit has held that

**\*28** [i]n determining whether a given benefits regime creates a property interest protected by the Due Process Clause, we look to the statutes and regulations governing the distribution of benefits. Where those statutes or regulations meaningfully channel official

discretion by mandating a defined administrative outcome, a property interest will be found to exist.

*Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir.2005) (internal citations and quotation marks omitted). Courts in this circuit have held that statutory framework may create a property interest. *See* Kapps, 404 F.3d at 104; *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir.1978) (holding that city administrative code created a property right in receipt of accident disability retirement benefits, where the code required officials to give benefits to applicants who met specified criteria); *see also Winston*, 759 F.2d at 242; *Sparveri v. Town of Rocky Hill*, 396 F.Supp.2d 214, 218 (D.Conn.2005) (noting that the plaintiff claimed that her entitlement to the level of pension and healthcare benefits was rooted in the statutory pension scheme established by the Town Charter and Plan ordinance).

In the Amended Complaint, plaintiffs' Third Cause of Action contains allegations relating to due process. Plaintiffs allege that they have a vested property right to maintain the same contribution rates contained in the contract that was in effect on the date each retiree retired and that the State's increase in contribution rates, absent due process, resulted in an impermissible forfeiture of their vested property rights. Am. Cplt. at ¶¶ 115–116. Plaintiffs assert that they were deprived of this property right without adequate notice or a reasonable opportunity to be heard. *Id.* at ¶ 117. While the Court cannot conclude as a matter of law that plaintiffs' possessed a property interest within the meaning of the Fourteenth Amendment, plaintiffs have sufficiently articulated and pled due process violations to survive a motion to dismiss.

### CONCLUSION

**IT IS HEREBY**

**ORDERED** that defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 11) is **GRANTED IN PART AND DENIED IN PART;** it is further

**ORDERED** that defendants' motion to dismiss plaintiffs' amended complaint as against the State of New York, New York State Civil Service Department, New York State Civil Service Commission, New York State

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6020058 (N.D.N.Y.)

(Cite as: 2012 WL 6020058 (N.D.N.Y.))

and Local Retirement System and New York State Unified Court System is **GRANTED.** All claims against these defendants are dismissed; it is further

**ORDERED** that defendants' motion to dismiss plaintiffs' claims for monetary damages asserted against defendants Hite, Ahl, Hanrahan, Megna, DiNapoli and Lippman in their official capacity is **GRANTED;** it is further **ORDERED** that defendants' motion to dismiss plaintiffs' claims for injunctive and declaratory relief asserted against defendants Hite, Ahl, Hanrahan, Megna, DiNapoli and Lippman in their official capacity is **GRANTED** only to the extent that such claims seek retrospective relief; it is further

**\*29 ORDERED** that defendants' motion to dismiss plaintiffs' Article 78 claims is **GRANTED;** it is further

**ORDERED** that defendants' motion is denied in all other respects.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

Donohue v. New York
Slip Copy, 2012 WL 6020058 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
FAHS CONSTR. GROUP, INC., Plaintiff,
v.
Michael GRAY; John Van Auken; Timothy Farrell;
John Doe No. 1; John Doe No. 2; John Doe No. 3; John
Doe No. 4; and John Doe No. 5, Defendants.
No. 3:10–CV–0129 (GTS/DEP).

July 12, 2012.
Hinman, Howard & Kattell, LLP, Adam P. Hatch, Esq., of
Counsel, Binghamton, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Adam W. Silverman, Esq., of Counsel,
Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this civil rights
action filed by Fahs Construction Group, Inc., ("Plaintiff")
against Michael Gray, John van Auken, Timothy Farrell,
John Doe No. 1, John Doe No. 2, John Doe No. 3, John
Doe No. 4, and John Doe No. 5 ("Defendants"), in their
individual and official capacities, is Defendants' motion to
dismiss Plaintiff's first claim for relief in its Amended
Complaint for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6) and to dismiss all claims against
Defendants in their official capacities for lack of
subject-matter jurisdiction pursuant to Fed.R.Civ.P.
12(b)(1). (Dkt. No. 31.) For the reasons set forth below,
Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended
Complaint alleges that, between approximately June of

2003 and April of 2010, Defendants, in their individual
and official capacities, violated Plaintiff's following rights:
(1) its right of equal protection under the Fourteenth
Amendment by engaging in disparate, discriminatory
conduct toward Plaintiff during a highway project for
which Plaintiff was the contractor, causing Plaintiff to
suffer significant financial loss; and (2) its right to free
speech under the First and Fourteenth Amendments by
engaging in the discriminatory conduct against Plaintiff in
unlawful retaliation for a previous dispute with an
employee from the New York State Department of
Transportation ("NYSDOT"). (*See generally* Dkt. No. 29
[Plf.'s Amend. Compl.].) Familiarity with the factual
allegations supporting these claims in Plaintiff's Amended
Complaint is assumed in this Memorandum–Decision and
Order, which is intended primarily for the review of the
parties. (*Id.*)

### B. Defendants' Motion

Generally, in support of their motion to dismiss,
Defendants argue as follows: (1) Plaintiff's first claim for
relief for violation of Plaintiff's rights of equal protection
fails to state a claim upon which relief can be granted
because it fails allege facts plausibly suggesting the
occurrence of any conduct within the applicable three-year
limitations period; and (2) based on Plaintiff's own factual
allegations, Defendants are protected from liability in their
official capacities as a matter of law by the doctrine of
sovereign immunity. (*See generally* Dkt. No. 31 Attach. 1
[Defs.' Memo. of Law].) Defendants do not argue, nor
does their motion request, that Plaintiff's claims be
dismissed against them in their individual capacities. (*Id.*)

Generally, in its response to Defendants' motion to
dismiss the first claim for relief, Plaintiff makes three
alternative arguments. First, Plaintiff argues that,
subsequent to Defendant's motion being filed, Plaintiff
received from the NYSDOT, by means of a New York
Freedom of Information Law ("FOIL") request,
documentation that supports its assertion that NYDOT
treated another, similarly situated contractor more
favorably. (Dkt. No. 33 [Plf.'s Opp'n Memo. of Law].)
Plaintiff argues that this document supports its equal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

protection claim by showing disparate treatment within the three-year limitations period. (*Id.*) Plaintiff requests that the Court take judicial notice of this document and thus deny Defendants' motion, because Plaintiff will have met its burden under Fed.R.Civ.P. 8(a) by plausibly suggesting a timely claim. (*Id.*) In the alternative, Plaintiff argues that the Court should *sua sponte* convert the motion to dismiss into a motion for summary judgment pursuant to Fed.R.Civ.P. 12(d). (*Id.*) Plaintiff argues that the document received from the FOIL request demonstrates a genuine issue of material fact, which would prevent the granting of a motion for summary judgment. (*Id.*) Finally, Plaintiff alternatively argues that, if the Court decides to grant the motion to dismiss, the Court should do so without prejudice and give Plaintiff another opportunity to amend the Complaint to reflect this information newly obtained from the FOIL request. (*Id.*) Plaintiff does not oppose Defendants' motion to dismiss Plaintiff's claims against them in their official capacities because of sovereign immunity. (*Id.*)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Failure to State Claim

**\*2** Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing dismissals for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Wade v. Tiffin Motorhomes, Inc.,* 05–CV–1458, 2009 WL 3629674, at *3–5 (N.D.N.Y. Oct. 27, 2009) (Suddaby, J.), which accurately recites that legal standard.

The Court would add only a few words regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 12(c) is contemplated, the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided

by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[FN1]

> FN1. *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.");
> *L–7 Designs, Inc. v. Old Navy, LLC,* No. 10–573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed.R.Civ.P. 12[d] if the "matters outside the pleadings" consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (explaining that a district court considering a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citations omitted).

**B. Legal Standard Governing Motions to Dismiss for Lack of Subject–Matter Jurisdiction**

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir.2000). When resolving a motion to dismiss for lack of subject-matter jurisdiction, a district court may look to evidence outside of the pleadings. *Makarova,* 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova,* 201 F.3d at 113 (citing *Malik v. Meissner,* 82 F.3d 560, 562 [2d Cir.1996] ). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (citing *Makarova,* 201 F.3d at 113).

**C. Legal Standards Governing Plaintiff's Claims**

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Memorandum–Decision and Order, which (again) is intended primarily for review by the parties. (*See generally* Dkt. No. 31, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 33 [Plf.'s Opp'n Memo. of Law].)

**III. ANALYSIS**

**A. Whether Plaintiff's First Claim for Relief Should Be Dismissed for Failure to State a Claim upon Which Relief Can Be Granted**

**\*3** As stated in Part I.B. of this Memorandum–Decision and Order, Defendant seeks dismissal of Plaintiff's first claim for relief because Plaintiff failed to allege facts plausibly suggesting the occurrence of any conduct within the applicable three-year limitations period and thus failed to state a claim upon which relief can be granted. After carefully considering the matter, the Court answers this question in the affirmative, generally for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 31, Attach.1) The Court would add only the following analysis.

In *Bell Atlantic Corp. v. Twombly,* the Supreme Court clarified that pleading standard under Fed.R.Civ.P. 8(a) turns on the *plausibility* of an actionable claim, rather than turn on the *conceivability* of an actionable claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–70 (2007). As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 129, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Here, Plaintiff's first claim for relief in the Amended Complaint does not allege facts plausibly suggesting any disparate treatment by Defendants within the applicable statute of limitations period, but instead alleges that Plaintiff could show disparate treatment only after discovery. (Dkt. No. 29, at ¶ 94.) As the Supreme Court noted in the analogous situation in *Twombly,* Plaintiff must allege facts plausibly suggesting a plausible claim in order to proceed to discovery and cannot rest its Amended Complaint on the mere hope that the discovery process will provide necessary facts to support its claim. *See Twombly,* 550 U.S. at 559. As a result, an analysis of the material within the four corners of Plaintiff's Amended Complaint requires the conclusion that the Amended Complaint fails to state a plausible claim upon which relief can be granted as to the first claim for relief under Fed R.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

Civ. P. 8(a)(2).

In its response, however, Plaintiff has attached as Exhibit A the documentation it received from its FOIL request from NYSDOT, which purports to show disparate treatment of another, similarly positioned company beyond the statute of limitations period. (Dkt. No. 33, Attach.1.) Plaintiff requests that the Court take judicial notice of this documentation pursuant to Fed.R.Evid. 201(b) and (c), when ruling on this motion. (Dkt. No. 33 [Plf.'s Opp'n Memo. of Law].) Rule 201(b) states that a court may take judicial notice of a fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Because NYSDOT's payment of a particular contractor is not generally known within the Northern District of New York, the Court could take judicial notice of the documentation only under Fed.R.Evid. 201(b)(2).

**4** As the Advisory Committee Notes to Fed.R.Evid. 201 explain, "the tradition [with respect to judicial notice] has been one of caution in requiring that the matter be beyond reasonable controversy." Fed.R.Evid. 201(b), Advisory Committee's Notes. More specifically, a "high degree of indisputability is the essential prerequisite" to taking judicial notice of an adjudicative fact. Fed.R.Evid. 201(a), Advisory Committee's Notes. As a result, courts often take judicial notice of records prepared for widespread and open public release.[FN2] However, the document in question is of a distinctly different character. It was not prepared for review for the general public and could be obtained only by a time-consuming response to a FOIL request. See In re Take Two Interactive Sec. Litig., 551 F.Supp.2d 247, 263 n. 4 (S.D.N.Y.2008) (declining to take judicial notice of unauthenticated, unpublished documents). The only interpretation of the documentation is provided by Plaintiff's affidavit, which may or may not be accurate. (Dkt. No. 33, Attach.1.) Furthermore, because Plaintiff does not provide the Court with its original FOIL request, the Court is unable to determine, from the documents provided, what exact information Plaintiff requested from NYSDOT. Simply stated, because Exhibit A does not have a high degree of indisputability that is beyond reasonable controversy, the Court may not, and

does not, consider it when deciding Defendants' motion to dismiss for failure to state a claim.

FN2. *See, e.g. Island Software and Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005) (affirming judicial notice of copyright registrations); *Driebel v. City of Milwaukee,* 298 F.3d 622, 630 n. 2 (2d Cir.2002) (affirming judicial notice of duly promulgated and published rules and regulations); *In re Rogers,* 07–31186, 2008 WL 1902050, at *1 (Bkrtcy. E.D. Tenn. April 25, 2008) (taking judicial notice of advisory opinions issued by the Tennessee Attorney General).

In the alternative, Plaintiff requests that the Court (1) rely on the document in question to *sua sponte* convert Defendants' motion to dismiss into a motion for summary judgment under Fed.R.Civ.P. 12(d), and (2) conclude that, based on that document, Plaintiff has raised a genuine issue of material fact that precludes the Court from granting summary judgment. (*Id.*)

With all due respect, the Court finds this argument to misconstrue Fed.R.Civ.P. 12(d) and Fed.R.Civ.P. 56. It is true that, pursuant to Fed.R.Civ.P. 12(d), a court must convert a defendant's motion to dismiss for failure to state a claim into a motion, made by defendant, for summary judgment if (1) matters outside the pleadings are presented to the court, and (2) the court decides not to exclude those matters. Fed.R.Civ.P. 12(d). It is also true that, pursuant to Fed.R.Civ.P. 56, the court can then, *inter alia,* deny the defendant's motion, thus enabling the plaintiff to reach a jury on its claims.[FN3]

FN3. Indeed, the court can also, inter alia, actually grant summary judgment in the plaintiff's favor (if the issue has been sufficiently noticed and briefed). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") [citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

However, to do so, the following two preconditions must be met: (1) the Court must decide not to exclude the matters outside the pleadings; and (2) Defendants must be given notice of the conversion and a reasonable opportunity to present all the material that is pertinent to the conversion. Fed.R.Civ.P. 12(d); *see, e.g., B.V. Optische Industrie De Oude Delft v. Hologic,* 909 F.Supp. 162, 167 (S.D.N.Y.1995) ("Because in this case it was the non-movant who offered the supplemental submissions, the movants could not have had adequate notice that this motion might be treated as one for summary judgment. Therefore, conversion is inappropriate ."). In this case, neither of these preconditions has been met. For these two reasons alone, the Court rejects Plaintiff's argument.

**\*5** In any event, even if the above-described two preconditions were met, the matters outside the pleadings could be considered only to the extent that they support (or attack) the *evidentiary* sufficiency of a claim;[FN4] they could not be considered also in an effort to support (or attack) the *pleading* sufficiency of that claim.[FN5] This is because, att all times during the consideration of extra-pleading material on a motion for summary judgment, the claim at issue must be well-pled (without resort to the extra-pleading material): this is why, on a defendant's motion for summary judgment, the claim at issue may be dismissed for failure to state a claim.[FN6] Frankly stated, in the Court's view, the argument that a plaintiff can use a document to create a genuine issue of fact (pursuant to Fed.R.Civ.P. 56) with regard to a claim that is not even actionable (pursuant to Fed.R.Civ.P. 12[b][6] ) when construed without that document is a bootstrap leap into a world ungoverned by the Federal Rules of Civil Procedure.[FN7] As a result, the Court could, and would, in deciding a converted motion for summary judgment in this case, focus on the glaring pleading issues presented before proceeding to any evidentiary issues presented. For this alternative reason, the Court rejects Plaintiff's argument.

FN4. 5C Wright & Miller, *Federal Practice & Proc.* § 1366 ("The element that triggers the conversion is a challenge to the sufficiency of the pleader's claim supported by *extra-pleading* material.") [emphasis added].

FN5. *See* Fed.R.Civ.P. 12(d) (requiring that, if

matters outside the pleadings are considered by the court, the motion ceases to be one that addresses the pleading sufficiency of the claim and becomes one that addresses the evidentiary sufficiency of the claim).

FN6. *See Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."); *Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N .Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

FN7. Viewed from another perspective, a claim is ready for summary judgment only after adequate discovery has been conducted on that claim. Fed.R.Civ.P. 56(d)(2). The scope of permissible discovery of a civil claim in federal court is defined, in large part, by what matter is relevant to that claim. Fed.R.Civ.P. 26(b)(1). Given these facts, the Court has difficulty imagining how relevant discovery could be adequately conducted on a claim if the contours of that claim have not even been sufficiently delineated for purposes of Fed.R.Civ.P. 8(a)(2) and/or Fed.R.Civ.P. 12(b)(6).

Finally, Plaintiff requests that, if the Court grants Defendants' motion to dismiss Plaintiff's first claim of relief, that dismissal should be without prejudice and with leave to replead. (Dkt. No. 33 .) The Court construes this argument under the standard that governs a cross-motion for leave to file an amended complaint, given that Plaintiff's desired result is leave to file a Second Amended Complaint.

Motions for leave to amend a complaint are governed by Fed.R.Civ.P. 15, which states that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993). Nevertheless, leave to amend a complaint is not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

automatic; and a court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, "such as [1] undue delay, bad faith or dilatory motive on the part of the movant, [2] repeated failure to cure deficiencies by amendments previously allowed, [3] undue prejudice to the opposing party by virtue of the allowance of the amendment, [4] futility of amendment, etc." *Foman,* 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous., 608 F.2d 28, 42 (2d Cir.1979).*

With regard to the second factor described above (i.e., repeated failure to cure deficiencies by amendments previously allowed), the Court notes that granting a plaintiff an opportunity to amend before dismissal of his action is not required where the plaintiff has already been afforded the opportunity to amend. *Abascal v. Hilton,* 04–CV–1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008)* (Kahn, J., adopting, on *de novo* review, Report–Recommendation by Lowe, M.J.) ("Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading."), *aff'd,* 357 F. App'x 388 (2d Cir.2009); *accord, Shuler v. Brown,* 07–CV–0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. March 23, 2009)* (McAvoy, J., adopting Report–Recommendation by Lowe, M.J.), *Smith v. Fischer,* 07–CV–1264, 2009 WL 632890, at *5 & n. 20 (N.D.N.Y. March 9, 2009)* (Hurd, J., adopting Report–Recommendation by Lowe, M.J.).[FN8]

> [FN8]. *See also Foman v. Davis,* 371 U.S. 178, 182 (1962) (explaining that denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading); *Coleman v. brokersXpress, LLC,* 375 F. App'x 136, 137 (2d Cir.2010) ("Nor can we conclude that the district court abused its discretion in denying Coleman leave to amend. The district court afforded Coleman one opportunity to amend the complaint, and Coleman made no specific showing as to how he would cure the defects that persisted if given a second opportunity to amend."); *Dyson v. N.Y. Health Care, Inc.,* 353 F. App'x 502, 503–03 (2d Cir.2009)* ("[T]he district court did not abuse its discretion by dismissing Dyson's third amended

complaint with prejudice.... [T]he district court afforded Dyson three opportunities to file an amended complaint so as to comply with Rule 8(a)(2), and, despite these, she did not plead any facts sufficient to show that she was plausibly entitled to any relief."); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988)* ("We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible."); *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972)* (affirming dismissal of *pro se* plaintiff's amended complaint without leave to amend, for failure to state a claim upon which relief can be granted, without engaging in analysis of whether second amended complaint would be futile); *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002)* ("Yang's amended complaint fails to remedy this defect in his pleadings.... His equal protection claim is dismissed."), *aff'd,* 71 F. App'x 90 (2d Cir.2003); *Payne v. Malemathew,* 09–CV–1634, 2011 WL 3043920, at *6 (S.D.N.Y. July 22, 2011)* ("Plaintiff has repeatedly failed to cure the defects in his claims despite having received detailed instructions and despite the bases of the dismissals having been specified in advance, and he has not identified any additional facts he could advance now that would address these defects. Accordingly, notwithstanding Plaintiff's pro se status, leave to amend yet again is denied."); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998)* ("While that failure to plead special damages with respect to the other alleged representations in theory might be cured by amendment, plaintiff already has amended once and has not sought leave to amend again. Accordingly, the fraud claims will be dismissed except to the limited extend indicated.").

**\*6** Finally, in this District, a motion for leave to amend a pleading must (1) attach an unsigned copy of the

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

proposed amended pleading, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means. N.D.N.Y. L.R. 7.1(a)(4).

Here, Plaintiff's cross-motion fails to (1) attach a copy of the proposed Second Amended Complaint, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the Amended Complaint or other equivalent means, in violation of Local Rule 7.1(a)(4). For this reason alone, the Court can, and does, deny Plaintiff's cross-motion.

In the alternative, the Court denies Plaintiff's cross-motion because, under the circumstances, the following relevant factors weigh decidedly against granting that cross-motion: (1) Plaintiff already had a full and fair opportunity to correct the pleading deficiencies in question, through its receipt of the Court's detailed Memorandum–Decision and Order of January 27, 2011, and its ability to file an Amended Complaint on March 13, 2011; (2) Defendants would be unduly prejudiced as a result of (a) the fact that they have already spent the time and incurred the expense of filing two separate motions to dismiss, and (b) the fact that a significant amount of time has elapsed since the events giving rise to Plaintiff's proposed claims (some of which occurred more than eight years ago) and the filing of his motion, [FN9] and (3) Plaintiff's proposed claims appear to be futile because they rely on document of questionable meaning.

> [FN9.](link) *Cf. [Barber v. U.S.,](link)* 11–CV–1100, 2012 WL 1681978, at *1 (N.D . N.Y. May 14, 2012) (Suddaby, J.) ("[T]he prejudice posed to Defendant by Plaintiff's failure to prosecute is exacerbated somewhat by the age of the case (which arises from events allegedly occurring as far back as 2009) and the number of events giving rise to the case. Under the circumstances, a further delay may well affect the memories of the numerous parties (and presumably witnesses) in the case, the ability to locate witnesses, and the preservation of evidence (particularly documentary evidence regarding the housing sale

in question)."); *[Geordiadis v. First Boston Corp.,](link)* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

For each of these alternative reasons, Plaintiff's cross-motion for leave to file a Second Amended Complaint is denied, and the first claim for relief contained in his Amended Complaint is dismissed with prejudice.

**B. Whether Plaintiff's Claims Against Defendants in Their Official Capacities Should be Dismissed Because of Defendants' Sovereign Immunity Under the Eleventh Amendment**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 31, Attach. 1 [Defs.' Memo. of Law].) As stated above in Part I.B. of this Memorandum–Decision and Order, Plaintiff does not oppose dismissal against Defendants in their official capacities. (Dkt. No. 33 [Plf.'s Memo. of Law].)

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.[FN10] As a result, Defendants must show only that this argument possesses facial merit in order for that argument to succeed. The Court finds that Defendants have met this modest burden. Indeed, Defendants' argument would survive even the more rigorous scrutiny appropriate for a contested argument.

> [FN10.](link) *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *[Rusyniak v. Gensini,](link)* 07–CV–0279, 2009 WL 3672105, at *1 n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316

(Cite as: 2012 WL 2873532 (N.D.N.Y.))

(collecting cases); *Este–Green v. Astrue, 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug. 7, 2009)* (Suddaby, J.) (collecting cases).

**\*7** For these reasons, Plaintiff's claims against Defendants in their official capacities are dismissed. Plaintiff's claims against Defendants in their individual capacities survive Defendant's motion to dismiss.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 31) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's first claim for relief in its Amended Complaint (Dkt. No. 29) is **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against all Defendants in their official capacities are **DISMISSED** with prejudice; and it is further

**ORDERED** that this case is referred back to Magistrate Judge Peebles to set new pretrial deadlines.

N.D.N.Y.,2012.

Fahs Const. Group, Inc. v. Gray
Slip Copy, 2012 WL 2873532 (N.D.N.Y.), 88 Fed. R. Evid. Serv. 1316
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Mark W. GANTT, Plaintiff,
v.
William LAPE and Gary Mielenz, Defendants.
No. 9:10–CV–0083 (GTS/TWD).

July 31, 2012.

Mark W. Gantt, Coxsackie, NY.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Laura A. Sprague, Esq., of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court are Plaintiff's motion for a temporary restraining order (Dkt. No. 44) and Defendant Gary Mielenz's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 31). For the reasons that follow, I recommend that the Court deny Plaintiff's motion for a temporary restraining order and grant Defendant's motion for summary judgment.

### I. BACKGROUND

The complaint alleges that on September 8, 2009, Plaintiff Mark W. Gantt filed a grievance because the commissary charged him $10.49 for an item he had not purchased. (Dkt. No. 1 at 4.[FN1]) Thereafter, Defendant Gary Mielenz, a commissary clerk, came to Plaintiff's cell and screamed at Plaintiff that Plaintiff "did make [t]he

purch[ase] and [t]hat [h]e was [g]oing [t]o [t]ake the $10.49 and [Plaintiff] would never [g]o [t]o [the] commissary" again. *Id.* at 4–5.

> FN1. The page reference is to the page number assigned by the Court's electronic filing system.

Defendant Mielenz wrote a misbehavior report charging Plaintiff with lying. *Id.* at 5. A hearing was conducted on the misbehavior report. *Id.* The hearing officer "[r]ead [t]he [g]rievance at [t]he [t]ime of [t]he hear[ ]ing" and found Plaintiff guilty. *Id.* Plaintiff states that the grievance he filed was the only evidence the hearing officer considered. *Id.* The hearing officer imposed a penalty of thirty days' loss of commissary privileges and a $5.00 fine. *Id.*

Plaintiff filed the complaint in this action on January 22, 2010. (Dkt. No. 1.) The complaint named William Lape (the superintendent of Coxsackie Correctional Facility) and Mielenz as defendants. *Id* . at 1–2. The complaint did not name the hearing officer as a defendant.

Defendants answered on July 6, 2010. (Dkt. No. 11.) On that same date, Defendant Lape moved for judgment on the pleadings. (Dkt. No. 12.) Plaintiff opposed the motion. (Dkt. No. 14.) In addition, Plaintiff requested leave to amend his complaint to add the hearing officer as a defendant. (Dkt. No. 15.) Defendants opposed that request. (Dkt. No. 16.)

On January 18, 2011, Magistrate Judge George H. Lowe [FN2] recommended that the Court grant Defendant Lape's motion for judgment on the pleadings. (Dkt. No. 25.) Judge Lowe denied Plaintiff's request to amend his complaint without prejudice to the filing of a procedurally proper motion. *Id.* The Court adopted the Report–Recommendation on February 17, 2011. (Dkt. No. 26.) Plaintiff did not move thereafter to amend his complaint.

> FN2. Judge Lowe retired on February 9, 2012. This case was reassigned to me on February 10, 2012. (Dkt. No. 38.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

Plaintiff has now moved for a temporary restraining order. (Dkt. No. 44.) Defendant Mielenz has opposed the motion. (Dkt. No. 45.) Plaintiff has filed reply affidavits. (Dkt.Nos.46–48.) In addition, Defendant Mielenz moves for summary judgment. (Dkt. No. 31.) Plaintiff has opposed the motion. (Dkt. Nos. 33 and 40.)

## II. MOTION FOR PRELIMINARY INJUNCTION

### A. Governing Legal Standard

**\*2** Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consol. Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35, 38 (2d Cir.2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Citigroup Global Mkts., Inc.,* 598 F.3d at 35; *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 405–06 (2d Cir.2011). When, however, the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the standard is higher. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006), amended on other grounds, 480 F.3d 138 (2d Cir.2007); *see also Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Mkts.,* 598 F.3d at 35 n. 4 (internal quotation marks omitted).

"To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." *Lewis v. Johnston,* No. 08–CV–482 (TJM/ATB), U.S. Dist. LEXIS 32310, at *6–7, 2010 WL 1268024, at *3, 2010 (N.D.N.Y. Apr.1, 2010) (internal quotation marks and citations omitted). [FN3] "[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines,* 111 F.3d 14, 16 (4th Cir.1997); *accord Ball v. Famiglio,* 396 Fed. App'x 836, 837 (3d Cir.2010); *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir.2010); *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994). In addition, except in limited circumstances not relevant here, a court may not order injunctive relief as to non-parties to an action. *See* Fed.R.Civ.P. 65(d) ("[e]very order granting an injunction ... binds only ... the parties ...."); *United States v. Regan,* 858 F.2d 115, 120 (2d Cir.1988).

> FN3. *See e.g., Scarbrough v. Evans,* No. 09–CV–0850 (NAM/DEP), 2010 U.S. Dist. LEXIS 38990, at *6, 2010 WL 1608950, at *2 (N.D.N.Y. Apr.20, 2010) (denying motion for preliminary injunction alleging use of excessive force and denial of medical care by non-parties where complaint alleged denial of mental health care and proper conditions of confinement); *Lewis,* 2010 U.S. Dist. LEXIS 32310, at *6, 2010 WL 1268024, at *3 (denying motion for injunctive relief based upon actions taken by staff at Great Meadow Correctional Facility in 2010, where the complaint alleged wrongdoing that occurred at Franklin and Upstate Correctional Facilities in 2006 and 2007); *McKinnon v. Tresman,* No. 3:02CV2305, 2004 U.S. Dist. LEXIS 428, at *4, 2004 WL 78091, at *1 (D.Conn. Jan.9, 2004) (denying plaintiff's motion for preliminary injunction when the inmate's complaint alleged improper disclosure of confidential medical information and the motion concerned a possible prison transfer).

Under the Prison Litigation Reform Act, preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm. *See* 18 U.S.C. § 3626(a)(2). In considering an application for prospective

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

relief, the court is required to give substantial weight to any adverse impact such relief may have on public safety or on the operation of the criminal justice system. *See* 18 U.S.C. § 3626(a)(1)(A).

**B. Analysis of Plaintiff's Motion**

**\*3** Plaintiff states that since his return to Coxsackie Correctional Facility in January 2012 he has been subjected to numerous acts of misconduct and wrongdoing by corrections staff in retaliation for his pending litigation. (Dkt. No. 44 at 2–7.) FN4 Specifically, Plaintiff claims that he has been harassed and threatened with physical harm, numerous false misbehavior reports have been written against him, his property has been interfered with, and his requests for medical care and for religious meals and study have been denied. *Id.* Read liberally in the light most favorable to Plaintiff, the motion seeks an order of this Court (I) transferring Plaintiff to a different correctional facility or (ii) restraining correctional staff at Coxsackie Correctional Facility from future acts of retaliation. *Id.*

> FN4. In late 2011, Plaintiff requested and was approved for an "area of preference transfer" within the Clinton Hub. (Dkt. No. 44 at 1.) However, because the only facility in the Clinton Hub with a security level appropriate for Plaintiff housed an inmate who was a known enemy of Plaintiff, Plaintiff had to be sent outside of the Clinton Hub to either Coxsackie Correctional Facility or Eastern Correctional Facility. (Dkt. No. 45–4 at ¶ 9.) Area of preference transfers are handled exclusively by the Office of Classification and Movement in Albany. *Id.* ¶ 8.

Defendant opposes the motion. (Dkt. No. 45.) Defendant argues that Plaintiff's motion should be denied on the ground that it improperly seeks to restrain conduct by individuals who are not parties to this action. *Id.* at 4. Defendant also contends that the motion should be denied because Plaintiff has not made the showing required for this extraordinary relief. *Id.* at 5–8.

Plaintiff has filed a reply, as well as two "supplemental" submissions. (Dkt. Nos.46–48.) Plaintiff maintains that the requested injunctive relief is necessary because corrections staff at Coxsackie Correctional

Facility have continued to retaliate against him by issuing false misbehavior reports. (Dkt. Nos.46–47.) Plaintiff also claims that several items of his personal property were improperly confiscated when he was transferred to the special housing unit on May 30, 2012. (Dkt. No. 48.) Significantly, however, Plaintiff does not claim that Defendant Mielenz had **any** involvement in these incidents, nor does he allege that Defendant exercises supervisory authority over the corrections staff at Coxsackie Correctional Facility. *Id.*

Based upon a review of the papers in the light most favorable to the *pro se* Plaintiff, I recommend that his motion for injunctive relief be denied. Plaintiff has not demonstrated any relationship between his retaliation claim against Defendant Mielenz and his claim that he has been subjected to ongoing acts of misconduct and retaliation by members of the corrections staff at Coxsackie Correctional Facility.FN5 In other words, Plaintiff's motion for injunctive relief is not intended to preserve the status quo and prevent irreparable harm until such time as this Court has the opportunity to address the merits of Plaintiff's claims against Defendant. Rather, Plaintiff seeks relief based on assertions of misconduct that are (1) against non-parties to this action, and (2) unrelated to the claims asserted in his complaint. No matter how meritorious these allegations might be, they do not afford a basis for the issuance of preliminary injunctive relief in this action.

> FN5. Plaintiff's conclusory assertions that staff work together and attend employee functions are patently insufficient to establish the required relationship between the harm alleged in the motion and the claims asserted in the complaint. *See* Dkt. No. 46 at 2, Dkt. No. 47 at 1.

In addition, Plaintiff's desire to be confined in a different correctional facility, no matter how sincere, is not sufficient to warrant the requested judicial relief. It is well-established that DOCCS has "broad leeway in deciding where to house the inmates under its protective care, be it state or county jail." *McFadden v. Solfaro,* Nos. 95 Civ. 1148(LBS) and 95 Civ. 3790 (LBS), 1998 U .S. Dist. LEXIS 5765, at \*36, 1998 WL 199923, at \*10 (S.D.N.Y. Apr. 23, 1998); *see also Meachum v. Fano,* 427

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

U.S. 215, 229, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("The federal courts do not sit to supervise state prisons, the administration of which is [of] acute interest to the States."). The law is clear that an inmate does not have a right to be confined to the prison of his own choosing or to a particular type of housing. *See Olim v. Wakinekona, 461 U.S. 238, 245, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)* (inmates have no right to be confined in a particular state or particular prison within a given state); *Montanye v. Haymes, 427 U.S. 236, 243, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)* (New York state prisoners have no right to incarceration at a particular prison facility); *Klos v. Haskell, 835 F.Supp. 710, 723 (W.D.N.Y.1993), aff'd, 48 F.3d 81 (2d Cir.1995)* (citing cases).

**\*4** For these reasons, it is recommended that Plaintiff's motion for injunctive relief (in any form) be denied.

### III. MOTION FOR SUMMARY JUDGMENT

Construed broadly, the complaint asserts (1) a retaliation cause of action against Defendant Mielenz for issuing the misbehavior report; and (2) a due process cause of action against Defendant Mielenz for overcharging Plaintiff $10.49 on his commissary bill. Defendant argues that he is entitled to summary judgment because (1) Plaintiff failed to exhaust his administrative remedies; and (2) the complaint fails to state a claim for retaliation or any violation of due process.[FN6] (Dkt. No. 31–3.) For the reasons discussed below, I recommend that the Court dismiss this action on the constitutional merits.

> FN6. Defendant also argues that he is entitled to qualified immunity. (Dkt. No. 31–3 at 13–16.) Because I find that his arguments on the constitutional merits are dispositive, I have not addressed Defendant's qualified immunity argument.

### A. Legal Standard

1. *Legal Standard Governing Motions for Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006).* Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin, 467 F.3d at 272–73.* The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* In determining whether a genuine issue of material [FN7] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir.2008).*

> FN7. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson, 477 U.S. at 248.*

2. *Legal Standard Governing Motion to Dismiss*

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique, 405 F.2d 270, 273 (2d Cir.1968)* (citations omitted); *accord Katz v. Molic, 128 F.R.D. 35, 37–38 (S.D.N.Y.1989)* ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

12(b)(6) motions to dismiss.

**\*5** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

**B. Exhaustion of Administrative Remedies**

Defendant argues that he is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 31–3 at 5–8.) I find that Plaintiff has, just barely, raised a triable issue of fact that Defendant is estopped from asserting the defense.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*6** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

Any failure by the IGRC or the superintendent to timely respond to a grievance or firstlevel appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g) (2010). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Plaintiff's claims against Defendant Mielenz involve two events: (1) the initial $10.49 commissary overcharge; and (2) the misbehavior report that Defendant Mielenz issued. Plaintiff did not exhaust his administrative remedies regarding either of these events. Regarding the overcharge, the record shows that Plaintiff wrote to the IGRC on September 8, 2009, complaining about his commissary records in general and the $10.49 commissary overcharge in particular. (Dkt. No. 31–5.) The grievance was not processed. No grievance number was assigned to it and no decision was ever reached. It does not appear on the list of grievances that Plaintiff filed at the facility. (Dkt. No. 31–6 at 5.) Although he could have appealed the IGRC's failure to act to the superintendent, Plaintiff admitted at his deposition that he "never did nothing to follow up on the grievance for them not filing or anything." (Dkt. No. 31–4 at 64:10–14.) Moreover, it is undisputed that Plaintiff never filed a grievance regarding the misbehavior report that Defendant issued. (Dkt. No. 31–6 at 5.) Plaintiff never received a decision from CORC regarding either the overcharge or the misbehavior report. (Dkt. No. 31–7.) Therefore, Plaintiff failed to exhaust his administrative remedies.

**\*7** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN8] First, "the court must ask whether [the] administrative

remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotation marks omitted).

> **FN8.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 11 at 3 ¶ 7.) However, Plaintiff has raised a triable issue of fact that Defendant should be estopped from asserting the exhaustion defense. A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008); *Ziemba v. Wezner,* 366 F.3d 161, 162–63 (2d Cir.2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison). Here, Plaintiff testified at his deposition that his grievance regarding the $10.49 commissary overcharge, rather than being properly filed and processed, "ended up in Mr. Mielenz' hand." (Dkt. No. 31–4 at 65:17–18.) It was not a copy of the grievance, but rather "the actual one because it looked like the same paper I used to write it on." *Id.* at 65:23–25. Thus, when Plaintiff attempted to properly file a grievance, Defendant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

came into possession of the document, came to Plaintiff's cell, and screamed at Plaintiff that Plaintiff "did make [t]he purch[ase] and [t]hat [h]e was [g]oing [t]o [t]ake the $10.49 and [Plaintiff] would never [g]o [t]o [the] commissary" again. (Dkt. No. 1 at 4–5.) This is not precisely the type of behavior that the *Sandlin* and *Ziemba* courts cited as estoppel. However, it is similar enough that I find that Plaintiff has, just barely, raised a triable issue of fact that Defendant is estopped from asserting the exhaustion defense. I will therefore address Plaintiff's claims on the merits.

**C. Retaliation**

**\*8** Plaintiff claims that Defendant Mielenz retaliated against him for filing a grievance by issuing a misbehavior report. (Dkt. No. 1 .) Defendant argues that the complaint does not state a retaliation claim because (1) Plaintiff has not alleged that Defendant took "adverse action" against him; and (2) even if Defendant took adverse action, there is no causal connection between Plaintiff's filing of the grievance and Defendant's decision to issue the misbehavior report.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Here, Defendant concedes that Plaintiff engaged in protected conduct by filing a grievance. (Dkt. No. 31–3 at 10.) The issue, then, is whether Defendant took adverse action against Plaintiff and, if he did, whether there was a causal connection between that action and Plaintiff's protected conduct.

The filing of misbehavior reports that result in a "temporary loss of various privileges such as permission to visit the commissary do not constitute adverse action because they are *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 U.S. Dist. LEXIS 28285, at *21, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006); *Garcia v. Watts,* No. 08 Civ. 7778, 2009 U.S. Dist. LEXIS 85613, at *7–8, 2009 WL 2981911, at *2 (S.D.N.Y. Sept.15, 2009).[FN9] Here, Plaintiff was fined $5.00 and lost commissary privileges for thirty days as a result of Defendant's misbehavior report. (Dkt. No. 1 at 5.) This *de minimis* punishment does not constitute adverse action. Therefore, I recommend that the Court grant Defendant's motion and dismiss Plaintiff's retaliation claim.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4033729 (N.D.N.Y.)

(Cite as: 2012 WL 4033729 (N.D.N.Y.))

FN9. Defendant provided Plaintiff with copies of these unpublished decisions with his moving papers. (Dkt. No31–4 at 94–106.)

**D. Due Process**

**\*9** Read broadly, the complaint asserts a procedural due process claim based on the $10.49 commissary overcharge. Defendant argues that this claim should be dismissed because New York provides an adequate post-deprivation remedy for the loss of property by inmates. (Dkt. No. 31–3.) Defendant is correct.

"[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, I recommend that the Court dismiss Plaintiff's procedural due process claim regarding the $10.49 commissary overcharge.

**ACCORDINGLY,** it is

**RECOMMENDED** that Plaintiff's motion for a temporary restraining order (Dkt. No. 44) be **DENIED;** and it is further

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 31) be **GRANTED** and that the Court enter judgment in Defendant's favor.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2012.

Gantt v. Lape
Slip Copy, 2012 WL 4033729 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.
No. 9:08-CV-482 (TJM/ATB).

Aug. 5, 2010.

Marc Lewis, pro se.

Christina L. Roberts-Ryba, Asst. Attorney General, for Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

*1 This matter was referred by Senior U.S. District Judge Thomas J. McAvoy, for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 125).

While an inmate in the custody of the Department of Correctional Services ("DOCS"), plaintiff filed his complaint, pursuant to 42 U .S.C. § 1983, regarding incidents that occurred during his incarceration at Franklin Correctional Facility ("Franklin") and Upstate Correctional Facility ("Upstate"). Liberally construed, plaintiff's amended complaint FN1 (Dkt. No. 40) makes several claims against 14 defendants FN2 relating to events in 2006 and 2007. He alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers at Franklin on or about June 15, 2006, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. FN3 Plaintiff claims that defendants Secore and Favro violated his Eighth Amendment rights by assaulting him on June 19, 2006,

and that defendant Norcross failed to intervene. He also alleges that he was a victim of another unconstitutional assault on June 24, 2006, by defendant Reardon and other unnamed officers. Plaintiff claims that, over the following days and weeks, nurses Davenport, Volpe, Walsh, and Chesbrough, and physician assistant ("PA") Tichenor all denied him constitutionally-adequate medical care, by failing to properly treat him for the various injuries he suffered as a result of the two "assaults." He states that defendant Demars violated his due process rights, while presiding at the disciplinary hearing on the charges brought by defendant Johnson, which resulted in plaintiff's confinement in a Special Housing Unit ("SHU") until the charges were reversed by DOCS in June 2007. Finally, plaintiff suggests that defendants McCasland and Hoffnagle violated plaintiff's First Amendment rights by improperly handling his legal mail in January 2007. Plaintiff seeks substantial monetary damages from the defendants.

FN1. Plaintiff was granted leave to file an amended complaint on January 26, 2009. (Dkt. No. 39).

FN2. It is well-settled that the state itself cannot be sued under section 1983. Komlosi v. New York State OMRDD, 64 F.3d 810, 815 (2d Cir.1995) (citing Will v. Michigan Department of Police, 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 87 & n. 1 (2d Cir.1991). To the extent that the defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. Huang v. Johnson, 251 F.3d 65, 69-70 (2d Cir.2001); Posr v. Court Officer Shield # 207, 180 F.3d 409, 414 (2d Cir.1999).

FN3. Plaintiff characterizes the subsequent actions of defendants Secore, Favro, Norcross, Reardon, Demars, McCasland, and Hoffnagle as

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110). Plaintiff has responded in opposition to the motion. (Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No. 128), and plaintiff submitted a sur-reply (Dkt.Nos.129, 130). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*

**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124-3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18-19, Dkt. No. 110-3). The letter was stamped as received in the administrative office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A. The Misbehavior Report Filed by Defendant Johnson

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110-8).[FN4] He concluded that plaintiff's known handwriting was

similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110-8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.,* Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251-1.6 & 251-1.7, *Id.,* Ex. C, Dkt. No. 110-8 at 21-22).

> **FN4.** Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110-8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM-ECF header.

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1-67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 6, 13).[FN5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.,* Dkt. No. 124-4 at 14).

> **FN5.** During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.,* Dkt. No. 124-4

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

at 4-6, 11-14).

**B. The First "Assault" on June 19, 2005**

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3-4, Dkt. No. 40 at 9-10; FN6 Gardner Decl. ¶¶ 2-7, Dkt. No. 110-10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up." FN7 (AC ¶ 4).

> FN6. Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of Facts," unless the reference is to another section of the pleading.

> FN7. Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5-6).

**\*3** Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6-8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9-10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110-11; Favro Decl., Dkt. No. 110-12; Norcross Decl., Dkt. No. 110-18). FN8

> FN8. The correction officer's account of the

incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (*Id.*).

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries. (AC ¶¶ 13-17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110-19; Volpe Decl., Dkt. No. 110-14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (*Id.;* Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records FN9 at 34-36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124-2 at 4-6).

> FN9. The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

**C. The Second "Assault" on June 24, 2005**

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3-4, 10-12, Dkt. No. 110-13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (*Id.* ¶¶ 5-8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124-5 at 39-41). As a result of the grievance,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

plaintiff was eventually transferred to the SHU at Upstate. (*Id.*).

**D. Further Issues Regarding Medical Treatment**

*\*4* Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23-24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6-7, Dkt. No. 110-15; Chesbrough Decl. ¶¶ 6-9, Dkt. No. 110-16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6-11, Dkt. No. 110-17).

**E. Issues Regarding Legal Mail**

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66-71, AC ¶¶ 31-33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6-9, Dkt. No.

110-20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4-10, Dkt. No. 110-21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110-20 at 44).

**II. *Summary Judgment-Legal Standards***

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

*\*5* The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(N.D.N.Y.2007) (citing, *inter alia*, *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994)* (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995)* (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *Excessive Force/Failure to Intervene*

**A. Legal Standards**

**1. Eighth Amendment-Excessive Force**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**2. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07-CV654 (DNH/GHL), 2010 WL 2044705, at\*8 (N.D.N.Y. May 24, 2010) .[FN10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[FN11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

FN10. *See also* *Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

FN11. *See also* *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B. Application**

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

**1. The "Assault" on June 19, 2010**

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31-38, and pleadings in opposition to the summary judgment motion), plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33-34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than a *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

*7 The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of force required to restrain the plaintiff was used, and the

medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.FN12 However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90-92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,FN13 were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

FN12. As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment. *See,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

*e.g., Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial).

FN13. The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36-38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4-9, Dkt. No. 110-18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

*8 To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims. FN14 Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it

was over. In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present. FN15

FN14. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

FN15. *See e.g., Rendely v. Town of Huntington,* No. 2:03-CV-3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the subsequent correction officers. *Cf. Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm). FN16 A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced the other defendants

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

to commit assault.

> FN16. It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Ramirez v. Holmes, 921 F.Supp. 204, 210 (S.D.N.Y.1996).*

**2. The "Assault" on June 24, 2006**

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64). Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24-25, Dkt. No. 124-1; Dep. at 80). Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10-14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

**\*9** Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances-a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.FN17 While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.FN18

> FN17. Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19-20, Dkt. No. 110-6). This court interprets plaintiff's testimony (Dep. at 62-63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10-14 & Ex. D, Dkt. No. 110-13 at 32).

> FN18. Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.FN19 While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane, 974 F.Supp. 332, 340-41 (S.D.N.Y.1997)* (allegation that officers twisted baton in the chain of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). Cf. *Robison v. Via,* 821 F.2d 913, 924-25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

> FN19. During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU-*e.g.,* by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

## IV. *Due Process*

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

## A. Applicable Law

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property

interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards. [FN20]

> FN20. In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64-66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short-e.g., 30 days-and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65-66 (collecting

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

cases).

**\*10** In *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[FN21]

> FN21. "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

**B. Application**

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing.[FN22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30).[FN23]

> FN22. Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore,* 9:08-CV-085, 2010 WL 980233, at *5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

> FN23. Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110-8 at 28). However, after defendant Demars ascertained what assistance plaintiff

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6-9). Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6-7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

**1. "Some" Evidence**

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[FN24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 8-14). Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21-22).

FN24. Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32-33).

**\*11** While meager, the proof relied upon by defendant

Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e.g., Monier v. Holt,* 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* --- U.S. ----, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g ., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[FN25]

FN25. In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

*Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489-90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to crossexamination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

## 2. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, *898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1). [FN26] Dep. Sup. Demars offered assistance to plaintiff in securing

witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1-7).

> [FN26.] Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110-11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110-13 at 10).

*12 Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10-19, 25-29, 39, 41-42, 44-45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9-10, 29). While plaintiff raised numerous "objections" at the end of the hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64-65) .[FN27]

> [FN27.] Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01-CV-0510, 2005 WL 563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

they may not prejudge the evidence).

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin,* 902 F.Supp. 424, 433-34 (S.D.N.Y.1995). However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, inter alia, *Murray v. Dixon,* 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan,* 152 F.3d at 81. While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier,* 9:08-CV-909, 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson,* 30 F.Supp.2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 2010 WL 1489897, at *6 (no due process arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense) [FN28]; *Brown v. Dotson,* 2007 WL 1033359, at *3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

> FN28. *See also Clark v. Dannheim,* 590 F.Supp.2d 426, 429-31 (W . D.N.Y.2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

## V. *Alleged Mail Tampering*

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351-52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate,[FN29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29-33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss[FN30] of the two items interfered with any pending legal matter. (Dep. at 71-75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye,* 516 F.2d 1367, 1370-71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or

any other legal matter, was insufficient to survive summary judgment).

FN29. The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

FN30. Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26-32, Ex. D, Dkt. No. 124-5 at 43-61).

## VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588-89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself,

states a viable constitutional claim. *Id.*

**B. Application**

**1. First Amendment Protection**

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06-CV-0505, 2010 WL 985388, at \*3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95-CV-1135, 1991 WL 760231, at \*6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478-79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

**2. Connection Between "Speech" and Alleged Adverse Actions**

**\*16** Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52-53.) To the extent these defendants were motivated to take some adverse action [FN31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

> FN31. Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g., Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th-plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not

have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse

action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

**VII. *Deliberate Indifference to Medical Needs***

**A. Legal Standards**

***17** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

**1. Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

**2. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

***18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia* *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**B. Application**

**1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation**

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80-81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records at 25-36). In September and October 2006, PA Tichenor

evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8-10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm, [FN32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

> FN32. Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10-11; Dep. at 80-81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03. Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at \*5, 16 (S.D.N.Y. Sept. 2, 2008)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained.[FN33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing*

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[FN34]

> FN33. The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4-10, Dkt. No. 110-6).

> FN34. *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*20** However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3-13). It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[FN35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05-CV-1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records).[FN36]

> FN35. Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

> FN36. *But see Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512-13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48-57). He does

not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9-10). Even crediting only the medical evidence that plaintiff does not claim is fabricated,[FN37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 261-62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

> FN37. Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44-45, 80-81; Pl.'s Sur-Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80-81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8-11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

**2. "Deliberate Indifference"**

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate-July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7-9; Medical Records at 32-34). [FN38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference. [FN39]

> **FN38.** The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51-53).

> **FN39.** Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more

occasions (Dep. at 41-42, 47, 49-50, 51-53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue, 9:05-CV-857, 2007 WL 3047110 at \*9 (N.D.N.Y. Oct. 18, 2007)* (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos, 336 F.Supp.2d at 261-62, 263* (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44-45, 56-57, 80-81). [FN40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

> **FN40.** Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10-11).

**VIII. *Qualified Immunity***

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489-90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights. [FN41] Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

FN41. *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g .,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9-10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Amendment claims based on excessive force against defendant Reardon. And, it is further

**\*23 RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Lewis v. Johnson
Slip Copy, 2010 WL 3785771 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.